UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MELITA WILLOUGHBY | : | CIVIL ACTION NO. |
| | : | 3:14CV608 (XH) |
| PLAINTIFF | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY | : | |
| | : | |
| DEFENDANT | : | |
| | : | JULY 27, 2015 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The defendant has moved for summary judgment as to the plaintiff's complaint on the ground that it fails to state a claim for retaliation under Title VII because the plaintiff did not engage in a protected activity, there is no causal connection between the complaints which arguably could constitute protected activity and her termination, and retaliation was not the but-for cause of the plaintiff's termination. This memorandum of law supports that motion.

**I.     Factual Background**

By way of a complaint dated May 5, 2014, the plaintiff asserts a retaliation claim under Title VII. The plaintiff was hired by the defendant's security department as a casual employee on October 14, 2008. (Complaint at ¶6; Answer, at ¶ 6.) Thereafter, the plaintiff applied for a full-time position and her application was granted on September 14, 2010. (Answer, at ¶ 10.) The plaintiff claims that two male transit dispatchers, Manuel Rivera and Edward

Fusco, subjected the plaintiff to rude and inappropriate remarks and to disparate treatment such as being denied dinner breaks, restroom breaks or the state-mandated fifteen-minute breaks. (Complaint, at 12.)  She also alleges that a male security officer, Peter Leonardo, subjected her to severe sexual harassment.  He allegedly called her a "fucking ratbitch;" shouted at her, "Are you going to change your tampon?" when she took a bathroom break; and opened and tampered with her intimate personal belongings. (Complaint, at ¶ 14.)  The plaintiff claims that she complained about the aforementioned conduct to her supervisor, Richard Nucci. (Complaint, at ¶¶ 13, 14.)  In November, 2010, Mr. Nucci allegedly told the plaintiff that she should not be making complaints about harassment in an uncertain economy and while on probation for her permanent position.  Shortly thereafter, the plaintiff allegedly met with Human Resources Generalist Kristen Albis to repeat her complaint of gender discrimination. (Complaint, at ¶ 15.)

The defendant terminated the plaintiff's employment on December 6, 2010. (Complaint, at ¶ 16; Answer, at ¶ 16.)  The plaintiff claims that the defendant cited a minor motor vehicle accident involving the plaintiff as the reason for her termination.  She further alleges that several other security officers, including Judith Ocasio-Rivera, Cruz Costello and George Fusco, were involved in comparable or worse accidents and were not terminated. The plaintiff alleges that the defendant terminated her in retaliation for her complaints about sexual harassment and discrimination in violation of Title VII. (Complaint, at ¶¶ 17, 19.)

II.    **Legal Standard**

Summary judgment is appropriate where the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248. If the party moving for summary judgment demonstrates the absence of any genuine issue as to a material fact, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Id.  A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and "designat[ing] specific facts showing that there is a genuine issue for trial." (Internal quotations omitted.) Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

III.  **Argument**

"Retaliation claims under Title VII are analyzed under the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which requires that, to establish a prima facie case, the plaintiff must show:  (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  If a plaintiff sustains this initial burden, a presumption of retaliation arises and the defendant must articulate a legitimate, non-retaliatory reason for the adverse employment action.  If the defendant does so, the presumption of retaliation dissipates, and the employee must show that the proffered reason was pretextual and that retaliation was the but-for cause for the adverse employment action."  (Internal quotations and citations omitted.)  Sarkis v. Ollie's Bargain Outlet, 560 Fed. Appx. 27, 30 (2d Cir. 2014).  "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).  Since the plaintiff cannot satisfy the first and fourth elements of a prima facie case of retaliation and cannot prove that retaliation was the but-for cause of the termination of her employment, the defendant's motion for summary judgment should be granted.

**A.**     **The Plaintiff Did Not Engage in a Protected Activity.**

To state a viable claim for retaliation, the plaintiff must first establish that she engaged in a "protected activity." "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Store, Inc., 202 F.3d 560, 566 (2d Cir. 2000). Since the plaintiff's complaints to her supervisors fail to qualify as protected activity, the plaintiff cannot establish the first element of a prima facie case of retaliation.

In her complaint, the plaintiff alleges that she complained to her supervisor about three male employees who allegedly mistreated her. She claims that Mr. Rivera and Mr. Fusco subjected her to rude and inappropriate remarks and denied her dinner breaks, restroom breaks, and the state-mandated fifteen-minute breaks. (Complaint, at ¶ 12.) At her deposition, the plaintiff testified that Mr. Rivera did not schedule the plaintiff for a lunch or restroom break and avoided the plaintiff on the radio when she requested those breaks. (Depo. Melita Willoughby February 10, 2015, at pp. 71-73, 201; Depo. Melita Willoughby May 20, 2015, at p. 15, 65.) She complained to her supervisor, Paul Gallipoli, about this issue. (Depo. Melita Willoughby February 10, 2015, at pp. 72-73, 84-87). She further claimed that Mr. Rivera, on a regular basis, intentionally sent the incorrect address to the MDT, causing her to report to the wrong address. The plaintiff complained about this issue to Mr. Gallipoli and Mr. Nucci. (Depo. Melita Willoughby February 10, 2015, at p. 98-100; Depo. Melita Willoughby May 20, 2015, at pp. 67, 69, 71-72.) Mr. Rivera and Mr. Fusco were allegedly rude and disrespectful to the plaintiff over the radio, about which she

complained to Mr. Gallipoli and Mr. Nucci.  (Depo. Melita Willoughby May 20, 2015, at p. 15, 67-71.)  None of these complaints concern gender discrimination.  Although the plaintiff complained about the treatment she received from Mr. Rivera and Mr. Fusco, none of the incidents evinces an intent to discriminate against the plaintiff because of her gender.  Rather, these are employment concerns.  Such complaints are not activity protected under the anti-retaliation laws.  See, Woods v. N.M.C. Labs., 162 F.3d 1149 [published in full-text format at 1998   U.S.   App.   LEXIS   22088]   (2d   Cir.   1998)   ("Title   VII protects against retaliation for Title VII-protected activity, not simply [retaliation for] any permissible activity.")   "Absent   a   claim   of   unlawful   discrimination,   general   complaints   about employment concerns do not constitute protected activity under Title VII." Duckett v. Wal-Mart Stores, Inc., 2009 U.S. Dist. LEXIS 31624, *24 (W.D.N.Y. April 14, 2009.)  See also, Delaney v. LaHood, 2009 U.S. Dist. LEXIS 91293, *67 (E.D.N.Y. September 30, 2009) ("It is well settled that union grievances that do not allege discrimination do not constitute protected activity within the meaning of Title VII.")  Since the plaintiff's complaints about Mr. Rivera and Mr. Fusco do not concern gender discrimination, they cannot form the basis of a retaliation claim under Title VII.

The plaintiff also claims that Mr. Leonardo, subjected her to severe sexual harassment, calling her a "fucking rat-bitch," asking if she was going to change her tampon, and opening and tampering with her intimate personal belongings.  (Complaint, at ¶ 14.)  At her deposition, the plaintiff testified about Mr. Leonardo's conduct towards her over a two year period.  In October, 2008, Mr. Leonardo called the plaintiff a "fucking bitch" to her

6

supervisor, Billy Abbott.  The plaintiff admitted that she did not hear Mr. Leonardo call her a "fucking bitch" on this occasion.  The plaintiff did not make a complaint about this incident because Mr. Abbott apologized to her for Mr. Leonardo's behavior earlier that evening.  Mr. Abbott also told the plaintiff that he would speak to Mr. Leonardo about his behavior. (Depo. Melita Willoughby February 10, 2015, at pp. 116-21, 124-29.)  On another date in October, 2008, Mr. Leonardo and another security officer pulled up in a security car to look at the plaintiff's motorcycle.  As the other security officer was complimenting the plaintiff's motorcycle, Mr. Leonardo began "running his mouth off" and talking about other females in the department.  He did not say anything about the plaintiff.  The plaintiff did not complain about this incident.  (Depo. Melita Willoughby February 10, 2015, at pp. 130-36.)

From approximately October, 2008 to the spring of 2009, Mr. Leonardo rode by and yelled out the window at the plaintiff several times.  During the winter, he asked her if she was cold.  During the summer, he informed her that he had a nice beverage.  Essentially, he taunted her about being out in the weather.  On one occasion, Mr. Leonardo gave her the finger.  The plaintiff complained to her supervisor, Lou Passelli, only about Mr. Leonardo giving her the finger.  She did not report the incident to the Human Resources department. (Depo. Melita Willoughby February 10, 2015, at pp. 137-40.)

In the summer of 2009, the plaintiff attended a bike class in which Mr. Leonardo was also enrolled.  One day, the plaintiff's menstrual cycle started, and it showed through her clothing.  The following day, when the plaintiff went to the bathroom, Mr. Leonardo yelled, "Are you going to change your tampon?"  The plaintiff assumes, but does not know, that Mr.

Leonardo went through her bag and opened her female products while she was in the bathroom.  When she returned from the bathroom, the plaintiff overheard Mr. Leonardo bragging to the males in the class that he was sleeping with a supervisor.  The plaintiff first testified that she did not complain about this incident until after she became a full-time employee in September, 2010.  She then stated that she spoke to Mr. Abbott about the incident closer in time to when it occurred in the summer of 2009.[1]  (Depo. Melita Willoughby February 10, 2015, at pp. 166-73, 178, 182-83; Depo. Melita Willoughby May 20, 2015, at pp. 43-47.)

In approximately September, 2009, the plaintiff was transferred to third shift and stationed at the Yale Health Plan for approximately one year.  During that year, the plaintiff never saw Mr. Leonardo and had no complaints.  (Depo. Melita Willoughby February 10, 2015, at p. 161-66.)  Despite this testimony, the plaintiff testified about an incident that allegedly occurred in February, 2010.  At some point, after providing a walking escort in the rain, the plaintiff entered a building to warm up.  Mr. Leonardo and Bill Hewitt entered the building without acknowledging her.  While they were speaking with another security officer, the plaintiff overheard Mr. Leonardo say, "No, she's a fucking rat bitch."[2]  When she confronted him, Mr. Leonardo simply said that he was going to the car and told her to try to

---

[1] In her complaint, the plaintiff claims that Mr. Abbott alerted Assistant Director Daniel Killen about this incident.  (Complaint, at § 14.)  However, the plaintiff testified at her deposition that she did not know if Mr. Abbott spoke with Mr. Killen.  (Depo. Melita Willoughby February 10, 2015, at pp. 217-221.)

[2] The plaintiff assumes that the statement was made about her.  However, it is entirely possible that Mr. Leonardo was referring to another female.

stay dry.  The plaintiff spoke with Mr. Abbott about the incident, who spoke with Mr. Killen, the Director of Yale Security Operations.  On March 1, 2010, the day after the plaintiff overheard Mr. Leonardo call her a "fucking rat bitch," Mr. Killen sent an e-mail instructing officers not to yell out the window to other officers about the inclement weather and that only one officer should be in a car.[3]  (Depo. Melita Willoughby February 10, 2015, at pp. 141-44.) The plaintiff indicated that she did not complain about Mr. Leonardo's comments about the weather, described above, until he called her a "fucking rat bitch."  She admitted that once she complained, her complaints were addressed.  (Depo. Melita Willoughby February 10, 2015, at pp. 145-49; Depo. Melita Willoughby May 20, 2015, at pp. 37-42.)  The plaintiff claimed that Mr. Leonardo drove by and yelled out the window to her two or three times after the March 1, 2010 e-mail, but she did not know what he said.  The plaintiff complained to Mr. Nucci regarding Mr. Leonardo's comments while driving by her prior to the March 1, 2010 e-mail as well as those after.  She did not complain that Mr. Leonardo was sexually harassing her.  (Depo. Melita Willoughby February 10, 2015, at pp. 154-61.)  The plaintiff also claimed that Mr. Leonardo regularly told male employees to feed her cheese because she was a rat.  (Depo. Melita Willoughby May 20, 2015, at p. 36.)

When the plaintiff was hired as a full-time employee in September, 2010, Mr. Leonardo was upset that his friend, Brandon McCormick, who was a dispatcher, was not

---

[3] The plaintiff later testified that the incident in which Mr. Leonardo called her a "fucking rat bitch" occurred after March 1, 2010.  (Depo. Melita Willoughby February 10, 2015, at p. 150.)  However, this testimony does not correlate with her testimony that she did not complain about his comments about the weather until he called her a "fucking rat bitch" and that Mr. Killen responded to her complaints with the March 1, 2010 e-mail.  (Depo. Melita Willoughby February 10, 2015, at pp. 143-45.)

hired as a full-time employee. He told Richard Mongillo, a security officer, and a room of transit dispatchers that the plaintiff should not have received full-time status and that Mr. McCormick was a better candidate. Mr. Leonardo asked Mr. Mongillo, in front of a group of Yale police officers if there was "something going on" between Mr. Mongillo and the plaintiff because they took motorcycle rides together. Ms. Willoughby did not complain about these incidents until just before her termination. (Depo. Melita Willoughby February 10, 2015, at pp. 187-91; Depo. Melita Willoughby May 20, 2015, at 52-57.) Mr. Leonardo also called the plaintiff a "loud mouthed bitch" when speaking with Mr. Mongillo. The plaintiff did not report this to her supervisors at the time it occurred. (Depo. Melita Willoughby February 10, 2015, at pp. 194-95.) Whenever the plaintiff was on the radio, Mr. Leonardo pressed the squelch button to disrupt her transmission and then laughed. In the beginning of November, 2010, the plaintiff requested that Mr. Gallipoli and Mr. Nucci listen to the radio transmissions, but she did not know whether they did. (Depo. Melita Willoughby February 10, 2015, at pp. 199-200, 203.)

In October, 2010, the plaintiff went for a motorcycle ride with a girlfriend. When they were stopped at a red light, Mr. Leonardo jumped out of his security car, walked by their bikes, and looked at the plaintiff in a hostile manner. He did not say anything to the plaintiff. The plaintiff reported the incident to Mr. Nucci, who confirmed that Mr. Leonardo did not say anything to the plaintiff. The plaintiff responded that Mr. Leonardo should have said "hello" instead of acting scary. The plaintiff believed that Mr. Nucci spoke to Mr. Leonardo because Mr. Leonardo made it a point to say "hi" to the plaintiff at roll call. He then asked

the plaintiff why she did not say "hi" back.  Mr. Nucci was in the room at the time, and the plaintiff felt that he should have removed Mr. Leonardo and the plaintiff from the room. (Depo. Melita Willoughby February 10, 2015, at pp. 207-11, 213-16; Depo. Melita Willoughby May 20, 2015, at pp. 60-65.)

While calling the plaintiff a bitch and asking her if she was going to change her tampon arguably could constitute gender discrimination or sexual harassment, none of Mr. Leonardo's other behavior towards the plaintiff constitutes gender discrimination or sexual harassment.  Mr. Leonardo's comments and conduct do not suggest that they were made due to the plaintiff's gender.  Rather, they suggest a personality conflict between co-workers.  In this regard, the plaintiff offered that Mr. Leonardo had problems with many people, both male and female, and agreed that he had a personality issue.[4]  (Depo. Melita Willoughby May 20, 2015, at pp. 8-10.)   The plaintiff did not complain that Mr. Leonardo was sexually harassing her.  (Depo. Melita Willoughby February 10, 2015, at p. 160.)  Complaints about non-discriminatory comments and conduct are not activities protected under the anti-retaliation laws. See, Woods v. N.M.C. Labs., 162 F.3d 1149 [published in full-text format at 1998 U.S. App. LEXIS 22088] (2d Cir. 1998) ("Title VII protects against retaliation for Title VII-protected activity, not simply [retaliation for] any permissible activity.")   "Absent a claim of unlawful discrimination, general complaints about

---

[4] The plaintiff described an incident that occurred shortly after she began working for the defendant in October, 2008 wherein Mr. Leonardo yelled at, embarrassed, and intimidated a male security officer, Mike Guzman, with regard to the requirement to wear a vest.  (Depo. Melita Willoughby February 10, 2015, at pp. 116-20.)  She also claimed that Mr. Leonardo would "shoot[] his mouth off about everybody and everything."  (Depo. Melita Willoughby, February 10, 2015, at p. 193.)

employment concerns do not constitute protected activity under Title VII." <u>Duckett v. Wal-Mart Stores, Inc.</u>, 2009 U.S. Dist. LEXIS 31624, *24 (W.D.N.Y. April 14, 2009.) <u>See</u> <u>also</u>, <u>Delaney v. LaHood</u>, 2009 U.S. Dist. LEXIS 91293, *67 (E.D.N.Y. September 30, 2009) ("It is well settled that union grievances that do not allege discrimination do not constitute protected activity within the meaning of Title VII.")

The plaintiff claims that Mr. Leonardo called her a bitch on three occasions. She overheard the comment on one occasion[5] and was told about the comment on the other two occasions. Mr. Leonardo never called the plaintiff a bitch when speaking to her. The plaintiff also alleges that Mr. Leonardo asked her if she was going to change her tampon. Four comments over a one and a half year period can only be described as isolated. Isolated comments are insufficient to demonstrate that the plaintiff's termination occurred under circumstances giving rise to an inference of gender discrimination. <u>See</u>, <u>Thomas v. St. Francis Hosp. & Med. Ctr.</u>, 1999 U.S. App. LEXIS 23699 *3 (2d Cir. September 28, 1999). Moreover, Mr. Leonardo was a co-worker, not the plaintiff's supervisor or the individual who terminated her. "Courts have routinely held that 'stray remarks by [] non-decisionmakers are insufficient, without other evidence, to raise an inference of discrimination.'" <u>Hasemann v. UPS of Am.</u>, 2013 U.S. Dist. LEXIS 25704 *20 (D.Conn. February 26, 2013), citing <u>Adam v. Glen Cove School</u>, 2008 U.S. Dist. LEXIS 13039 (E.D.N.Y. February 21, 2008); <u>Beshty v. GM</u>, 327 F.Supp.2d 208, 213 (W.D.N.Y. 2004); <u>Georgy v. O'Neill</u>, 2002 U.S. Dist. LEXIS 4825 (E.D.N.Y. March 25, 2002). There also can be no gender discrimination in this case

because the plaintiff was hired into the full-time position and then terminated three months later by the same person.  (Depo. Melita Willoughby May 20, 2015, at p. 124.)  "[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."  (Internal quotations omitted.)  Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000).  Since there was no gender discrimination in this case, the plaintiff's complaints about Mr. Leonardo's comments cannot constitute protected activity.  See, Cruz v. Coach Store, Inc., 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination.")[6]

If the incidents wherein Mr. Leonardo allegedly called the plaintiff a bitch and asked her if she was going to change her tampon could constitute gender discrimination – and they do not – then the plaintiff only engaged in protected activity in the summer of 2009 when she complained that Mr. Leonardo asked her if she was going to change her tampon and in February, 2010 when she complained that she overheard Mr. Leonardo call her a "fucking rat bitch."   Therefore, the plaintiff's retaliation claim can only be based on these two complaints.[7]

---

[5] Again, the plaintiff assumes that Mr. Leonardo was referring to her.

[6] The CHRO factfinder determined that the defendant had not discriminated against the plaintiff.

[7] In the event that the Court finds that the plaintiff engaged in other instances of protected activity, then the arguments delineated in the remainder of this brief also should be applied to that protected activity.

**B.**   **There is No Causal Connection Between the Plaintiff's Complaints and Her Termination.**

The Second Circuit "has consistently held that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.ed 111, 117 (2d Cir. 2000).   The plaintiff relies on the temporal proximity of her complaints with her termination to support her claim that she was terminated in retaliation for complaining about gender discrimination and sexual harassment.[8]  (Complaint, at ¶ 16; Depo. Melita Willoughby February 10, 2015, at p. 119.)  The incidents about which the plaintiff complained occurred in the summer of 2009 and in February, 2010.  The plaintiff first complained about these incidents to Mr. Abbott at the time of the incidents.  The plaintiff claims that Mr. Abbott in turn informed Mr. Killen.  (Depo. Melita Willoughby February 10, 2015, at pp. 143-44, 178; Depo. Melita Willoughby, May 20, 2015, at p. 44.)  Therefore, the plaintiff's first complaints occurred approximately eighteen months and nine months prior to

---

[8] The plaintiff identifies three co-workers who were allegedly involved in motor vehicle accidents, but were not terminated.  (Complaint, at ¶ 17.)  "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.…  In other words, the comparator must be similarly situated to the plaintiff in all material respects."  (Internal quotations and citations omitted.)  Ruiz v. County of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010).  The plaintiff has provided no evidence that any of these co-workers had a similar disciplinary history to the plaintiff.  Therefore, these individuals do not qualify as similarly situated employees.

her termination on December 6, 2010.  The plaintiff again complained about these incidents in November, 2010, approximately two weeks prior to her termination.  (Complaint, at ¶ 15.)

In Holmes v. Donohue, 2014 U.S. Dist. LEXIS 90084 (March 25, 2014), the plaintiff alleged that the defendant suspended him and then terminated his employment in retaliation for the plaintiff's complaint with the EEOC alleging that he had been discriminated against by his supervisors.  In its motion for summary judgment, the defendant argued that the plaintiff could not establish a causal connection between his protected activity in March, 2008 and the employment actions taken in April and May, 2009.  The district court determined that the plaintiff could not claim the inference of temporal proximity because more than a year separated the plaintiff's complaint of discrimination to the EEOC from the adverse employment actions.  Id. at *25-28.  See also, John v. Kingsbrook Jewish Med. Ctr./Tutland Nursing Home, 2014 U.S. Dist. LEXIS 39322 (E.D.N.Y. March 25, 2014) (ten months between last complaint and suspension and termination too attenuated to establish a causal connection between the protected activity and the alleged adverse action); Bastian v. New York City Dep't of Educ., 2008 U.S. Dist. LEXIS 57467 (S.D.N.Y. July 29, 2008) (a fifteen-month gap was too long to establish a causal link); Donlon v. Group Health, Inc., 2001 U.S. Dist. LEXIS 1001, *8-9 (S.D.N.Y. February 8, 2001) (periods of eight and a half months and four months were insufficient to imply causation; Daly v. Presbyterian Hosp., 2000 U.S. Dist. LEXIS 5 (S.D.N.Y. January 4, 2000) (one year period was insufficient evidence of causation).  In the present case, spans of eighteen months and nine months separate the plaintiff's complaints about Mr. Leonardo's conduct.  These time periods are

insufficient to raise the inference of temporal proximity and the plaintiff cannot establish a causal connection between her complaints about gender discrimination and her termination. It should also be noted that the incidents and the plaintiff's initial complaints occurred prior to her becoming a full-time employee in September, 2010.  Had the defendant wished to retaliate against the plaintiff for complaining about sexual harassment or gender discrimination, it would not have hired her as a full-time employee.

### C.    The Defendant Had a Legitimate, Non-Retaliatory Reason for Terminating the Plaintiff's Employment.

In the December 6, 2010 termination letter, the defendant informed the plaintiff that the decision to terminate her employment during her probationary period was made based on the evaluation of her performance as a Security Officer I.  (Exhibit A to Affidavit of Daniel Killen.)  During her three month probationary period, the plaintiff acted inappropriately with a supervisor and members of the public, accused a co-worker of deliberately sending her to an incorrect address, accused a co-worker of engaging "in Nazi practices" and "trashing" people's cars, accused her supervisors of running a "good old boys club," and was involved in a motor vehicle accident for which she was at fault.  The plaintiff's 30 Day Employee Performance Review rated the plaintiff's performance as "Less-than-Effective."  She was issued a letter regarding her interactions with Mr. Leonardo.  This poor work performance serves as a legitimate, non-retaliatory reason for the plaintiff's termination.

On September 24, 2010, the plaintiff was in the process of picking up a passenger from the School of Nursing when her supervisor, Mr. Gallipoli, observed her interaction with

a student.  When the student approached the plaintiff's vehicle, the plaintiff asked for her name.  As the student began to explain that she was not the original passenger but had been approved to join the original passenger, the plaintiff stated in a rude and unprofessional manner, using unpleasant hand gestures, that the plaintiff knew how to read her manifest. She then instructed the passenger to sit in the vehicle.  Thereafter, Mr. Gallipoli received a phone call from the student wishing to make a complaint about the plaintiff's conduct.  The student explained that the plaintiff had missed the street and did not want to drop the student at her address.  Instead, she dropped the student off down the street.  The student asked that the plaintiff never pick her up again.  At her deposition, the plaintiff acknowledged that the student made a complaint.  She believed that the student complained because the plaintiff refused to make a U-turn and declined to talk about her day.  The plaintiff admitted that she did not drop the student at her door and that the student had to walk a far distance to her apartment building.  (Exhibit B to the Affidavit of Daniel Killen; Depo. Melita Willoughby February 10, 2015, at pp. 72-85.)

On September 25, 2010, a transit dispatcher reported that the plaintiff had not reported for work.  When contacted by the supervisor, Thomas Helland, the plaintiff claimed that she had been in her car for two hours, waiting for her first call of the night.  At her deposition, the plaintiff agreed that this incident occurred.  However, she claimed that it was caused by the mistake of a dispatcher.  (Exhibit C to the Affidavit of Daniel Killen; Depo. Melita Willoughby February 10, 2015, at p. 94-98; Depo. Melita Willoughby May 20, 2015, at pp. 120-121.)

On September 30, 2010, Mr. Nucci received an irate telephone call from the plaintiff because a transit vehicle was not located at a certain address. The plaintiff was very rude over the telephone. When Mr. Nucci counseled the plaintiff regarding her behavior, she indicated that she was not pleased with Mr. Nucci allowing Medical School Patrol and Cross Campus Bike personnel to use vehicles during inclement weather. Mr. Nucci informed the plaintiff that he did not require her consent to make operational decisions. During the conversation, the plaintiff stated, "I'm just going to wait until my 90 days are up before blowing the lid on this place" and accused Mr. Leonardo of engaging in "Nazi practices." The following day, the plaintiff spoke with Mr. Nucci and asked him to forget that the conversation occurred. After he indicated that he could not do so, the plaintiff claimed that her vehicle was not safe because Mr. Leonardo had "trashed" other people's cars in the past. She also accused Francisco Ortiz (a supervisor), Mr. Killen, Mr. Nucci and other supervisors of running a "good old boys club." The plaintiff agreed during her deposition that the conversation occurred, but denied that she was irate or rude. She admitted that she accused Mr. Leonardo of engaging in Nazi practices and trashing people's cars and that she accused Mr. Nucci of running a boys club. (Exhibit D to the Affidavit of Daniel Killen; Depo. Melita Willoughby February 10, 2015, at pp. 89-93; Depo. Melita Willoughby May 20, 2015, at pp. 105-118.)

On October 6, 2010, Mr. Nucci observed conflict between the plaintiff and Mr. Leonardo at roll call. When Mr. Leonardo said "hello," the plaintiff replied, "Now you are saying hello to me. What brought this on?" Mr. Leonardo stated that he liked to be

consistent, and the plaintiff replied that she like inconsistency.   At her deposition, the plaintiff acknowledged that the incident occurred, but disputed Mr. Nucci's account. (Exhibit D to the Affidavit of Daniel Killen; Depo. Melita Willoughby February 10, 2015, at pp. 214-17.)

On October 23, 2010, the plaintiff complained to Mr. Gallipoli that Mr. Rivera sent her to an address that did not exist.  She appeared to believe that the dispatchers were intentionally making her late for pick-ups.  Since the numbers were so closely related, Mr. Gallipoli suggested that the numbers were simply punched in incorrectly.  The plaintiff insisted that she was "going to management to let them know what was going on."  Mr. Gallipoli informed Ms. Albis that most contacts with the plaintiff were negative on her part and that her constant negative attitude was monotonous.  (Exhibit E to the Affidavit of Daniel Killen.)

On October 29, 2010, a man approached the plaintiff and Mr. Nucci, complaining that the students in Saybrook College were loud.  In a confrontational tone, the plaintiff replied that the students were singing and then asked, "Who are you?"  He indicated that he was trying to get his two small children to sleep and that he was the Dean of Davenport College. Mr. Nucci interjected to introduce himself and assure the Dean that the issue would be addressed.  At her deposition, the plaintiff agreed that this incident occurred, but maintained that she had acted appropriately.  (Exhibit F to the Affidavit of Daniel Killen; Depo. Melita Willoughby February 10, 2015, at pp. 109-110; Depo. Melita Willoughby May 20, 2015, at pp. 121-22.)

On November 9, 2010, Mr. Nucci completed a 30 Day Employee Performance Review of the plaintiff. He noted that, since beginning her probationary period, the plaintiff had been involved in several negative situations that had adversely impacted her performance. The situations included an ongoing conflict with Mr. Leonardo, an altercation with a student, conflicts with Mr. Rivera, inappropriate behavior towards her supervisors, and a two hour time frame where she could not be located while on duty. The incidents had resulted in direct supervisor to employee counseling sessions as well as two formal meetings with Mr. Nucci and Ms. Albis. Mr. Nucci rated the plaintiff's performance as "Less-than-Effective." (Exhibit G to the Affidavit of Daniel Killen.)

On November 11, 2010, Mr. Nucci sent a letter to the plaintiff as a follow up to the October 29, 2010 meeting. Mr. Nucci advised the plaintiff that he and Ms. Albis had met with Mr. Leonardo to address the concerns that the plaintiff raised about Mr. Leonardo on October 29, 2010. Mr. Nucci outlined his expectations for both the plaintiff and Mr. Leonardo: (1) treat one another with mutual respect and professionalism; (2) refrain from allowing personal feelings to interfere with work responsibilities; and (3) completely refrain from speaking negatively about one another, with any of their fellow co-workers or other employees at Yale. Future allegations of misconduct would be investigated and, if necessary, disciplinary action could occur. (Exhibit H to the Affidavit of Daniel Killen.)

On November 12, 2010, the plaintiff hit a parked car while attempting to pull over to drop off a passenger. She admitted that she caused the accident. (Depo. Melita Willoughby February 10, 2015, at pp. 65-68.) One week later, on November 19, 2010, Mr. Gallipoli

received a call from a member of the public, Major Nelson, who reported that he was driving down York Street when he was cut off by a security vehicle driving on the wrong side of the road.   Mr. Gallipoli spoke to the plaintiff, who admitted that an incident occurred.   She claimed that she had to turn left near York Street and George Street and signaled to the driver that she needed to move over one lane.   The driver looked directly at the plaintiff and the plaintiff believed that he acknowledged her and that it was ok to proceed to the left in front of him.   When the plaintiff proceeded forward to pull in front of the vehicle, the driver sped up and gave her the middle finger several times.   He followed her for a short distance before turning in a different direction.   Mr. Gallipoli followed up with Mr. Nelson to ask whether the plaintiff attempted to signal or motion to him that she wanted to move from her lane and proceed in front of his vehicle.   Mr. Nelson stated that the plaintiff did not signal in any way to indicate that she was trying to move into the lane in which he was traveling.   The plaintiff acknowledged at her deposition that the incident occurred, but disagreed with Mr. Nelson's account.   (Exhibits I and J to the Affidavit of Daniel Killen; Depo. May 20, 2015, at pp. 86-88.)

Taken together, all of the incidents described above, which occurred within a two and a half month period, serve as a legitimate, non-retaliatory reason for the termination of the plaintiff's employment on December 6, 2010.

**D.**   **Retaliation was not the But-For Cause of the Plaintiff's Termination.**

"The Supreme Court recently held that a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not

21

simply a 'substantial' or 'motivating' factor in the employer's decision." <u>Kwan v. Andalex Group, LLC</u>, 737 F.3d 834, 845 (2d Cir. 2013).  In order to satisfy this standard, the plaintiff must prove that "the adverse action would not have occurred in the absence of the retaliatory motive." <u>Id.</u> at 846.  "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." <u>Id.</u> at 847.

As explained above, the plaintiff made complaints that Mr. Leonardo asked her if she was going to change her tampon in the summer of 2009 and called her a "fucking rat bitch" in February, 2010.  The plaintiff complained about these incidents both at the time of the incidents and shortly before her termination.  Both of these incidents, and the plaintiff's first complaints about the incidents, occurred prior to the time the plaintiff was hired as a full-time employee.  As detailed above, the plaintiff performed poorly during her three month probation.  She had two complaints lodged against her by members of the public, acted inappropriately with a supervisor and members of the public, accused a co-worker of deliberately sending her to an incorrect address, accused a co-worker of engaging "in Nazi practices" and "trashing" people's cars, accused her supervisors of running a "good old boys club, and was involved in a motor vehicle accident for which she was at fault.  Given the plaintiff's poor performance during her three month probationary period, the plaintiff cannot establish that retaliation was the but-for cause of her termination.

IV.     **Conclusion**

For the foregoing reasons, the plaintiff cannot establish a <u>prima facie</u> case of retaliation under Title VII or that retaliation was the but-for cause of the plaintiff's termination. Therefore, the defendant's motion for summary judgment should be granted.

DEFENDANT
YALE UNIVERSITY

/s/

By:_____ct18777_____

BROCK T. DUBIN (ct18777)
COLLEEN NOONAN DAVIS (ct27773)
DONAHUE, DURHAM & NOONAN, P.C.
Concept Park, Suite 306
741 Boston Post Road
Guilford, CT   06437
Telephone:  (203) 458-9168
Fax:  (203) 458-4424
Email:  bdubin@ddnctlaw.com

## **CERTIFICATION**

I hereby certify that on July ___, 2015, a copy of the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic mail.  Notice of this filing was sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 

 

_____/s/_____
BROCK T. DUBIN