UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| MELITA WILLOUGHBY | : | CIVIL ACTION NO. |
| | : | 3:14CV608 (XH) |
| PLAINTIFF | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY | : | |
| | : | |
| DEFENDANT | : | |
| | : | JULY 27, 2015 |

### AFFIDAVIT OF BROCK T. DUBIN

I, Brock T. Dubin, being duly sworn, depose and say that:

1.     I am over the age of eighteen years and believe in the obligation of an oath.

2.     I make this affidavit of my own personal knowledge and in support of Yale University's motion to dismiss.

3.     I am a partner at Donahue, Durham & Noonan, P.C. and am counsel for Yale University in the above-captioned matter.

4.     True and accurate copies of relevant portions of the transcript of the plaintiff's deposition taken on February 10, 2015 are attached hereto as Exhibit 1.

5.     True and accurate copies of relevant portions of the transcript of the plaintiff's deposition taken on May 20, 2015 are attached hereto as Exhibit 2.

6.     A true and accurate copy of the Commission on Human Rights and Opportunities factfinder's Draft Finding of No Reasonable Cause is attached hereto as Exhibit 3.

Dated at Guilford, Connecticut this _28_ th day of July, 2015.

_____
**Brock T. Dubin**

STATE OF CONNECTICUT            )
                                ) ss. Guilford
COUNTY OF NEW HAVEN             )

Subscribed and sworn to before me this _28_ th day of July, 2015.

_____
Notary Public
**My Commission Exp. Mar. 31, 2016**

DEFENDANT
YALE  UNIVERSITY


/s/
By:_____ct18777_____
BROCK T. DUBIN (ct18777)
COLLEEN NOONAN DAVIS (ct27773)
DONAHUE, DURHAM & NOONAN, P.C.
Concept Park, Suite 306
741 Boston Post Road
Guilford, CT   06437
Telephone:  (203) 458-9168
Fax:  (203) 458-4424
Email:  bdubin@ddnctlaw.com

## CERTIFICATION

I hereby certify that on July ___, 2015, a copy of the foregoing Affidavit of Brock T. Dubin was filed electronically and served by mail on anyone unable to accept electronic mail. Notice of this filing was sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/
BROCK T. DUBIN

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:14CV608(XH)

- - - - - - - - - - - - - - - -X
MELITA WILLOUGHBY,                      :
                    Plaintiff           :
                                        :
VS                                      :
                                        :
YALE UNIVERSITY,                        :
                    Defendant           :
- - - - - - - - - - - - - - - -X

        Deposition of MELITA WILLOUGHBY taken at
the offices of John R. Williams and Associates, LLC,
51 Elm Street, New Haven, Connecticut  06510, before
Clifford Edwards, LSR, Connecticut License No.
SHR.407, a Professional Shorthand Reporter and
Notary Public, in and for the State of Connecticut
on February 10, 2015, at 10:22 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT  06443

HARTFORD          NEW HAVEN          STAMFORD

65

1      Q      Did you have any accidents during the

2   probationary period?

3      A      I did.

4      Q      How many accidents did you have?

5      A      One.

6      Q      And when was that?

7      A      November of 2010.

8      Q      Okay.  And are you aware of any other

9   people who were on their probationary period who had

10  accidents?

11     A      Oh, I gave a half a dozen different

12  names.

13     Q      Are you aware of any other people --

14     A      Yes.

15     Q      -- who --

16            And who are those people?

17     A      Judith Cuss- -- she was married, Judith.

18  There's only one Judith in the department.

19     Q      And you --

20     A      Another officer on probation, Costillo

21  (phonetic).

22     Q      Okay.

23     A      Another person on probation, Richard

24  Mongillo (phonetic).  I can't recall any names but I

25  do have a list of several names, just people on
                    www.DelVecchioReporting.com

```
 1   probation that had accidents, yes.

 2        Q     And do you know --

 3        A     Much worse accidents.

 4        Q     Okay.  And, you know, the accident that

 5   you were involved in, you caused that accident.

 6              Correct?

 7        A     No.

 8        Q     You did not?

 9        A     I was parking and slightly brushed a

10   mirror on the car.

11              There wasn't, like, an accident.  It was

12   a parked car with nobody sitting in it.  There -- it

13   wasn't, like, an accident with another car, it was a

14   parked car.

15              And the girl quickly said, Pull over.

16   Pull over now.  And she started yelling.

17              I had four passengers in the car.  There

18   was a parked car on Trumbull Street at the very

19   corner.  I think there's even a no parking sign for

20   vehicles, but there was a parked car.  We were on

21   Orange.

22              She wanted me to make a right and she

23   told me at the last minute to pull over.  As one of

24   the four passengers yelled to pull over, because she

25   didn't want to walk far, she lived on the -- the
```

1   passenger that yelled to pull over said, Right here.

2   I can't walk with my groceries.

3         And at which point there was a parked

4   car.  There was traffic behind me and going toward

5   the light.  And as I was making the turn -- and the

6   parked car -- and she said, Right -- right here.  I

7   pulled over to stop and safely let her exit the

8   vehicle.  And I brushed the mirror.

9         When I finally made a safe pullover and

10  explained to the people in the car that I hit the

11  car, they said that I didn't.  The four passengers

12  in the car, one exited with about ten bags of

13  groceries, she was talking to one of the girls in

14  the car, and two people were maybe husband and wife

15  speaking in another language.  I believe they were

16  speaking -- I believe they were Indian people.

17        But it was a lot of confusion and alls

18  they kept telling me to do was to get them to their

19  destination.  And I said to them, I can't leave.

20  This is an accident.  I hit a car.

21        They said, No, you didn't.

22        And when my supervisor got there, he

23  goes, Melita, you didn't hit this car.

24        I said, I most certainly did.

25        He said, You did not hit the car.  He

68

1    took his flashlight out.  He looked at the car over

2    and over and he said he didn't see damage.  But I

3    know that I believe -- maybe my mirror brushed the

4    woman's mirror.  But when the woman came back to her

5    car, the owner of the car, she thanked me profusely

6    for waiting.  And the other three passengers in the

7    car had to get transported to their final

8    destination by a Yale shuttle.

9        Q      Okay.

10       A      That's all I recall.

11       Q      No one was in the car that you hit.

12              Correct?

13       A      Correct.

14       Q      Okay.  And nevertheless, it's your belief

15    that the -- the car you were driving came into

16    contact with another car?

17       A      I know it did.

18       Q      Okay.  So you caused that accident?

19       A      Correct.

20       Q      Okay.

21       A      Yes.  I caused the accident.

22       Q      That was my question.

23       A      I'm sorry.

24       Q      And that occurred while you were on your

25    probationary period?

71

1    of any performance issues you had during the

2    probationary period.  And at first you told me no

3    but we just discussed an accident.  So I want to ask

4    you:  Do you consider this accident to be a

5    performance issue?

6        A    No.  It was an accident.

7        Q    Okay.  Did anyone ever complain about you

8    during your performance period -- your probationary

9    period?

10       A    I was made aware of a girl that was

11   crying -- that got into my vehicle crying.  She got

12   into the vehicle crying.  Apparently, her professor

13   was mean to her and humiliated her in -- in the

14   class.

15            There were two -- two girls that

16   approached me as I was trying to speak to my

17   supervisor and tell him that it was yet another

18   evening that Manny Rivera avoided me on the radio

19   when I was attempting to get my lunch break and a

20   restroom break because they weren't scheduling me

21   for lunch and restroom breaks.

22       Q    Okay.  And I don't mean to interrupt you

23   but again, we'll get to that.  We'll get to all of

24   your claims in this case.

25            What I want to know now is what are

                    www.DelVecchioReporting.com

72

1    your -- I want to talk about any performance issues

2    that you are aware of during your probationary

3    period.

4            Do you understand that?

5    A    Yes.

6    Q    Okay.  So we talked about the accident,

7    which you said was an accident, which you don't

8    believe to be a performance issue.

9            That was --

10   A    Correct.

11   Q    Okay.  So the next one I want to talk

12   about is:  Are you aware of any complaints that were

13   made about you?

14           Okay?

15           And you started to talk about two girls?

16   A    Yes.

17   Q    Okay.  Why don't you tell me what

18   complaints you are aware of that these two girls

19   made against you?

20   A    One evening I was talking to Paul

21   Gallipoli because he approached me yelling at me,

22   What are you doing?  What are you doing?

23           I said, I'm waiting for -- I have a call

24   right here.  I explained to him that -- he -- he --

25   he accused me of, like, doing nothing.  He drove up

1   to me and accused me of doing anything.

2              And I said, I'm waiting for somebody to

3   come out of the nursing school.

4              At which point I was standing at his car.

5   Actually, physically standing at his car and

6   discretely telling him so that I wouldn't have to

7   yell from my car that I was having issues again with

8   Manny Rivera, who was not scheduling me for a

9   restroom break or for a lunch break.  It was already

10  eleven o'clock at night.  I started my shift at

11  6 p.m.

12             A girl came out of the building and I

13  don't recall which girl came out first, if it was

14  the girl crying or the other girl.  But a girl came

15  out and told me to -- to -- that another girl was

16  coming.

17             And I told her, It's fine.  You can just

18  sit in the car.

19             I was still talking to my supervisor.  I

20  don't think she realized I was actually speaking to

21  my supervisor, I think she thought it was just,

22  like, two security guards just chatting.  At which

23  point because I wanted to make clear to my

24  supervisor that I had yet to have a restroom break

25  at eleven o'clock at night.  And when she exited the

74

1    nursing building, I -- again, I wasn't just going to

2    walk away from the car.  I wanted him to know that

3    this was an ongoing issue.

4            Would you like me to finish my story?

5        Q    Yeah.  Absolutely.

6        A    Oh, okay.  At which point, again, I think

7    this girl may have thought it was just, like, two

8    guards just chitchatting.  So I politely told her

9    that she can just sit in the car and I'd be right

10   there.

11           At which point he fluffed me off and

12   just, Go take care of your ride.  But he didn't even

13   apologize for accusing me of sitting there and doing

14   anything.  At which point, when he pulled up to me

15   and yelled out of the car, he was really

16   unprofessional.  He should have probably apologized

17   for accusing me of doing nothing and he should have

18   addressed, at some point, immediately probably,

19   addressed via radio or even his cellar phone why I

20   never got a lunch or a restroom break, but he

21   didn't.  He didn't at all.

22           I went and finished doing my job because

23   at one point another girl was walking out of the

24   building.  So one was just about in the car, the

25   other one got in the car.  He drove off and I just

75

1  greeted them like I would normally greet anybody

2  getting in the car and stayed quiet because the girl

3  was crying, one girl was crying.

4          I do recall their conversation.  And

5  because she was clearly upset and humiliated by what

6  a professor did to her, I didn't say too much.  I

7  got close to one girl's destination and she asked me

8  to make a U-turn on State Street.  And I told her I

9  couldn't.

10          She goes, Just make it.  Just make it.

11  You are going to have to go down blocks.

12          And I said, I can't make a U-turn.  And I

13  pointed out that a Yale -- excuse me, not even a

14  Yale -- that a New Haven police officer was sitting

15  on the corner of State Street where she wanted me to

16  make the U-turn.

17          At which point I proceeded about four

18  blocks down where I could make a proper left and

19  get -- an proper turn to get them back on the other

20  direction of State Street.  And I dropped the girl

21  off.

22          The next girl that was in the car was the

23  girl that was upset.  And she asked me a couple

24  questions and asked me if I was upset.

25          And I said to her, I'm sorry.

www.DelVecchioReporting.com

1        She goes, No.  Just tell me about your

2   day.

3        And I don't know if she just sensed by my

4   being quiet that maybe I had a bad day, I don't

5   really know but she -- I listened to her about her

6   day and it being bad but she wanted me to share my

7   night.  And I didn't feel it was professional to

8   tell her really what went on in that department.

9        At which point, after not sharing what

10  went on, I got to her drop off, which was probably,

11  like, Temple Street.  And I couldn't get close

12  enough due to cars already being double parked.  I

13  believe it was on a Thursday or Friday night and

14  there was a lot of activity.  And I dropped her, but

15  not knowing that I didn't drop her close enough to

16  her door, she got mad and called up and said that I

17  made her walk really far -- far to her apartment

18  building.

19        That was, to my knowledge, the basis of

20  the complaint.

21    Q    How do you know that was the basis of her

22  complaint?

23    A    Because when the -- Manny Rivera, over

24  the radio, said, You can't just drop people

25  wherever.

                www.DelVecchioReporting.com

77

```
 1          So -- and I dropped -- I felt I dropped
 2  her off -- I -- I wasn't trying to do anything
 3  unsafe.
 4              MR. MERLY:  Could we go off the
 5          record for one minute?
 6              MR. DUBIN:  Yeah.
 7              MR. MERLY:  I'll be right back.  I
 8          just got to get something.  I'll be right
 9          back.
10              (THEREUPON, THERE WAS A RECESS TAKEN
11              FROM 12:01 p.m. TO 12:02 p.m.)
12  BY MR. DUBIN:
13      Q    Ms. Willoughby, that -- so you were aware
14  that someone did make a formal complaint against
15  you?
16      A    Yes.
17      Q    Okay.  When did you first become aware of
18  that?
19    . A    When I was accused of not dropping her
20  close enough to her -- to her -- her apartment
21  building.
22      Q    And that's something that you, in fact,
23  did not do; you did not drop her close to her
24  apartment building.
25          Correct?
                www.DelVecchioReporting.com
```

1      A     I -- I don't know where the actual

2   entrance would have been so I really don't know.   I

3   don't know.

4            The building had a few entrances.

5      Q     Did you ask her?

6      A     No.

7            She didn't say she wanted to be close to

8   the building or the door.   I didn't know.

9            I just thought I was dropping her in the

10  right place.

11     Q     Okay.  And did she have any words with

12  you while she was in the car?

13     A     No.

14     Q     Okay.  And this complaint was brought to

15  your attention, I'm assuming, at some point soon

16  after it occurred?

17     A     I mostly learned of it after I left Yale

18  when I saw it all in writing.  It was all -- it

19  wasn't -- this -- this was -- the only person I

20  discussed it with was Paul Gallipoli, but it

21  wasn't -- it was a simple discussion.

22     Q     Okay.

23     A     It wasn't me being reprimanded or

24  anything like that.  It was a simple discussion.

25     Q     Okay.  The question I have for you is:

1   Was it brought to your attention --

2        A    Yes.

3        Q    -- that someone made a complaint about

4   you soon after the incident occurred?

5        A    It wasn't brought to my attention that it

6   was a complaint.  It was brought to my attention

7   that I didn't drop her close enough to the

8   building.

9        Q    Okay.  So the first time you ever learned

10  that someone called and made a formal complaint

11  about you was after you were terminated?

12       A    No.  Prior.

13       Q    Okay.  So before your termination,

14  someone at Yale told you that someone you picked up

15  made a formal complaint against you?

16       A    He never used the word, formal complaint.

17       Q    Okay.  I'll try it again.

18            Before your termination you were advised

19  by Mr. Gallipoli that someone you were driving made

20  a complaint about you.

21            Is that fair to say?

22       A    Yes.

23       Q    Okay.  And I'm -- the date of the

24  incident that we are talking about, and I'll use the

25  word "incident" -- I understand that you don't

1    believe it rose to that level -- but I have

2    September 24, 2010.

3              Does that sound about right?

4    A    Probably about right.

5    Q    Okay.  So it was shortly after you were

6    hired as a full-time employee on a probationary

7    status.

8              Is that correct?

9    A    The dates are shortly after, yes.

10   Q    Okay.  And you were accused of being

11   rude.

12             Is that correct?

13   A    I don't recall what -- I don't recall.

14   Q    Okay.  You have given me your version of

15   what occurred that evening?

16   A    Okay.

17   Q    What I want to know is -- whether you

18   believe it to be right or wrong -- tell me what you

19   believe the complaint about you was?

20   A    I believe that because I didn't share

21   what was going on in our department because she

22   asked me, clearly, why I was being quiet.  I don't

23   know if I ever drove the girl before.  I drove many

24   people and normally I would give them a little

25   conversation.

81

1          I don't know if she sensed that there was

2     a problem between my supervisor and myself or was

3     wondering why I was at the car so long, but I feel

4     like she wanted me to talk to her about what my

5     night was like.

6          I felt it was inappropriate to speak with

7     a student about what was happening in my department

8     because if I was being unprofessional I would have

9     told her, I am not being allowed my restroom breaks.

10    I am not being allowed my lunch breaks like all the

11    other male officers.

12     Q     The question I have for you is:  What did

13    Paul tell you this woman's complaint was?

14          Whether you believe it to be right or

15    wrong I just want to know, in your head, what did

16    Paul tell you this woman was complaining about?

17     A     That I dropped her off too far from her

18    building.

19     Q     Anything else?

20     A     I don't really recall.

21     Q     Did Paul ever tell you that this woman

22    said that you were rude?

23     A     He may have.

24     Q     Did Paul ever tell you that this woman

25    never wanted to be picked up by you again?

1     A     He may have.

2     Q     Did Paul observe any of your conduct that

3   evening?

4     A     No.

5           He wasn't in the car with us.

6     Q     Okay.  But Paul, actually, was with you

7   before the girls came out?

8     A     I was standing at Paul's car so we were

9   having a private discussion.  But no, he was not

10  there to observe any conduct.

11    Q     Did Paul -- okay.  So is it your

12  testimony that Paul was there when the girls came

13  out or was not?

14    A     One girl yelled from the steps that there

15  was going to be another pickup, which is normally

16  not allowed.  And she knew that they would cancel

17  the ride if -- and I told her, No problem.  It was

18  already added on and just to wait in the car.  It

19  was not a problem.

20          I knew that they flagged another person

21  because I had been paying attention to the device in

22  the car that can allow another person, I believe

23  it's called a flag.  I can be wrong, but I believe

24  it's called a flag, when another person is added to

25  the -- to the transport of -- last moment.  I --
                    www.DelVecchioReporting.com

1    I -- everything has to be done in the computer

2    correctly.

3         Q     Okay.  And when this woman told you that

4    she wasn't the original pickup, did you use any --

5    well, what did you tell her?

6         A     She didn't tell me she wasn't the

7    original pickup.  She told me somebody else was

8    coming.

9              And I told her, Yes.  I'm aware.  And I

10   told her, And you can wait in the car.

11             And she goes, We are just waiting for

12   another person.  I believe she peeked back into the

13   building.

14             Paul and I were finishing a conversation

15   that he was just trying to avoid.  One was about

16   getting in the car, to the best of my memory.

17   Another one started coming out and he just brushed

18   me off.

19             He said, Just go give them a ride.

20        Q     And did you use any unpleasant hand

21   gestures?

22        A     No.  Absolutely not.

23        Q     So if Paul testified that he was there

24   with you and witnessed you using an

25   unprofessional -- sorry -- unpleasant hand movement,

1    that would be a lie?

2        A    It would be a lie.

3        Q    Okay.  And if Paul testified that he saw

4    you use rude and unprofessional -- sorry.

5             That if you told the woman that you,

6    quote, Know how to read your manifest, would that be

7    a lie?

8        A    That would be a lie.

9        Q    And did Paul ever talk to you after these

10   complaints were made about you?

11       A    I approached him to ask him when I was

12   going to be getting my restroom breaks.

13            And the only thing he rudely interrupted

14   me with was that he wanted to talk about me dropping

15   a woman off in an unsafe place, but he didn't want

16   to talk about anything else.

17       Q    Did you ever have another discussion with

18   Paul after the initial discussion about this

19   incident?

20       A    I don't recall.

21       Q    Did you call him 20 minutes after he

22   first brought this to your attention --

23       A    I --

24       Q    -- and told him that you thought about

25   this situation and should not have been so abrupt

85

1    with the passengers and that it was not like you to

2    act that way?

3        A    I called him about when I was going to

4    get a restroom break.  And I told him that the only

5    thing that I did wrong was not talk to the girl when

6    she wanted to.

7        Q    Okay.  So if Paul testifies that you

8    called him and you said you thought about the

9    situation and should not have been so abrupt when

10    talking to your passengers and it was not like you

11    to act that way, Paul would be lying?

12        A    I don't recall exactly what we said.  But

13    I called to talk about a restroom break, and the

14    only thing I felt bad for the girl was that since

15    she already had a horrible night, I would never want

16    to be a part of making it worse.  It's the only

17    thing I recall.

18        Q    So you don't recall telling Paul --

19        A    No.

20        Q    -- that it was not like you to act the

21    way you did?

22        A    I don't recall right now.

23        Q    Okay.  This complaint, okay, we agree

24    that there was a complaint made about you during

25    your probationary period.

1               Correct?

2      A     Yes.

3      Q     Would you consider that to be a

4   performance issue?

5      A     No.

6      Q     Okay.  Did you ever tell Mr. Nucci that

7   you were going to, quote, wait until your 90 days

8   are up before blowing the lid on this place?

9      A     I never said I would blow the lid on any

10  place in my entire life.  That is a lie.

11     Q     Okay.  Did you have a heated conversation

12  on September 30th with Mr. Nucci?

13     A     I don't think it was as heated as much as

14  he didn't like me finally complaining.  That would

15  be probably the first time I ever told him that he

16  was part of the problem.

17     Q     Okay.  So the question I have for you is:

18  Did you have a heated conversation with Mr. Nucci on

19  September 30th?

20     A     I don't think it was heated.  We had a

21  conversation and he didn't like it.

22     Q     Okay.  What was the conversation about?

23     A     He approached me on Park Street and he

24  asked me why I was so quiet.

25            And I said to him, Really?  Are you

1  kidding me?

2            And he goes, Well, why are you quiet?

3  Why don't you talk to anybody anymore?

4            And I explained to him that since I had

5  started in my new driving position that on a regular

6  basis I wasn't receiving my restroom breaks.

7            And let me just back up, sir, for just

8  one moment.  One or two nights a week, with my new

9  full-time position, I was a security officer on foot

10 at one of the colleges.  So three nights a week I

11 drove and two nights a week I was a security officer

12 on foot.  And that's where he approached me was at

13 the college that I was patrolling.

14     Q     When was this?

15     A     He approached me in maybe October, maybe

16 September, November.  It was within the three month

17 period prior to me leaving to my termination.

18     Q     All right.  I guess maybe I'm talking

19 about something else then.

20            I'm talking about a phone conversation

21 regarding a transit vehicle not being located at 100

22 Church Street South.

23            Do you remember that phone conversation?

24     A     Oh, we had many phone conversations.

25 But -- but the question you first asked, I think,

89

1      Q      Did you ever accuse Pete Leonardo of

2  being into Nazi practices?

3      A      Oh, yes.  Not to his face, to the

4  supervisors.

5             Excuse me, can we just have the record

6  straight that I said this to the supervisors?

7                   MR. MERLY:  Yeah, sure.

8                   THE WITNESS:  Thank you.  So this is

9         .    all --

10                  MR. MERLY:  Yeah.

11  BY MR. DUBIN:

12     Q      How many times did you accuse Pete

13  Leonardo of being into Nazi practices?

14     A      One time.  But to the supervisors.

15     Q      I understand that.  You've said that.

16             Why would you accuse Pete Leonardo of

17  being into Nazi practices?

18     A      One of the supervisors, Reginald Chavez

19  (phonetic), prior to becoming a supervisor

20  complained to me when he was trying to help start

21  the union but also showing me what was necessary to

22  patrol on my new full-time assignment, the two

23  nights a week at the college, that was his college

24  for quite a while.  He was just transitioning from a

25  security officer into a supervisor but he was

90

1   letting off some steam because he was disgusted with

2   the treatment of the security officers.  And he told

3   me that all of the supervisors were ignoring how he

4   sat there with his Nazi magazines and memorabilia

5   buying it off of eBay and just all his craziness,

6   pretty much.

7        Q     Did you ever -- referring to Mr. Nucci?

8        A     No.  Referring to Pete Leonardo.

9        Q     I'm sorry.  Mr. Leonardo.

10             Did you ever see Mr. Leonardo with a Nazi

11   magazine?

12        A     He had all kinds of crazy magazines.

13        Q     That was not the question I asked you.

14        A     Yes.

15        Q     Did you ever see Mr. Leonardo with a Nazi

16   magazine?

17        A     They were magazines that kind of sold

18   that sort of memorabilia, gun magazines mostly.

19        Q     What gun magazines?

20        A     Oh, I don't know the names of them.  He

21   would have two or three.  And I would try to avoid

22   him when he would walk into any type of room I was

23   in.  I tried to avoid him completely.

24        Q     Okay.  So since you tried to avoid him,

25   how do you know that these magazines sold Nazi

                  www.DelVecchioReporting.com

1  memorabilia?

2      A      That's at least what Reggie Chavez said.

3      Q      Okay.  So you are basing this on

4  something that someone else told you, you never saw

5  Mr. Leonardo with a Nazi magazine?

6      A      I don't know that there are Nazi

7  magazines.  I believe there's magazines that sell

8  Nazi memorabilia.

9      Q      Okay.  I'm going off what you told me.

10  And you told me that he had a Nazi magazine --

11      A      He had --

12      Q      -- and he was buying all sorts of

13  memorabilia off eBay.  I then asked you what

14  magazine?

15              You said it was a gun magazine that sold

16  Nazi memorabilia.

17              And I said, How did you know that?

18              And you said, Well, I wouldn't look at

19  them.  I would just walk by.

20              So the question I have for you is:  How

21  do you know these magazines sold Nazi memorabilia or

22  do you not know?

23      A      He would be talking about it in front of

24  me, within earshot, what he was buying and what he

25  was doing.

92

1      Q      What did he say?

2      A      That he was buying certain guns, Nazi

3   uniforms.  I do recall Nazi uniform off of eBay.

4      Q      So you recall that Mr. Leonardo said

5   within earshot that he was buying a Nazi uniform

6   from eBay?  That's something you heard.

7             Is that what you are saying under oath?

8      A      Yes.

9      Q      When was that?

10      A      Oh, I don't recall the date.  But I know

11   we were in the same room for, basically, roll call.

12      Q      So when would that have been?

13      A      Within the three months of my getting

14   hired full-time.

15      Q      Okay.  So it was before your probationary

16   period began?

17      A      There was -- throughout my probationary

18   period.  That would be the only time that he would

19   come into the room.  He actually didn't even need to

20   be in there.  He got in earlier than me and had

21   already been through his roll call.  He would go in

22   there just to taunt me.  He didn't need to be in

23   there.

24      Q      Did you ever accuse Pete Leonardo of

25   trashing people's cars?

93

1    A    People were scared of him and didn't want

2  to park near him, including myself.

3    Q    Okay.  So if you can do me a favor and

4  just listen to my question --

5    A    No.

6    Q    The question was:  Did you ever accuse

7  Pete Leonardo of trashing people's cars?

8    A    No.

9    Q    So if Mr. Nucci says that during a

10  conversation between you and he, you accused Pete

11  Leonardo of trashing people's cars in the past, that

12  would be a lie?

13    A    That would be a lie.

14    Q    Okay.  Did you ever accuse Mr. Ortiz,

15  Mr. Killen and Mr. Nucci of running a good old boys'

16  club?

17    A    I never said that.

18    Q    So that would be a lie?

19    A    That would be a lie.

20         And can I respond to that?

21    Q    Sure.

22    A    I directly accused Richard Nucci of

23  running a boys' club.  Not a good old boys' club.

24  But I accused solely Mr. Nucci of running a boys'

25  club, I was very specific about that.  Never the two

94

1    directors.

2        Q       Okay.   There was an incident, and maybe

3    you can tell me about this, on October 1, 2010,

4    where you avoided taking any calls of a period of

5    two and a half hours on Saturday night by failing to

6    sign in on the radio.

7                Do you recall that?

8        A       I signed in.   The person that signed me

9    in, his name was Ed Fusco (phonetic).   But he

10   admittedly mistakenly or forgot to sign my car in.

11   And without the transportation person following

12   through, it makes it appear as if I'm not there.

13   But he admittedly, to my face, told me that it was

14   his error.

15       Q       Explain that, explain how that works.   So

16   you get your car and then you sign in?

17       A       So if you are going to start driving at,

18   like, maybe six o'clock, you get to work ten, 15

19   minutes early and you pull a key.   If there's a key

20   to the vehicle and the vehicle is on site, and it

21   should be on site because the key is in that key

22   track, you go get a car.

23               You turn what is called an MDT device on.

24   You either use your cellular or you use the radio to

25   call in or you can physically walk by the office and

1   tell them what car that you'll be driving that

2   night.  So you -- you have a couple of ways to tell

3   them.

4          You tell them what car you'll be driving

5   so that they can link it to you and start giving you

6   your regular calls.

7       Q    Okay.  So what did you do that night?

8       A    I went in.  I pulled the key.  I poked my

9   head in.  I said hi to everybody in the room.

10          I told the one person that I knew I had

11   his attention, his name is not Ed Fusco.  I'm sorry.

12   I'm giving you the wrong name.  His name is Paul --

13   no.  He's Italian.  It might be Paul.  But I told

14   him -- it's in all the documents.  It -- it -- it's

15   there.

16          He -- I told him that I was signing in

17   with a specific car.

18       Q    And then what happened?

19       A    I did what everybody does, I waited.  I

20   waited for a call.

21          And finally, nobody called me so I called

22   dispatch's number and asked them what the problem

23   was, why I wasn't getting any calls.  And at which

24   point they apologized for and actually the person

25   I'm referring to -- and the name, it may be Paul, he

96

1    said to me, You know, I'm sorry.  He goes, We'll put

2    you -- we'll put you on.  We didn't realize you are

3    here.  It's very busy.

4         Q    So it's your testimony that you actually

5    brought this to your supervisor's attention, that

6    they didn't call you to find out where you were?

7         A    They didn't call me.

8         Q    So if Tom Helland says that he actually

9    called you because you hadn't responded to a call,

10   he would be lying?

11        A    I already told Tom, at which point that I

12   already spoke to them and it was all straightened

13   out.  Because at one point a kid named Brandon

14   McCormick (phonetic) got involved, and I'm not sure

15   why, maybe because he's a good friend of Pete

16   Leonardo.  And he told them that I wasn't responding

17   to calls but I had already spoke with the person

18   that actually took responsibility for not plugging

19   me into the system.

20             My -- my name has to show up as I'm on

21   that night and working.  He -- there -- there was

22   already somebody there that took responsibility for

23   it.

24        Q    Okay.  You didn't take responsibility for

25   it?

1     A     Well, I didn't make any mistakes.

2     Q     You sat -- you sat in your car for a

3    period of two and a half hours and did not receive a

4    call.

5          Correct?

6     A     There's a lot of times if there weren't

7    calls on a slow night.  On that night I couldn't

8    understand it because I was listening to the radio.

9    I had the radio on in the car and I had my personal

10   radio on and I wasn't being given any calls.

11    Q     So am I correct that you sat there for

12   two and a half hours and did not receive a call?

13    A     It was under two hours.

14    Q     Okay.  And it is your testimony that you

15   actually called to bring this to someone's

16   attention?

17    A     Yes.

18    Q     If Tom Helland says that he had to call

19   and track you down, Tom would be lying?

20    A     It didn't happen that way.

21    Q     Okay.  And the name of the person who

22   says they took responsibility for this, you don't

23   know their name?

24    A     It may be Paul.

25    Q     Paul Gallipoli?

98

```
 1      A     No.

 2      Q     Another Paul?

 3      A     It's somebody -- it's one of the

 4  dispatchers.

 5      Q     Okay.

 6      A     I'm -- I'm sorry, I just don't recall the

 7  name.  If you read through and see the name, I

 8  will --

 9      Q     Okay.  So that was another incident that

10  occurred during your probationary period but you are

11  saying that that had nothing to do with you, that

12  had to do with somebody else?

13      A     Yes.

14      Q     Okay.  Let's talk about another incident

15  that occurred during your probationary period.  Did

16  you accuse your transit dispatcher of intentionally

17  misdirecting you?

18      A     Yes.

19      Q     Tell me how that happened?

20      A     On a regular basis, and I believe it's

21  Manny Rodriguez, not Rivera.  On a regular basis

22  Manny would send incorrect addresses through the

23  MDT.  So if I were supposed to pick somebody up at

24  241, he might put 124.  And I'd be sitting down at

25  the other end of the road and the student would come
```

1  out to me yelling to me, whistling.

2        But I finally started taking pictures

3  with my cellar phone to show both Paul Gallipoli

4  and Richard Nucci what was happening -- occurring

5  every night, the three consecutive nights a week.

6  They refused to listen to the radio transmissions

7  and even actual proof from pictures that I would

8  take.

9        I don't think somebody can give you -- I

10  know that the transportation department gets busy,

11  but this was regular occurrences and it would get

12  the students directly mad at me if I went to the

13  wrong address.  But I can only go by what's on the

14  MDT.  Yes, I did accuse him of that.

15     Q    How many times did that happen?

16     A    Regularly.

17     Q    Well, how many times did you complain

18  about it?

19     A    I complained regularly, more than a half

20  a dozen times, and it continued to happen.  It was

21  like a big joke around there.

22     Q    So you think it was more than a half a

23  dozen times?

24     A    That I got the wrong address?

25        Definitely.

100

1    Q    And you believe you complained to Paul

2  Gallipoli about it regularly?

3    A    I complained to Paul; I remember the

4  female supervisor's name, Laurie, I just can't

5  recall her last name; I complained to Richard Nucci;

6  I may have complained to Tom Helland; I complained

7  to several people.

8    Q    How many pictures did you take?

9    A    Oh, several.

10   Q    Did you show all of them to Mr. Gallipoli

11 or just one?

12   A    He got -- he was furious that I took

13 pictures.  He was furious.  He didn't want to see

14 them.

15   Q    Can you do me a favor and just answer the

16 question?

17        Did you show them all to Mr. Gallipoli or

18 just one?

19   A    I tried to show them all.

20   Q    Do you still have them?

21   A    I might on -- I might.  I might.  I have

22 the old phone and if I can plug the old phone in, I

23 probably do.  I may.

24   Q    Where is the phone?

25   A    If I have the phone it would be at home.

1    college -- oh, I'm sorry.  He may have been in the

2    college across the street.

3            No.  He was -- he may have been the

4    college that I was assigned to.  I think I was

5    assigned to Davenport.

6        Q    Do you recall an incident on October 29th

7    where a man approached you from Davenport College

8    and crossed York Street and asked whether there was

9    a student partying inside Saybrook College and was

10   making complaints about how loud they were?

11       A    A recall a man approaching me.  At the

12   time I didn't know who it was.

13           I politely asked him who he was because

14   he seemed agitated.  And I told him that we would

15   take care of it.  And he actually was very happy

16   with my response.

17       Q    So you would deny that where you said

18   that you politely asked him who he was, you would

19   deny that you said in a confrontational tone, Who

20   are you?

21       A    Absolutely.

22       Q    Okay.  And you don't know who that person

23   is?

24       A    I later on found out because Richard

25   Nucci twisted the story.  So I know it was a -- one

                www.DelVecchioReporting.com

110

1    of the professors -- it was one of the deans.  We --

2    we had a decent conversation and I would think

3    Richard Nucci would walk off and would actually be

4    impressed with how I handled the situation.  And

5    then when I saw the e-mail that he lied and said I

6    handled him in a confrontational tone, that would be

7    kind of stupid on my part in front of my supervisor

8    that I was speaking to to handle this man in a

9    confrontational tone.

10           I actually handled him in a really good

11   tone.

12       Q    Okay.  So if the dean testifies that you

13   addressed him in a confrontational tone, he too

14   would be lying.

15           Correct?

16       A    Correct.

17       Q    Okay.

18           MR. MERLY:  I need to go off the

19           record for a minute.

20           (THEREUPON, THERE WAS A LUNCH RECESS

21           TAKEN FROM 12:47 p.m. TO 1:38 p.m.)

22   BY MR. DUBIN:

23       Q    Ms. Willoughby, we've just taken a lunch

24   break.  We are back on the record.

25           What are your claims against Yale
                www.DelVecchioReporting.com

116

1    Ms. Willoughby, to make it as clear as possible, I

2    want to start with the first incident that

3    occurred --

4          A     Okay.

5          Q     -- that you believe supports your claim

6    and I want to work forward to the date of your

7    termination.

8                Do you understand that?

9          A     Okay.   There's one other very big

10   incident prior to that.

11         Q     Do you understand what I just said?

12         A     Yes.   Yes.

13         Q     Okay.   So let's start with the first one

14   and do your best to give me the year and month it

15   occurred?

16         A     The first month that I worked there, in

17   October of 2008, I was working at 25 Science Park.

18   I was standing with another officer named Mike

19   Guzman.   Mike Guzman went inside to either relieve

20   himself or take a break, it was cold.   Pete Leonardo

21   pulled up to the building in a security car and

22   demanded from me to know where Mike Guzman was.

23                I was a bit confused because although I

24   had only been there a couple weeks, I felt that he

25   was also just a security officer and didn't

                    www.DelVecchioReporting.com

1   understand why he was demanding to know where Mike

2   Guzman was.

3              At which point I said to him, I'm sorry,

4   are you the supervisor?

5              And he yelled out that he was.

6              At which point I believe I told him he

7   was relieving himself.

8              When Mike Guzman did appear back outside,

9   I don't recall how long it took him, Pete Leonardo

10  came back in the car, he actually sat up the street

11  if I'm not mistaken in the car watching the front of

12  the building and waiting for, I would assume, Mike

13  Guzman.  He pulled up in the car again and he

14  started yelling and asking him where his vest was.

15             At which point, Mike Guzman had a bit of

16  a stutter to begin with, and you can clearly see was

17  intimidated and tried to tell him that he didn't

18  have it.  He was yelling at him that he needed to

19  wear -- Pete Leonardo was yelling at Mike Guzman

20  just clearly embarrassing him that he needed to wear

21  a vest.

22             At a later point that night, my

23  supervisor, my actual supervisor, Billy Abbott, I

24  don't know if he called me first or came to the

25  canal.  I believe he came to the canal and asked me

1    why Pete Leonardo was going wild.  Apparently, Pete

2    Leonardo called me an f-ing bitch to Billy Abbott,

3    the supervisor, and told him that since I was such a

4    bitch he didn't want to deal with me.

5              He said that I wasn't -- I don't know --

6    cooperating with him that -- when he came to check

7    on us.  So the confusion was -- I asked Billy Abbott

8    who the supervisor was because I was brand new, I

9    was there not even a month.

10             And Billy Abbott explained that it was

11   his fault.  He apologized.  He said, yeah, he was

12   using my car.

13             I did tell him to ride by Science Park

14   but I never told him to have any conversation with

15   either you or Mike.

16             Last I know, Billy apologized and I kind

17   of knew from there to maybe just stay away from Pete

18   Leonardo.

19       Q    Okay.  So how does that support any claim

20   of sexual harassment?

21             I'm not -- where is the sexual harassment

22   in there?

23             It sounds like what you just told me, he

24   was yelling at Peter Guzman and you believe,

25   although you did not hear, that he called you a

119

1   fucking bitch behind your back to Billy Abbott.

2            Is that correct?

3      A    Yeah.  Correct.

4            Usually you don't call a male a fucking

5   bitch and he was ranting and raving about me.  But

6   Billy Abbott would have to be testified to that if

7   it ever comes to it.

8      Q    Right.  So you --

9      A    And I'm sure he would.

10     Q    So you didn't hear Pete Leonardo call you

11  a fucking bitch?

12     A    I heard him call me a fucking rat bitch

13  when he was talking to Damien at a later time.

14     Q    Okay.  Can we stay on this incident?

15     A    Sure.

16     Q    I'll get to that.

17     A    Sure.

18     Q    So we are talking about this incident.

19  You have a claim against Yale --

20     A    Okay.

21     Q    -- that you were sexually harassed and

22  you were terminated because of your gender.  And

23  what I'm hearing from you is that on this date he

24  yelled at Mr. Guzman.

25            Is that correct?
                www.DelVecchioReporting.com

120

1    A    He yelled at me and told me to stay out

2  of it and not stick up for Mr. Guzman.

3    Q    Okay.  So he yelled at both you and

4  Mr. Guzman.

5         Correct?

6    A    (The witness nods head.)

7    Q    Yes?

8    A    Yes.

9    Q    And Mr. Guzman is a male?

10   A    Mr. Guzman is a male.

11   Q    Okay.  And you did not hear Mr. Leonardo

12  call you a bitch or a fucking rat bitch on this

13  incident in October of 2008.

14        Correct?

15   A    That day Billy Abbott told me he called

16  me a fucking bitch.

17   Q    Okay.  So am I correct you did not hear

18  Mr. Leonardo --

19   A    I did not hear him.

20   Q    Okay.

21   A    That day.

22   Q    Okay.  And who was your supervisor at

23  that time?

24   A    Billy Abbott.

25   Q    Did you have any other supervisors at
                www.DelVecchioReporting.com

1    that time?

2         A    At the time, Bob Pollack.

3         Q    Did you complain to Mr. Abbott about this

4    incident?

5         A    Mr. Abbott apologized to me and told me

6    that this was a young kid and that he was basically

7    out of control.

8         Q    Mr. Abbott told you that Mr. Leonardo was

9    a young kid and was out of control?

10        A    Yes.

11        Q    When Mr. Leonardo pulled up, he was

12   yelling at Mr. Guzman.

13             Is that correct?

14        A    Mr. Guzman wasn't there.  He was

15   asking -- yelling out of the window to -- he wanted

16   me to tell him exactly where he was.  He couldn't

17   accept that he was off having a restroom break and

18   he wanted to know how long exactly he was gone.

19        Q    Okay.

20        A    A he wanted specifics.

21        Q    And tell me why you believe that incident

22   is evidence of sexual harassment?

23        A    I feel like if that was, at which point,

24   a male standing there, anybody that would stand up

25   to him, he would have handled that differently.

124

1    front of me.   He --

2         Q     What's Cookie's full name?

3         A     I'm sorry.  I really don't know.

4    Everybody called her Cookie, and I'm sure I knew her

5    name at one point.

6         Q     What did he do in front of you?

7         A     He was saying that because she was half

8    Hispanic and half black that she played the race

9    card with management to help her whenever she got in

10   trouble.  He was ranting and raving about her one

11   night at my post as I was being relieved.  I don't

12   know what their problem with each other was but he

13   was clearly calling her some of the -- he didn't

14   respect females, in my opinion.

15        Q     He was calling her what?

16        A     He was calling her a fucking bitch.

17        Q     Okay.

18        A     Normally what he -- he personally called

19   me a rat fucking bitch.

20        Q     Did you make a complaint about this -- so

21   this incident in October 2008, did you make a

22   complaint about Mr. Leonardo's behavior on that

23   evening?

24        A     That -- are you talking about with Billy

25   Abbott?

1    Q    Just that incident, we are just talking

2  about that first incident.

3         Did you make a complaint?

4    A    The first incident involving Mike Guzman,

5  so I'm clear?

6    Q    Uh-huh.

7    A    I didn't really have to make a complaint.

8  Billy called me first to apologize and didn't want

9  me to think the whole department was like that.  It

10  was a brand new employee, there for less than a

11  month.

12   Q    What did he apologize for?

13   A    He apologized for him coming there and

14  acting just unprofessional.  He said that he didn't

15  sent him there to have anything verbal with us.

16  That he just sent him there to make sure people were

17  on their post.

18        And he said he apologized because that

19  wasn't his job to send him there to begin with.  He

20  said he knew he was wrong to send a security

21  officer.

22   Q    It sounds like Mr. Leonardo treated,

23  actually, Billy Abbott worse than he treated you on

24  that incident.

25        Is that fair to say?

126

1      A      I don't think that's the case.

2      Q      No?

3      A      No.

4      Q      It seemed that based on what you told me

5  it appears, correct me if I'm wrong, that Mr. Guzman

6  was the subject of Mr. Leonardo's ranting and raving

7  rather than you?

8      A      He didn't call, from what Billy Abbott

9  told me, Mike any bad names using profanity.  He

10  said that he didn't like me because I pretty much

11  think he called me a big mouth.  He said I should

12  have answered his questions.

13     Q      Okay.  So now you are testifying that in

14  addition to calling you a rat bitch he called you a

15  big mouth?

16     A      Oh, yes.

17     Q      Okay.

18     A      But Billy would as I'm sitting here

19  recalling our conversation, and I'm sure he called

20  me quite a few other things.

21     Q      Ms. Willoughby, what I want to know is

22  what you are --.what was told to you.

23            Okay?

24     A      Billy told me those two things.

25     Q      Okay.  So you said I'm sure he called me

127

1  a lot of other things.  You don't know that, is that

2  fair to say?

3        A    That's fair to say.  You are correct.

4        Q    It's complete speculation on your part.

5             Is that correct?

6        A    Correct.

7        Q    Okay.  And you are aware that he called

8  you a big mouth and a rat bitch on this first

9  occasion in October 2008.

10            Is that correct?

11       A    Yes, I am.

12       Q    And the reason you are aware of that is

13  not because Pete Leonardo told you but Billy Abbott

14  told you.

15            Is that correct?

16       A    Yes.  Correct.

17       Q    Okay.  And on this evening you would

18  agree that Mr. Leonardo attempted to embarrass

19  Mr. Guzman?

20       A    Agreed.

21       Q    It's fair to say that he treated you both

22  poorly?

23       A    Yes.

24       Q    And you didn't make the complaint to

25  anyone about Mr. Leonardo's conduct on that evening

128

1    and you felt you didn't have to because Billy Abbott

2    apologized to you?

3          A     That's correct.

4                I was a brand new employee.  I wasn't

5    trying to make a complaint the first month I was

6    there.

7          Q     Okay.  Do you know if anyone talked to

8    Mr. Leonardo about his conduct that evening?

9          A     I -- I know Billy Abbott talked to him

10   but I don't know exactly what he said to him.

11         Q     How do you know Billy Abbott talked to

12   him?

13         A     Because he told me he was going to.

14         Q     Okay.  And do you know what happened?

15         A     I don't know.

16         Q     How do you know -- okay.

17               Other than Billy Abbott telling you he

18   talked to him, how do you know there was a

19   conversation?

20         A     Because that's where I think the part

21   about me being a big mouth came in because the next

22   time I talked to Billy Abbott he said the kid just

23   had no respect, he was going wild.

24         Q     And we can agree that Peter Leonardo was

25   not your supervisor?

1       A       No.

2       Q       But you believe that Billy Abbott was

3    your supervisor?

4       A       Oh, he was my supervisor.

5       Q       And what you believe is that this

6    incident occurred and even though you didn't

7    complain about it, Billy Abbott took it upon himself

8    to one, apologize to you and, two, speak to Peter

9    Leonardo about his conduct?

10      A       Correct.

11      Q       Okay.  Let's now discuss the next

12   incident that you recall, which you believe supports

13   your claim that you were sexually harassed?

14      A       Some of the next incidents were --

15      Q       I didn't ask that.  I want to know the

16   next incident.  I'm trying to go in absolute order.

17   And just let me -- I want you to understand

18   something:  You understand that there's going to be

19   a trial in this case?

20      A       Yes.

21      Q       You understand there's going to be a

22   jury?

23      A       Yes.

24      Q       Okay.  You understand that.  Okay.  So I

25   want to know exactly what you are going to be

1    telling the jury.  So I want to be as clear today to

2    the best you can as it will be when you tell the

3    story to the jury.

4              Do you understand?

5      A     Yes.

6      Q     Okay.  So what I want to know is the next

7    incident you can recall in chronological order,

8    understanding that this incident with Mr. Guzman is

9    the first, what is the next incident that you

10   believe supports your claim of sexual harassment?

11     A     One of the next incidents, I was leaving

12   work.  I was in the back of Science Park.  It was

13   late at night, maybe ten o'clock.

14             He and another --

15     Q     When you say "he" --

16     A     Peter Leonardo and another officer or

17   possibly two pulled up in a security car.  I don't

18   know why they were there.

19     Q     When did this occur?

20     A     Probably about a month after I started

21   working there.  I know it was possibly even in

22   October, possibly the first month I started working

23   there of 2008.  The other officer wanted to look at

24   my motorcycle.

25             And I believe it was probably October

1    because I wouldn't have ridden in November or

2    December.

3        Q    Personal motorcycle?

4        A    Yes.

5        Q    Okay.

6        A    And they were looking at it.  There were

7    two or three guys looking at it and complimenting

8    it.  Peter just started running his mouth off,

9    talking about different other females in the

10   department.  And I was just trying to keep my mouth

11   shut because I already knew in my opinion that he

12   was bad news.  And one kid called him an f-ing

13   asshole and said, Stop trying to show off in front

14   of her.

15          At which point the guys that were with

16   him -- I remember who it was.  The kid's name was

17   Jessie.  He called him an f-ing asshole and said,

18   you are just trying to show off in front of her.  He

19   goes, Come on, let's not let her think the rest of

20   us are like this.

21          At which point I was putting my gear on.

22   I knew it was time to leave.  I simply had to call

23   out on the radio.  And prior to that, he was talking

24   about that night he didn't like Cookie.  I can't

25   recall her first name, but apparently him and Cookie

1  had some type of something going on, I just don't

2  know what.

3           I don't recall.  I was new and I really

4  didn't want any part of the discussion.  I really

5  didn't want any part of him even talking about

6  females in front of me.

7      Q    Okay.  Have we discussed that incident

8  fully?

9      A    At this point, yeah.

10     Q    What do you mean "at this point"?

11     A    If there's a trial and they want to

12  discuss it more, we are going to be discussing it I

13  suppose.  I don't know how this is all going to play

14  out.  I really don't, sir.

15     Q    Okay.  I have a good idea of how it's

16  going to play out.

17     A    Okay.

18     Q    And what I want to know is everything you

19  can recall about that incident.  I don't want to

20  learn at trial that you have a different idea as to

21  what happened.

22          Do you understand?

23     A    (The witness nods head.)

24     Q    You do?

25     A    Yes, I understand.

www.DelVecchioReporting.com

133

1     Q    Okay.  So when I say, "Is that all?"

2        And you say, "at this point," that

3  suggests to me that there may be something you are

4  leaving out.

5        Do you understand?

6     A    I'm not leaving out anything.

7     Q    Okay.  So that --

8     A    That's everything I can recall.

9     Q    Have we discussed everything that you can

10  recall as pertaining to that incident?

11    A    Everything that I can recall, yes.

12    Q    Okay.  So my next question is did you

13  complain to anyone about that incident?

14    A    Oh, of course not.

15    Q    What do you mean "of course not"?

16    A    I was a brand new employee.  It had to

17  have been probably October.  I just got hired in the

18  middle of October.  If this happened in the first

19  two weeks of getting hired, if I complained and I'm

20  working as a -- in a casual status, they simply

21  never had to make another phone call to say, Come in

22  to work.  Hey, you are done.

23    Q    Okay.  And I guess what I want to know is

24  how -- it doesn't sound like Peter Leonardo did

25  anything to you.  It sounds like he was talk about

134

1   other people during this conversation?

2       A      He was talking about another female.

3       Q      All right.  How did you -- why do you

4   believe that this was sexual harassment towards

5   you?

6       A      The way I interpret that is if a female,

7   me or any other female, is with all males, they are

8   brand new to the organization and the profanity and

9   calling another woman a fucking bitch and going on

10  and on about her and talking about her being half

11  Hispanic and half African-American when I didn't

12  even know this woman, I feel like that was a little

13  too much for me to be exposed to.

14           I -- I honestly was uncomfortable.  I can

15  look you square in your eyes and tell you it was a

16  hard position to be in.  I remember riding home that

17  night uncomfortable.  I remember saying, This is

18  what I just got hired into?

19      Q      All right.  And during the same

20  conversation one of my Mr. Leonardo's peers called

21  him an asshole?

22      A      Jessie called him a fucking asshole.

23      Q      Okay.  Did that make you uncomfortable?

24      A      No.  Honestly, no.

25           Profanity, you know, people use it.  No,

1    it didn't make me uncomfortable.

2          Q      Why were you uncomfortable when

3    Mr. Leonardo referred to someone else as a fucking

4    bitch but when Jessie referred to Mr. Leonardo to

5    his face a fucking asshole, did that not make you

6    uncomfortable?  I don't understand.

7          A      I felt like he shouldn't be talking

8    about somebody that I don't know in a derogatory

9    manner and planting a seed.  I felt like I didn't

10   like the racial aspect of it.  I didn't like his

11   demeanor.

12         Q      Okay.  And you believe that this

13   incident supports a claim of sexual harassment in

14   this case?

15         A      Yes.

16         Q      How so?

17         A      I feel like if that were a guy -- I think

18   he was almost trying to condition me, like, to

19   become one of these women because I had already

20   dealt with the Mike Guzman incidents to be, like,

21   one of these women to just like keep my mouth

22   shut.

23         Q      And how is it that you feel like he was

24   trying to condition you to keep your mouth shut?

25         A      Because he was calling Cookie a loudmouth

136

```
 1   and saying that she was constantly complaining, that

 2   sort of thing.

 3        Q     We can agree he said nothing about you at

 4   that --

 5        A     No.  He didn't say anything about me.

 6        Q     We can agree?

 7        A     Yes.

 8        Q     Okay.  What is the next incident that you

 9   can recall that you believe supports your claim that

10   you were sexually harassed?

11        A     There were several times, I don't -- I

12   can't give you dates, but several times throughout

13   quite a few months that he would ride by and --

14        Q     When you say "he" you are talking about

15   Peter Leonardo?

16        A     Peter Leonardo.

17        Q     Okay.  Let me be clear.

18        A     Okay.

19        Q     Let me be very clear here.  What I want

20   to make sure we understand is, I want to know every

21   allegation that supports your claim of sexual

22   harassment, not just Peter Leonardo.  And maybe it

23   was just Peter Leonardo, I don't know.  That's what

24   I'm here to find out.

25               So do you understand that?
```

```
 1      A      Yes.

 2      Q      Okay.  We are not just talking about

 3   Peter Leonardo.  So when you say "he," just specify

 4   who it is.  And if there's somebody else that did

 5   something that you believe supports your claim of

 6   harassment, let me know about that too.

 7             Okay?

 8      A      Yes.

 9      Q      All right.  So we'll continue on in

10   chronological order.  And you said, Several times

11   throughout quite a few months, Peter Leonardo

12   would --

13      A      Would come by, whether it was throughout

14   the summer months and into the winter months,

15   because I was there through October of 2008 until

16   maybe the winter months of 2009, probably close to

17   the end of the winter months of 2009, maybe up to

18   the spring.  I believe it was over a year.

19             But there were several times where he

20   rode by and he would yell out of the window.  He

21   actually flipped me off one time with the middle

22   finger, like, actually flipped me off.  I reported

23   that to Lou.

24             Lou, he was my -- he had just been made a

25   new supervisor and then he lost his job.  Lou -- I'm
```

138

```
 1    sorry, I'm trying to recall his last name.  He
 2    wasn't my supervisor long but I did report that
 3    instance to him.
 4              The next thing I can remember --
 5         Q    Well, how many times did he flip you off?
 6         A    One time, I recall.
 7         Q    Okay.  And you said rode by, was he in a
 8    bike?
 9         A    No.  He was in a car.
10         Q    Was he working?
11         A    He -- yeah.  I think he was working.
12         Q    Were you working?
13         A    Yes.
14         Q    Okay.  All right.  So just so we are
15    clear here, you -- there was only one time where he
16    flipped you off?
17         A    From what I recall, yes.
18         Q    Okay.  And you reported this to someone
19    named Lou?
20         A    Lou Paselli.
21         Q    And what did Lou do?
22         A    Lou told me he would investigate it.
23         Q    And did he?
24         A    I really don't know.  I couldn't really
25    complain.  I was a casual employee trying to gain
```

139

1   full-time status.

2        Q     Well, did you complain or did you not

3   complain?

4        A     Oh, I did complain to Lou but I didn't go

5   to HR.  I complained to Lou.

6        Q     Is there any policy that says you can't

7   complain if you are a casual employee?

8        A     I think it's just kind of common

9   knowledge.

10        Q     So it's your testimony that when you were

11   a casual employee, you did not make complaints to

12   HR?

13        A     Oh, I never went to HR.  As I -- I only

14   did that when I was a full-time -- when I was on

15   probation as a full-time employee.

16        Q     And you can agree that if HR didn't know

17   about the complaints, there's nothing they can do

18   about them?

19        A     I agree.

20        Q     Okay.  Did you tell Lou not to go to HR?

21        A     Oh, I didn't tell Lou to do anything.   I

22   just asked him to handle it.

23        Q     Okay.  What is the -- all right.

24              So you made some comment about several

25   times he would drive by and yell out the window and

140

1    then he flipped you off one time.  So what would he

2    say when he yelled out the window?

3        A    Pretty much asking me how it felt to be

4    out in the weather.  You know, in the summer months,

5    you know, he would make it known that he had a nice

6    beverage.

7             He would just taunt me.  There was a lot

8    of taunting, like little kid stuff.

9        Q    What else did -- what else in this period

10   between October of 2008 to the winter of 2009 did

11   Peter Leonardo say to you when he would drive by and

12   yell out the window?

13       A    Several times when it was cold he would

14   ask me if I was cold.

15       Q    Anything else?

16       A    That I could make out, no.

17       Q    So all you can remember between October

18   of 2008 and the winter of 2009 is that Peter

19   Leonardo gave you the finger on one occasion and you

20   reported that to Lou, not to HR, that Peter would,

21   in the summer months, make it known that he had a

22   nice beverage and in the winter months ask you if

23   you were cold.

24             Is that correct?

25       A    Yes.

141

1     Q      Anything else?

2     A      Not that I can recall.

3     Q      Okay.  What next happened that you

4  believe supports your claim of sexual harassment in

5  this case?

6     A      I had a walking escort.  I came into the

7  foyer.  I was dripping wet.  You just can't walk

8  with an umbrella with somebody that walks twice as

9  fast as you and she needed an escort to The Whale.

10            We finished walking.  I walked back.  It

11  was dark.  It was cold.  And I walked into the foyer

12  to just stand up by the heater and --

13     Q      What building?

14     A      It was 25 Science Park.

15            And I wanted to stand near the foyer near

16  the heater and just warm up before my shift was over

17  at 7 p.m.  It was winter months.  It was dark.

18            He pulled up with -- I'm sorry.  Pete

19  Leonardo pulled up with Bill Hewitt.  I don't recall

20  who was driving.  They walked in the building.  They

21  didn't acknowledge me.  I didn't acknowledge them.

22  And they walked up to the desk and they were talking

23  to a security officer that worked for SSC named

24  Damien.  At a later time, Damien told me that they

25  were trying -- that Pete Leonardo was trying to sell

142

1    him a gun safe, a small gun safe.

2          Damien was in the process, I believe, of

3    trying to get his pistol permit.  So he was gung ho.

4    He wanted to just buy, I guess, anything he could,

5    you know, to help him get ready for a pistol he

6    intended on buying.

7          Q    Go ahead.

8          A    And, at which point, he must have told

9    him that he couldn't be doing -- conducting that

10   business because later on when Damien and I talked,

11   he even apologized because he felt bad.

12         And then, all of a sudden, Pete really

13   loud goes, No, she's a fucking rat bitch.  I just

14   turned around.  I was upset when I heard it.  I was

15   clearly upset.  I shook my head.

16         And at first, I really wasn't going to

17   walk in and confront him.  And I said, I need to

18   confront this person.  To myself -- I thought to

19   myself, I need to confront him.  Clearly, the bosses

20   don't -- they are not effective.

21         And I walked up to him and Bill Hewitt

22   put his head down, he was embarrassed, like I have

23   no part in this.  And Damien kind of, like, turned

24   his back, not to be disrespectful to me.  But, you

25   know, he didn't want to look at me, Peter Leonardo

143

1     didn't want to look at me.

2              And I asked him, Can you repeat that?  Do

3     you have anything to say to me?  Can you repeat

4     that?

5              And he didn't want to know anything and

6     he walked by me real abrupt and he said, going to

7     the car, you know, You want to try to stay dry out

8     there?

9              Like, you know, you are wet.  You know, I

10    can't remember, like, word for word but he was

11    telling me because I was soaking wet to just stay

12    dry out there.  And yes, I was dripping wet.

13             Just disrespectful, that's -- that's all

14    I can recall.  He left.  I reported it to my

15    supervisor because I was upset.  I spoke to --

16        Q    Who was your supervisor?

17        A    I believe Billy Abbott at the time.

18             And I reported the instance and said,

19    this is -- this is crazy.  I said, I feel like I

20    can't go to anybody because I'm in this, you know,

21    status where I'm -- my goal is to obtain full-time

22    employment but if I complain I'll never get it.

23             And he confirmed that I would never get

24    it.  And Billy Abbott confirmed and made it very

25    clear.

144

1          He goes, No, you don't -- you are not in
2     a position to complain.  He goes, I'll talk to Dan
3     Killen.
4          Dan Killen sent out an e-mail that I
5     provided in my response, in my rebuttal and it
6     clearly tells any officers not to yell out of the
7     window to other officers about inclement weather.  I
8     believe Dan Killen wouldn't have wrote that e-mail
9     if he didn't believe there was any truthful basis to
10    my allegation.
11          I feel like he really wouldn't have
12    wrote that.  So it should be included in the
13    paperwork you have because I did provide it to the
14    CHRO.  And he also told the officers that they
15    weren't supposed to be riding together, that it
16    should be one officer to a car.  The e-mail, pretty
17    much at first, made me feel good.  I really felt
18    like Dan Killen cared.
19          Q    Okay.  Ms. Willoughby, you've already
20    admitted to me that up to this point you didn't make
21    any complaints about Peter Leonardo?
22          A    We are going in chronological order?
23          Q    Yeah.  Yeah.  So you told me that you
24    heard Peter Leonardo say that you were a rat bitch.
25    And then you testified that you need to confront

145

1  him because the bosses are not effective.   I thought

2  you weren't making complaints because you were

3  worried you weren't going to get full-time

4  employment?

5       A     I'm sorry if I confused you.   But I mean

6  formal complaints to HR or even going directly to a

7  director.

8              When Billy Abbott told me that he, like,

9  actually took it all the way up the next day to Dan

10 Killen, I was nervous.   Billy Abbott is actually the

11 one that provided me with the e-mail.

12      Q     But prior to this point in time -- okay?

13 -- prior to the point in time where this incident in

14 Science Park where Pete Leonardo said that you were

15 a rat bitch -- and by the way, that's something he

16 didn't say to your face, you overheard that.

17             Correct?

18      A     Yes.

19      Q     Okay.   Prior to that point did you ever

20 make any complaints about Peter Leonardo?

21      A     The first instance, Billy came to me when

22 Mike Guzman was involved.   The other times, when he

23 was yelling out of the car, I kept all of that to

24 myself up until the time where he was in 25 Science

25 with Damien.

146

```
 1      Q      Right.

 2      A      And he had called me a fucking rat bitch.

 3      Q      Right.

 4      A      Then I went with -- I -- I told Billy

 5   about that and I told Billy -- I'm sorry.  Please

 6   ask me the question again.

 7      Q      Did you make any complaint about Peter

 8   Leonardo before this incident in Science Park where

 9   he called you a rat bitch?

10      A      Well, not really.  Billy came to me the

11   first time.

12      Q      Okay.

13      A      I was just scared to make complaints.

14      Q      Okay.  And --

15      A      I'm sorry if I'm confusing you.

16      Q      You are not confusing me at all.

17             So this was be the first time you made a

18   formal complaint --

19      A      Yes.

20      Q      This was the first time you made a

21   complaint.

22             Correct?

23      A      That would be probably the first formal

24   complaint.  I can recognize that e-mail.

25      Q      Okay.  This time that we are talking
```

147

```
 1    about right now, this is the first time you made a
 2    complaint about Peter Leonardo?
 3        A     Yes.
 4        Q     Okay.
 5              MR. DUBIN:  And why don't we mark
 6              that as an exhibit.
 7        A     That I recall.
 8              (THEREUPON, DEFENDANT'S EXHIBIT NO.
 9              2, E-MAIL SENT TO BILLY ABBOTT FROM
10              DAN KILLEN, WAS MARKED FOR
11              IDENTIFICATION.)
12    BY MR. DUBIN:
13        Q     So why don't you tell me if you can
14    identify what we've marked as Defendant's Exhibit
15    No. 2?
16        A     It's an e-mail sent to Billy Abbott from
17    Dan Killen.
18              The reason I -- and this was given to me,
19    this copy of Billy Abbott's personal e-mail from Dan
20    Killen, there was a little more under here, maybe
21    the time stamp.
22              I had to -- I had to rip it in half
23    because as it was handed to me minutes after Billy
24    left, somebody was, I believe, attacked in the canal
25    and she approached me.  Somehow -- I can't remember
```

www.DelVecchioReporting.com

148

1    the specifics -- a lot would go on or she was
2    approached by a male but I ripped this off to get
3    all her information that day.
4            But I got this the next day. So I want
5    to say I probably got this on a Tuesday.  And Bill
6    Abbott was handing this to me to assure me that he
7    took my complaint serious.  And I remember just
8    standing there being nervous just saying, oh, wow.
9    Now this kid is going to know that I complained and
10   it's probably going to get worse.
11       Q    Okay.  So this e-mail was handed to you
12   shortly after the incident we just discussed, the
13   Science --
14       A    Probably the next day.
15       Q    Okay.  Shortly after the incident in
16   Science Park?
17       A    Correct.
18       Q    Okay.  So what we do know is that when
19   you did finally make a complaint, it was addressed?
20       A    Yes.  It was addressed.
21       Q    Okay.  And this e-mail of March 1st,
22   2010, you believe supports the fact that it was
23   addressed?
24       A    I believe this line -- do you mind?
25       Q    Go ahead.

1    A    I believe when he says, "I have received
2  a couple of complaints in the last two weeks
3  complaining that officers are driving around and
4  making comments to other officers regarding being
5  exposed to the weather, this behavior must stop."
6    Q    Okay.  And it doesn't say anything about
7  being limited to female officers, it says officers
8  making comments to other officers.
9              Correct?
10   A    I was the only one that complained.  He
11 was just trying to let him know.
12   Q    Okay.
13   A    I -- I -- it's speculation.  It's -- this
14 is clearly speculation.  But I believe, to my
15 knowledge, I was the only one that made that
16 complaint.
17   Q    Okay.  But you are not aware of any other
18 person --
19   A    No.
20   Q    -- making or not making complaints?
21   A    No, I'm not.
22   Q    Okay.  So then -- so we have this
23 incident where you were wet and Pete called you a
24 rat bitch, you complained, and then Dan Killen
25 addressed it.
                    www.DelVecchioReporting.com

150

1               Correct?

2                    MR. MERLY:  I'm going to object.

3        A      That was about --

4                    MR. MERLY:  I'm going to object to

5               the form of the question.

6                    You can answer that.

7        A      That was two separate incidents.

8    BY MR. DUBIN:

9        Q      Okay.

10       A      That was him yelling out to me from the

11   car about being soaking wet on several occasions.

12   He did this on several occasions.  The incident in

13   25 Science where Damian was involved and he called

14   me an f-ing rat bitch, that was on a different

15   night.  But when he walked by he told me to try to

16   stay dry.

17       Q      Okay.  So that's why I'm trying to go in

18   chronological order here so that I understand it

19   because you told me about that incident and then

20   you told me about this e-mail.  So that incident

21   that we just discussed where he called you a fucking

22   rat bitch, did that happen before or after this

23   e-mail?

24       A      That happened, I believe, after the

25   e-mail.

154

1  separated themselves from 13 supervisors in my

2  department.

3      Q      When did that occur?

4      A      I believe in the spring, maybe in the

5  spring of 2009.  I believe so.  I believe it

6  was the -- I believe it was the spring of 2009, just

7  a couple months after I was there.  I had no idea

8  what was going on.

9              Alls I know is I left my other job and I

10  needed to work full-time, that was it.

11      Q      So you believe Billy Abbott was gone?

12              Billy Abbott was one of the people that

13  was let go?

14      A      Billy Abbott was one of the ones that

15  was -- I don't know exactly what Yale did with him.

16  They -- I don't know if it was fired or terminated.

17      Q      Okay.  What is the next event that you

18  can recall that you believe supports your claim for

19  sexual harassment in this case?

20      A      There were several more times of him

21  driving by so the e-mail literally meant it was a

22  joke to him.

23      Q      So he continued to drive by after the

24  e-mail was sent?

25      A      Yes.

155

```
 1        Q      Did you complain about those incidents?

 2        A      I told Richard Nucci that Pete was

 3   continually disrespectful to me.  We were standing

 4   in Science Park and he basically fluffed me off and

 5   didn't want to hear it.

 6               And then the next time I --

 7        Q      When was this?

 8        A      It was in -- he was first hired.  It was

 9   probably the first month that he was hired and I

10   thought that maybe --

11        Q      When?

12        A      I don't know.  The first month he was --

13   meaning Richard Nucci.

14        Q      You are telling me that --

15        A      He was --

16        Q      Let me just be clear.

17               You are telling me that even after this

18   e-mail of 2010, there were more instances where Pete

19   would drive by and yell at you?

20        A      Yes.

21        Q      And what would he say when he would yell

22   at you?

23        A      Pretty much always joking about me being

24   out in the weather, and me having to deal with the

25   neighborhood people, and just always some -- some
```

156

1    nonsense.   A lot of times you couldn't really make

2    out what he was saying.

3         Q     How many times did he drive by you after

4    this e-mail was written?

5         A     Probably two or three.

6         Q     In those two or three time he would talk

7    about the weather.

8               Correct?

9         A     Or whatever he was saying.   I really,

10   honestly, couldn't make it out but it would be

11   directed towards me.

12        Q     Okay.   Ms. Willoughby, what I need to

13   know is what you remember him saying.   Did he talk

14   to you about the weather or do you not know what he

15   said?

16        A     I don't know what he said those times.

17        Q     Okay.   So the two or three times he would

18   drive by and say something out the window, you have

19   no idea what he said?

20        A     No.

21        Q     I am correct?

22        A     Yes.

23        Q     Okay.   And you made a complaint?   It's

24   your testimony that you made a complaint about these

25   two or three times when Mr. Leonardo drove by after

157

1   this e-mail was written?

2        A     I attempted to speak to Richard Nucci.

3        Q     And who is Richard Nucci?

4        A     He was hired as a supervisor in our

5   department.

6        Q     And who did he replace?

7        A     They fired 13 people and hired five,

8   maybe.

9        Q     Okay.

10       A     So he replaced maybe a couple of the 13

11  people.

12       Q     What did you say to Mr. Nucci?

13       A     You know, I told him that my goal was to

14  obtain full-time status because I knew that in the

15  department you needed your supervisors to kind of,

16  maybe, help you.  I did talk about Pete Leonardo to

17  him and then knew I made a huge mistake because I

18  found out that they were riding around together and

19  that he was making statements, meaning Richard

20  Nucci, that Pete Leonardo was the backbone of the

21  department.

22            Quote/unquote, Pete Leonardo was the

23  backbone of the department.

24       Q     Okay.  So if you can just do your best

25  here and try to answer my question.
                    www.DelVecchioReporting.com

158

```
 1      A     Yes.  Sorry.

 2      Q     I want you to listen to my question --

 3      A     Okay.

 4      Q     -- and then I need you to answer my

 5  question.

 6      A     Okay.

 7      Q     I understand that you are frustrated with

 8  what happened to you at Yale.  Okay.  I understand

 9  that.  You have a tendency to want to, you know, put

10  as much as you can about your frustrations in your

11  answer.  We'll get to that and you're going to have

12  the opportunity to talk to me about that.

13            Okay?

14      A     Okay.

15      Q     But the question I asked you is:  What

16  did you talk to Mr. Nucci about when you made the

17  complaint?

18      A     I talked to him about Pete Leonardo and

19  the recent yelling out of the window.

20      Q     And based on your own testimony, you

21  didn't know what Leonardo was saying?

22      A     I told him prior that he had flipped me

23  off.

24      Q     Okay.

25      A     And that I had reported that to Lou
```

159

1    Paselli.  I told him prior that he talked about me

2    being out exposed to the inclement weather.

3         Q    Okay.  And we know that some attempt was

4    made to address concerns about him yelling out of

5    the window through this March e-mail?

6         A    Yes.

7         Q    Okay.  Since the March -- after the

8    March e-mail, there were two or three times where

9    Leonardo would drive by and you have no idea what he

10   said, and after that you maid a complaint to

11   Mr. Nucci.

12              Correct?

13        A    Yes.

14        Q    After that complaint to Mr. Nucci, you

15   were telling him about what occurred before that

16   e-mail.

17              Correct?

18        A    Yes.

19        Q    And did you also tell him that he had

20   driven by two or three times since but you don't

21   know what he said?

22        A    Yes.

23        Q    Did you want Mr. Nucci to do something

24   about this?

25        A    Yeah.

                    www.DelVecchioReporting.com

160

1      Q      What did you want him to do?

2      A      Maybe talk to him.  Maybe let him know

3  that it was inappropriate.

4      Q      What was inappropriate?

5      A      Him being a security officer in Yale

6  University uniform screaming out of windows to a

7  coworker.

8      Q      Did you tell Mr. Nucci that you felt that

9  you were being sexually harassed?

10     A      I don't know what -- I don't recall my

11  words at the time and I don't believe that I would

12  have said that at the time.

13     Q      What do you recall other than complaining

14  that he was yelling out the window?

15     A      I recall that right around the time when

16  I found out that they were buddies, I probably made

17  a mistake by telling him anything.

18     Q      Okay.  That wasn't the question.

19     A      I'm sorry.  One more time, please.

20     Q      What do you recall telling him?

21     A      I recall telling him that he was

22  inappropriate, that he had yelled out of windows to

23  me as of recent and prior.

24     Q      And the recent yellings, you couldn't

25  possibly have told Nucci what he said because you

1      didn't know?

2          A      No, I didn't.

3          Q      Okay.  And the prior comments, those had

4      to do with the weather?

5          A      Yes.

6          Q      Okay.  What next occurred?

7                 I guess the question I should ask is:

8      Chronologically, what incident do you next rely on

9      to support your claim of sexual harassment in this

10     case?

11         A      So I was stationed shortly, probably

12     within a week after meeting Nucci, in another

13     position and working third shift so I never saw

14     Leonardo.  Leonardo's hours were two to ten.  They

15     were always two to ten when I worked there.

16                I worked third shift.  I didn't see

17     Peter Leonardo for almost a year and everything was

18     great.

19         Q      So this was --

20         A      Everything was great.  I worked at the

21     Yale Health Plan third shift.

22         Q      When did that transition occur?

23         A      Probably in the spring of 2009.

24                And I stayed at the Yale Health Plan

25     third shift for approximately a year and never saw

162

```
 1    Leonardo and that was the best year that I had

 2    working there.

 3         Q     Were you transferred in response to any

 4    complaints that you made?

 5         A     Oh, no.

 6               Yale -- the building was done -- the

 7    Winchester building start -- they started moving the

 8    employees -- the employees that I was -- I was

 9    pretty much stationed in Science Park for a visual

10    for, like, a liaison between the neighborhood people

11    and the employees that weren't comfortable that they

12    were getting moved to a different area that they

13    felt was unsafe.

14               They no longer needed my services at -- I

15    was simply being moved because now the Yale Health

16    Plan was being built.

17         Q     Okay.  Keep going.

18         A     And they needed -- and needed -- they --

19    there was 24 hour -- 24 hour coverage and I was

20    given third shift.  And I didn't see Pete for almost

21    a year.

22         Q     Did you have any complaints within that

23    year?

24         A     No.

25         Q     There were no complaints whatsoever,
                      www.DelVecchioReporting.com
```

1    there's no incident that you are relying on to

2    support your claim of sexual harassment during that

3    period?

4         A    Did I make any complaints?

5         Q    Is there any incident that you are

6    relying on to support your claim of sexual

7    harassment --

8         A    No.

9         Q    -- for that year period?

10        A    No.

11             I used to hear that he talked about me

12   all the time, like, a lot but it didn't matter to

13   me as long as I wasn't dealing with him face to

14   face.

15        Q    What year period was this?

16        A    It was probably I got moved there in

17   2009, probably the spring of 2009.  I think that's

18   when they started construction of the hospital or

19   maybe sooner.

20        Q    Okay.

21        A    But that's when I was placed there.

22             When they started construction, the bear

23   bones, they didn't really have us there 24 hours,

24   it's when they started closing it in.

25        Q    So this is the spring of 2009 to the
                    www.DelVecchioReporting.com

164

1    spring of 2010?

2         A     I got full-time and that's when my job

3    changed again, and that's when every night I dealt

4    with Pete Leonardo.

5                In September of 2009 -- of 2010.  So for

6    a year, from 2009 to -- I went full-time status for

7    about a year I was at the hospital.

8         Q     Ms. Willoughby --

9         A     I'm sorry.  I'm bad with dates.

10        Q     Ms. Willoughby, listen, we are doing all

11   right so far.  We are going through your employment

12   at Yale which began in October 2008.

13        A     Uh-huh.

14        Q     We've just gotten to a point in time

15   where you told me that there was a year period where

16   you did not have a complaint.

17               Correct?

18        A     Yes.

19        Q     Everything was fine?

20        A     Yes.

21        Q     You do not believe that you were the

22   victim of any sexual harassment at Yale for that

23   year period.

24               Correct?

25        A     No.

1    Q    I am correct?

2    A    Yes.

3    Q    Okay.  What I want to know is that year

4  period started at what month and year and ended at

5  what month and year?

6    A    I don't recall the exact date that I was

7  placed on third shift at the Yale Health Plan.  I

8  know it's approximately a year.

9    Q    Okay.  That year ended with you becoming

10  a full-time employee?

11    A    Correct.

12    Q    Okay.  So well, that helps.

13         MR. DUBIN:  So let's mark this as an

14         exhibit.

15         (THEREUPON, DEFENDANT'S EXHIBIT NO.

16         3, LETTER OF FULL-TIME EMPLOYMENT

17         DATED SEPTEMBER 14, 2010, WAS MARKED

18         FOR IDENTIFICATION.)

19  BY MR. DUBIN:

20    Q    All right.  I'm marking Exhibit 3.  Do

21  you recognize that document?

22    A    Oh, yes.

23    Q    What is that document?

24    A    This is the letter of full-time

25  employment.

1     Q    Okay.   That's Exhibit 3.  And that -- so

2  and the date on that letter is September 14th?

3     A    Yes.

4     Q    Okay.   So you became a full-time employee

5  on or about September 14, 2010?

6     A    Yes.

7     Q    Okay.   Is it fair to say then that this

8  period of time where you did not experience any

9  harassment began in September of 2009?

10     A    Yes.

11     Q    Okay.   So for the period of time between

12  September of 2009 and September 2010, you have no

13  complaints whatsoever regarding your employment at

14  Yale?

15     A    I didn't have any complaints.

16     Q    Okay.

17     A    Oh, excuse me.

18     Q    Go ahead.

19     A    I -- I went to a bike class and I'm so

20  sorry because this is huge.   I went to a bike class

21  in the summer of 2009.   This is probably the worst

22  and the biggest -- biggest complaint I have.

23          I went to a bike class that Billy Abbott

24  helped me get in.   Two other people were scheduled

25  from my department to get in the class and one was

1    terminated, it was Francisco Ortiz's nephew.  And

2    when Peter Leonardo found out that I was going to

3    the class, he told Billy Abbott, If she's in it, I'm

4    in it.

5              And he was -- had the ability to take the

6    boy that was terminated's place.  I wanted the class

7    because I ultimately wanted to become a bike

8    officer, that was my goal.  When we went to the

9    class, Peter Leonardo was showing off in front of

10   several different police departments because this

11   was mostly police departments that had their people

12   there for the training.

13             The class was at Southern Connecticut

14   University -- yeah, Southern.  And I don't recall

15   the instructor's name at the moment.  But this is --

16   if -- this is huge.  I am in the class and,

17   apparently, one day my menstrual cycle had started.

18   I didn't know it until the end of the day.  My

19   clothing showed otherwise though.

20             So the next day when I went in, I

21   obviously was prepared with female protection.  And

22   it's clear to me that in the bag I had with my lunch

23   and all my personal items -- when I found out that

24   they were opened and exposed, when I went back into

25   my bag later on -- there was one point where I went

168

1     to the restroom and Pete Leonardo, it was clearly

2     his voice, yelled, Are you going to change your

3     tampon?

4              I didn't ask for a restroom break, it was

5     just the time allotted for the entire class to go

6     and have a break.  He yelled it in front of

7     Christino Ocevado (phonetic), who was in the class.

8     And if he needs to -- if this goes to trial, I

9     hope my lawyers call him because he witnessed it

10    and he yelled out, Are you going to change your

11    tampon?

12             When I got back, I was just clearly

13    embarrassed and stayed a distance away from

14    everybody.  At this point I didn't even know that he

15    had went into my bike bag, and I have to assume that

16    it was him.  So no, I don't have a crystal ball to

17    say for sure it was him.  But later on in the day,

18    when I went into my bag where all my personals were

19    that was attached to the bike, all the female

20    products were unwrapped.

21             But at which point, when I got back, he

22    was apparently sleeping with one of the supervisors

23    in the department named Beth.  Beth was a transit

24    dispatcher who was one of the 13 that lost her job.

25    He was bragging to all the guys in the department

169

1    how he was f-ing her but he -- he was telling

2    everybody.  He was very loud, very boisterous and I

3    was just blown away.

4           I clearly felt embarrassed prior that he

5    yelled out, Are you going to change your tampon?  I

6    know, due to my clothing the prior day and all the

7    strenuous work we were doing on the bikes, that I

8    was probably a mess but I couldn't determine that

9    my cycle was going to be happening.  I had no

10   idea.

11          And when he started after getting back

12   from the bathroom and already hearing him make

13   mention of my tampon, I was embarrassed.  I was

14   clearly embarrassed.  I stayed away from the group.

15   I kept my head down.  I already knew this kid was

16   not a good person and now he's talking about f-ing

17   his supervisor Beth.

18          Beth was a transit dispatch supervisor

19   that apparently was sleeping with him from what he

20   says.  And I -- I knew it was just clearly --- I

21   felt -- I felt -- I don't know but I felt that he

22   was doing this to make me uncomfortable.  I felt

23   this way.

24          And, sir, honestly, there were just so

25   many different things with him.

1    Q    Well, that's what we are here to talk

2    about.

3    A    These are the big things.

4    Q    No.  No.  No.  No.  No.  We are going to

5    talk about whatever it is that happened that you are

6    relying on to sue my client.

7         Do you understand?

8    A    Correct.

9    Q    So let's talk about this one and I want

10   to make sure we talk about all of them.

11   A    Sure.

12   Q    So what relevance does the fact that he

13   was sleeping with Beth have to do with this

14   incident?

15        I mean, I understand that you were

16   embarrassed when he talked about your menstrual

17   cycle.  I guess I don't understand how you

18   interpreted this comment about him sleeping with

19   Beth as any type of sexual harassment, unless I

20   missed something so explain that to me?

21   A    So most men, in my experience, that have

22   any kind of respect for a woman, probably save those

23   discussions to talk about with the boys.

24   Q    But he was having that discussion with

25   other men?

171

```
 1      A     It was all men.  I was the only female in
 2   the class.
 3      Q     Okay.  And this was a class that you got
 4   into because your supervisor helped you get into
 5   it?
 6      A     Billy Abbott did help me get into the
 7   class, yes.
 8      Q     So this is a class of all men?
 9      A     Yes.
10      Q     And your supervisor at Yale assisted you
11   in getting into this class?
12      A     Yeah.  Oh, Billy was good to me.
13      Q     Okay.  And this class of all men other
14   than you, you said that you were embarrassed so you
15   walked away from --
16      A     I walked and sat under a tree.  It was
17   summertime.
18      Q     All right.
19      A     I don't recall the exact month.  I sat
20   under a tree because we all had -- that was our time
21   for lunch or a restroom break.
22      Q     Okay.  And while that was happening,
23   Peter was talking to other men about how he was
24   having some type of intimate relationship with his
25   supervisor?
```

1    A    Yeah.  He -- he probably should have kept

2  his voice down.

3    Q    But you were not involved in that

4  conversation?

5    A    No.

6    Q    Okay.  Now, were you being paid for this

7  class?

8    A    Oh, yes.

9    Q    Okay.  Who from Yale was at the class?

10    A    Ocevado.  Christina Resto Ocevado

11  (phonetic), he has the two last names.

12    Q    What's the first name?

13    A    Christino, Chris.  Probably go by Chris

14  if that's better.

15    Q    Okay.  Ocevado?

16    A    Resto.

17    Q    Okay.

18    A    Ocevado.  He's --

19    Q    When is the last time you talked to Chris

20  Resto Ocevado?

21    A    When I got fired he sent me a real nice

22  text and said if I ever needed anything to call him,

23  but I never did.

24    Q    And let me ask you this:  Were there any

25  supervisors at this class?

173

1      A      The Southern -- not our supervisors.

2      Q      That's what I want to know.

3      A      Only -- only -- only Yale people.

4      Q      Okay.  Did you --

5      A      Three Yale people, including myself.

6      Q      Did you report what occurred about your

7   menstrual cycle -- I'll just call it the menstrual

8   cycle issue -- did you report that to anyone at

9   Yale?

10     A      The only time I ever reported that was to

11  Richard Nucci and Kristen Albez (phonetic).  And

12  they both told me, because they were new, that I

13  couldn't report anything old.

14     Q      Okay.  When did you report this to Nucci

15  and Albez?

16     A      When I went to Kristen Albez when I was

17  on my 90-day probation for full-time status.

18     Q      Okay.  So this class was in the summer --

19     A      It was in the summer.

20     Q      -- of 2009?

21     A      Yes.

22     Q      Okay.  And you chose to wait a year and a

23  half to make that report?

24     A      Oh, I'm sorry.  I think it was 2010.  It

25  was 2010.

                  www.DelVecchioReporting.com

178

1    embarrassed you by making reference to your

2    menstrual cycle?

3        A    Yes.

4        Q    We can agree that you did not make any

5    complaint about that until some time after September

6    of 2010?

7        A    Actually, I did discuss it with Billy

8    Abbott and he explained to me that since nothing was

9    happening that I was better off trying to keep my

10    mouth shut prior to going full-time.

11        Q    What do you mean, "nothing was

12    happening"?

13        A    Well, he even felt like this fell on deaf

14    ears because --

15        Q    Ms. Willoughby --

16        A    Okay.

17        Q    -- I want to focus you on this incident

18    now.

19        A    Okay.

20        Q    What do you mean, "nothing was

21    happening"?

22            You said you talked with Billy Abbott

23    about this incident and Billy Abbott told you, since

24    nothing was happening keep your mouth shut.

25            What does that mean?
                www.DelVecchioReporting.com

182

1      Q      Okay.  Again, I wasn't asking that.

2             Mr. Killen was the appropriate person to

3   report it to?

4      A      Yes.  He would be the next in the chain

5   of command.

6      Q      Okay.  And you knew that at the time?

7      A      Oh, yes.

8      Q      So this bike class ends and now you

9   believe that it was in 2009 not 2010?

10     A      I think it was in the summer of 2009.

11     Q      Okay.  And you believe that because there

12  was a year period where you were essentially

13  harassment free?

14     A      Yes.

15     Q      Okay.  And that took us up to September

16  of 2010, when you began working full-time?

17     A      Yes.

18     Q      Okay.  And it was after that when you

19  made a complaint to Richard Nucci about the incident

20  in the bike class some 18 months earlier?

21     A      Yes.

22     Q      Okay.  Mr. Nucci, was he a supervisor?

23     A      Oh, yes.

24     Q      And was he on the same level as

25  Mr. Killen?
                    www.DelVecchioReporting.com

183

1     A     No.

2     Q     Below Mr. Killen?

3     A     Yes.

4     Q     And Ms. Albez, you said?

5     A     Kristen Albez.

6     Q     And was she a supervisor?

7     A     HR specialist.

8     Q     And did you make a complaint to Kristen

9   Albez, the HR specialist, about this incident that

10  occurred some 18 months earlier?

11    A     No.  I made a -- I complained to her the

12  last three months I was there.  I sat down with her

13  two separate times.

14    Q     Okay.  Now, I what I want to do is I'm

15  going to treat everything that happens after the

16  September 2010 incident kind of separately.  What I

17  want to know is have we discussed in your mind all

18  examples of sexual harassment between the date you

19  were hired as a casual employee up until the date

20  you were hired as a full-time employee on

21  September 14, 2010?

22    A     What we've discussed so far is what I can

23  recall right now, yes.

24    Q     Okay.  All right.  And how long have you

25  known that your deposition was going to be taken

187

1   sexual harassment that support your claim from

2   September of 2010 up until the date of your

3   termination?

4         A     A lot of it, when I first got hired as a

5   full-timer, was the he said/she said.  Different

6   officers were coming up to me and saying that Peter

7   Leonardo was really upset that his friend, Brandon

8   McCormick, that was a dispatcher didn't get

9   full-time and they hired me.

10        He couldn't understand, thinking Brandon

11  was a better candidate.  At which point he said to a

12  kid named Richard Mongillo in front of a group of

13  Yale police officers, I believe there may have been

14  some New Haven police officers; Richard Mongillo,

15  Pete Leonardo, there were several men there.

16        He started saying to Richard Mongillo, he

17  goes, What's going up with you -- going on with you

18  and Melita?  And just all this sort of stuff.  He

19  goes, Common, common.

20        Acting as if there was something sexual

21  going on.  He heard that we were taking motorcycle

22  rides, you know, out of state and that sort of

23  thing.

24        Q     Peter Leonardo said to Richard Mongillo

25  in front of other officers, What is going on between

188

1   you and Melita?

2        A      Right.

3        Q      And "you," being Melita?

4        A      Right.

5        Q      Because you were taking motorcycle rides

6   out of state?

7        A      And at which point, you know, Richard

8   already knew that him and I just weren't friendly

9   with each other.   Richard knew that I avoided Pete

10  and Pete made it known to everybody that he used the

11  word to everybody, he hated me; called me a

12  loud-mouthed bitch, called me a fucking bitch, and

13  again, called me a fucking rat bitch within earshot.

14  So it was pretty clear that Peter Leonardo didn't

15  like me.

16              He asked him if he was riding dirty with

17  me.   In my opinion, in front of all these men, he

18  was trying to insinuate if we were having any type

19  of, like, sexual contact or affair.   And Rich

20  Mongillo told me that he tried to stop the

21  discussion and he just continued with asking him

22  questions about me, like what goes on with these

23  rides?

24              And when I spoke with Rich, I said what

25  you need to tell him is that my husband is on all of

189

```
 1   these rides, that's he's always there.

 2              And he goes, Well, you know, don't say

 3   anything.  He goes, you know, he's buddies with the

 4   bosses.

 5              I said, I get all that.  But I said out

 6   of respect for me, please tell him that my husband

 7   is on all these rides.

 8              There was pure recreation.  People that

 9   rode motorcycles, they are going nice places, nice

10   restaurants on the weekend.

11        Q    Okay.  What next?

12              By the way, you said Peter thought

13   Brandon was a better candidate than you?

14        A    Yes.

15              He was telling several employees that --

16        Q    That's what I want to know, who was he

17   telling?  Who were the employees?

18        A    He told Rich Mongillo.

19        Q    Who else?

20        A    He was standing in front of a room full

21   of transit dispatchers because Brandon McCormick was

22   a transit dispatcher at the time and he was in the

23   room just shooting his mouth off while I was out on

24   the street working in one of the security vehicles

25   just doing my transports.  He was shooting his mouth
```
                    www.DelVecchioReporting.com

190

1    off that night that basically I wasn't -- I

2    shouldn't have gotten full-time status.

3            When Rich told me, I remember saying,

4    Please, I really don't want to hear this because

5    it's more aggravating than anything knowing that

6    he's standing in a room full of people speaking

7    derogatorily about me.

8            Brandon was in the room at the time I

9    heard.

10    Q    Well, did you ever complain to your

11    supervisors about this?

12    A    When I spoke to Paul Gallipoli and

13    Pete -- Rich Nucci the next time, I was telling them

14    about what was going on with Manny.  I was not

15    trying to run to them with every little thing.  They

16    really didn't care about that.

17    Q    Ms. Willoughby, if you can you answer my

18    question --

19    A    No, I didn't.

20    Q    Okay.  So we can agree --

21    A    Not at that time.

22    Q    So this interaction that you were having

23    with Peter Leonardo where he was telling people

24    that he thought Brandon was a better candidate, and

25    you never reported that incident to your

191

1   supervisors.

2           Correct?

3       A   No, I didn't.

4       Q   Okay.  And this incident where Peter

5   Leonardo was asking Richard Mongillo what was going

6   on in these bike rides, you never reported that to

7   your supervisors.

8           Correct?

9       A   Those two things got reported to Kristen

10  Albez when, at the very end, prior to getting

11  terminated, when I went to her at the very end and I

12  believe that's what led up to my termination.

13      Q   Okay.

14      A   So I didn't --

15      Q   When they occurred you didn't report

16  them?

17      A   No, I did not.

18      Q   Okay.  What occurred next that you

19  believe supports your claim for sexual harassment?

20      A   So on a regular basis when I would go in

21  to pull a key, anybody that had the ability to --

22      Q   Paul Key?

23      A   Pull.

24      Q   Pull a key?

25      A   Pull a key.

1   dorm in, he would get on the radio and lie and say

2   that he was busy doing something rather than doing

3   his job.  And then somebody like me would get called

4   to do it.

5         Q     Okay.

6         A     Any time I got on the radio --

7         Q     Well, let's stick with that.

8         A     Okay.

9         Q     So how do you know he wasn't busy?

10        A     Other security officers would know that

11  he was sitting in transportation.

12        Q     Who?

13        A     Several.

14        Q     Who?

15        A     Richard Mongillo would be talking about

16  it, a couple of the different security personnel --

17  excuse me -- the transit dispatchers.  There was a

18  woman named -- I'm sorry, I can't recall her name.

19  There -- I don't recall a lot of their names.  I

20  haven't been there for more than four years.

21               They were clearly upset that he'd be

22  sitting in their area just shooting his mouth off

23  about everybody and everything and they would verify

24  that he was doing nothing or they would say that he

25  would sit in the TV room next door just watching a

194

1    football game or whatever the case.

2         Q    How many times did that happen?

3         A    Regularly.

4         Q    Did you report that to your supervisors?

5         A    When I finally started telling them in

6    the last couple months in November and December

7    what was going on, pretty much the first couple

8    weeks I kept my mouth shut.  In October when hired

9    for a full-time status just wanting to keep clear of

10   him.

11        Q    So you didn't report it when it occurred?

12        A    Not the exact night.

13        Q    Okay.  You waited until the last either

14   November or December before your termination?

15        A    I believe so.

16        Q    Or you were terminated December 6?

17        A    Yes.

18        Q    So it was roughly the last month before

19   your termination you reported it?

20        A    Yes.

21        Q    Okay.  And how was this sexual

22   harassment?

23        A    In front of people he regularly referred

24   to me as a loud mouthed bitch.  That's usually a

25   derogatory word for a woman.

195

```
 1     Q     In front of you?

 2     A     No.  In front of other people.

 3     Q     Other people told you this?

 4     A     Oh, yes.

 5     Q     Who?

 6     A     Richard Nucci.

 7           Excuse me.  Richard Mongillo.  My

 8  apology.  Richard Nucci was the boss.

 9           Richard Mongillo.

10     Q     Okay.  Who else?

11     A     I'm trying to recall.

12           At this time I can't recall the name.

13     Q     So the only person that you are aware of

14  today that told you that Peter was calling you a

15  loud-mouthed bitch was Richard Mongillo?

16     A     Yes.

17     Q     And this was in the period of time

18  between September 14, 2010 and your termination?

19     A     Yes.

20     Q     And you did not report this to your

21  supervisors?

22     A     Not at that time.

23           MR. DUBIN:  Why don't we take a

24           short break.  It's about 3:15.

25           Is that okay?
```

www.DelVecchioReporting.com

199

1    instances, some are really horrible sexual
2    harassment and this is just part of his maybe hatred
3    towards me.
4         Q    Okay.  So what is the next --
5         A    Or maybe even towards women.
6         Q    You don't know?
7         A    I won't know.
8         Q    Okay.
9         A    Maybe we'll never know.
10        Q    Okay.  What is the next incident that you
11   have to support your claim?
12        A    I had to be on the radio several times.
13   Whether I was working in the car or on foot, any
14   time I got on the radio he pressed the squelch
15   button to completely disrupt my transmission.  He
16   laughed about it.
17             He'd make voices on the radio and I felt
18   it was directed toward me.  I went to Paul
19   Gallipoli.  I also spoke to Richard Nucci.  I asked
20   them to listen to the radio transmissions, whether
21   it was involving him or Manny Rodriguez to hear all
22   of the, just craziness going on in this department,
23   which so many other people had the ability to hear.
24   I just felt they would feel like it would be worth
25   listening to.  I felt it would validate everything

200

1    that I said to them.

2         Q    And did they listen to them?

3         A    They claimed when we were at the CHRO

4    that there were no radio transmissions to listen to

5    and the person that was doing the cross-examination,

6    that was pretty interesting because she -- she knew

7    and believed in such a big department that there

8    was -- that they had the ability to do this but they

9    claimed that they didn't have the ability to do

10   this.

11        Q    Ms. Willoughby, if you can listen to my

12   question.  You are telling me that Peter Leonardo

13   was on the radio and every time that you went on the

14   radio he would press button to squelch your voice

15   and then he would laugh at you on the radio.

16             Is that correct?

17        A    Yes.

18        Q    Okay.  And you complained about this to

19   Paul Gallipoli and Richard Nucci?

20        A    Yes.

21        Q    At the time it happened or again, right

22   before you were terminated?

23        A    Oh, one night that it happened a month or

24   so before.  An easy month or so, probably in the

25   beginning of November, I asked them to please start

```
 1                    THE WITNESS:  I'm sorry.

 2                    MR. MERLY:  All right.

 3    BY MR. DUBIN:

 4         Q     You don't know for sure whether they

 5    listened to any radio transmissions?

 6         A     No.  But if they -- I asked them to.

 7         Q     Okay.

 8         A     I did ask them to.

 9         Q     But you don't know whether they listened

10    to them?

11         A     I don't know.

12                    MR. DUBIN:  Can you mark that as an

13                    exhibit.

14                    (THEREUPON, DEFENDANT'S EXHIBIT NO.

15                    5, COMPLAINT, WAS MARKED FOR

16                    IDENTIFICATION.)

17    BY MR. DUBIN:

18         Q     Can you read paragraph 13 out loud,

19    please?

20         A     "The plaintiff" --

21                    MR. MERLY:  So the record is clear,

22                    you are reading from Defendant's Exhibit

23                    5, which is the complaint in this

24                    lawsuit.

25         A     I'm sorry.  Just give me one moment.
```

www.DelVecchioReporting.com

207

1    may not be true.

2              Is that fair to say?

3        A    If I asked him to listen to them and he

4    claimed he listened to them, I don't know for sure

5    that he did.  I wasn't there when he listened to

6    them.  I would have liked to be present.

7        Q    Okay.  Do you have any other evidence of

8    discrimination or sexual harassment that you'd like

9    to discuss with me today that you haven't already

10   discussed?

11       A    When I was sitting in a roomful of

12   officers for a roll call, Peter Leonardo walked in

13   and was clearly upset with me.  Let me -- let me,

14   please, go backwards.

15            One day before work while I was on my --

16   in my probationary status, it was October of 2010,

17   it was a really warm day.  A girlfriend and I

18   decided to go for a ride.

19            We went for a ride.  We were coming back

20   on Whitney Avenue in Hamden.  I believe we turned

21   right on Temple Street.  As we approached the light,

22   I want to say it was Temple and Grove -- Grove

23   and -- I'm trying to remember the names of the

24   streets but maybe Temple and Grove.

25            We get to a light.  A security car pulls
                    www.DelVecchioReporting.com

208

1   over to the right of us as we are sitting at the

2   light both on separate motorcycles.  I had to be to

3   work for six o'clock, 6 p.m.  It may have been maybe

4   three, three o'clock.

5          We are at the light.  I see a security

6   car.  Pete Leonardo jumps out.  I was going to nod

7   my head and smile, just trying to keep the peace.

8   He walks by the bikes, really hostile, really scary,

9   giving me this look where he doesn't stop looking at

10  me in kind of like a hostile manner.

11         The woman I worked with and I had just

12  finished eating lunch.  We never discussed the

13  university because I really don't like discussing

14  work and I didn't want to just down myself because I

15  knew I was going through a lot of bad stuff at

16  work, never mentioning work anything going on

17  there.  She was taken by that whole thing because

18  she knows I work for the university as a security

19  officer but was confused why he came by us in that

20  manner and walked around the bike when he didn't

21  need to.

22         He should have walked in front of his

23  car.  He literally walked around the bikes.

24     Q     Were you working at the time?

25     A     I wasn't at work.  I was going to go home
                www.DelVecchioReporting.com

1    and get prepared for work.  I was going to go home

2    and prepare for work.  I didn't need to be to work

3    until about six o'clock.

4          Q     So the answer to my question is, No, you

5    weren't working at the time?

6          A     I was employed at the university.

7          Q     You hadn't punched in?  You weren't being

8    paid?

9          A     No.

10         Q     This was on your personal time?

11         A     No.  I was on my personal time.

12         Q     Was Peter working?

13         A     Yes.

14         Q     And you were stopped at a light, you were

15   on a bike?

16         A     We were both on bikes.

17         Q     Were you on separate bikes or the same

18   bike?

19         A     Separate bikes.

20         Q     And Peter got out of a car and walked

21   around the bike?

22         A     Really kind of weird, hostile.

23               She first looked at me as he's away from

24   the car and she goes, Do you know him?

25               I nodded.

210

```
 1              You know, one of the questions was, Don't

 2     you work for the university?  I think that was

 3     first.

 4              I nodded, Yeah.

 5              She goes, Do you know him?

 6              I nodded, Yeah.

 7              And before the light changed she was,

 8     like, What was up with that?

 9              I said, Oh, long story.

10              And we left.

11     Q     Did you report that to your supervisor?

12     A     Later on, yes.

13     Q     When you say "later on," that day?

14     A     Probably yeah because --

15     Q     Probably or definitely?

16     A     Yes.

17     Q     Okay.

18     A     Because --

19     Q     To whom?

20     A     To Richard Nucci.

21     Q     Okay.

22     A     So yes.

23     Q     When was this?

24     A     I don't recall the exact date.

25              But the next night in work, Peter
```

www.DelVecchioReporting.com

1    Leonardo -- but would you like me to finish with

2    what the woman said to me?

3        Q    You can.  Go ahead.

4        A    She was a little concerned about just the

5    behavior.  Again, she didn't know anything was going

6    on at work and she didn't understand why he was just

7    so scary looking.  This kid is about six-two.

8             And she later on asked, you know, what's

9    going on with that, when she asked me if I knew

10   him.

11            And I said, Oh, long story.  This is

12   something that's been going on.  I said, you know

13   what, it's not really even worth getting into but I

14   think her -- her concern was he's in uniform and

15   acting kind of belligerent, if you will.  In my

16   opinion, that was the way he was acting.  At which

17   point I --

18       Q    We can agree he didn't say anything to

19   you whatsoever?

20       A    He didn't say anything at all.

21       Q    Okay.  Go ahead.

22       A    He said nothing.

23       Q    Okay.

24       A    But it was alarming to her.  And I would

25   have never said anything.  She couldn't see my eyes

1    our houses.  And at each light there wasn't really a

2    lot of time to, like, get into that.  I told her,

3    just another time.

4         At which point I went to work, I believe,

5    the next night or couple nights because I already

6    had time to see Nucci.  I could only see Nucci

7    before ten in the evening.  His hours were, like,

8    two to ten, the same as Pete's.  And at which point,

9    I told him whole story.

10         He kind of laughed it off.  So he said,

11   Oh, he didn't say anything to you?

12         And I looked at him and I said I don't --

13   I think you are missing the point.  For a stranger

14   to the university to sense such hostility.  She

15   goes, it was scary, like, you don't know if he's

16   going to come push you off the bike.  Like, the

17   woman was scared.  She was clearly scared.  At which

18   point I turned around and this was just our

19   conversation but she was alarmed.

20         And at -- and I'm telling him this story

21   and he is like, Oh, well, he didn't say anything to

22   you.

23         I said, At the very least, maybe he

24   should have said hello rather than acting scary to

25   us.

214

1     Q     Okay.  All right.

2     A     So --

3     Q     Okay.

4     A     And at this point --

5     Q     When was this?

6     A     This probably was in October or

7  September.  Probably -- I don't think I would have

8  ridden in November.  Usually I put the bike down for

9  the year every October.

10    Q     All right.  Any other instances of sexual

11 harassment that you can recall?

12    A     So after telling Nucci this story, he

13 apparently went back to Pete.  And Pete made it a

14 point to come into roll call one night when he

15 already had roll call prior that day.  And he came

16 in and from behind me in a really loud voice,

17 crackled voice, he was like, Hi, Melita.  And it was

18 just really long and drawn out.  So I just kind of

19 put my head down.

20    Q     He said hi to you?

21    A     Yes.

22    Q     Okay.

23    A     So I just put my head down and I just

24 didn't say anything and he started taunting me.

25    Q     Taunting you how?

1      A     Wanting to know why I wasn't saying hi

2  back.

3          And I looked up at him and I said, Pete,

4  would you just please be consistent.

5          Richard Nucci was acting at the head of

6  the table like he didn't hear or see any of this, he

7  just kept thumbing through his papers.  So as

8  Richard Nucci sat to the head of the table and Pete

9  and I were across from each other, I already had a

10  feeling that Richard Nucci had approached him about

11  what I said to him concerning me and my girlfriend

12  and him being in a vehicle stopping on Grove and

13  Temple.

14      Q     Okay.

15      A     And going to the building to the right,

16  which -- but long story short, he turned around and

17  he said, I'm saying hi to you, and that sort of

18  thing.

19          And I'm looking at him and I said, Could

20  you just please be consistent.  Everybody in the

21  room laughed at him, just laughed at him.

22      Q     Okay.  So you believe that this incident

23  occurred at some time in October of 2010.  It did

24  not occur while you were at work?

25      A     No.

1      Q      And you reported it to Mr. Nucci.

2             Correct?

3      A      Yes.

4      Q      And Mr. Nucci talked to Pete about it.

5             Correct?

6      A      I believe he did talk to him.

7      Q      You believe he did.

8             And in response to that, you believe at

9   roll call, Peter walked in and said hello to you?

10      A      After that, he turned around and said --

11   when I said, Could you just please just be

12   consistent, he turned around and said, after

13   everybody laughed at him, I like inconsistency --

14   well, I like inconsistency.

15             And I said nothing further.  Well, at

16   which point, when finally I get Yale's response,

17   Richard Nucci clearly lies.  There were a room full

18   of people, about a dozen people, and says that Pete

19   tried to be nice to me and say hello but that I said

20   I like inconsistency.

21             Well, that doesn't even make sense.  And

22   there were a room full of people that witnessed me

23   say, Would you please be consistent.

24             When Nucci tried to discuss that with me,

25   because I said to him, I wish I never complained to

217

1    you, the next time Nucci and I were together, I

2    said, I wish I never complained because Pete made a

3    joke out of it and you sat there when that was

4    probably the prime time to remove us both from the

5    room or wait until roll call.

6              And so Nucci didn't like me telling him

7    how to do his job.  And that was the night that

8    the remark about a good old boys' club was made.

9    It was never made about Dan Killen or Francisco

10   Ortiz.

11        Q    Okay.

12        A    And I never said a good old boys' club.

13   I accused him of running a boys' club for this

14   reason, because he sat in the room as I was

15   humiliated.

16        Q    And I want to go back to the bike

17   incident just for a second.  You said you told --

18   that menstrual cycle incident.

19              You said you told Billy Abbott but Billy

20   did not tell Dan Killen?

21        A    I don't know if Billy did or not.  I

22   believe that they were having problems at the time

23   and I believe that he may not have told him.  He may

24   have told him.

25        Q    You don't know?
                   www.DelVecchioReporting.com

218

```
 1        A     I don't recall.

 2        Q     All right.  I'm just going to hand you

 3   your complaint again.

 4              In paragraph 14 of your complaint in

 5   reference to the tampon incident, it says, "She

 6   complained about these matters to her then

 7   supervisor, Billy Abbott, who alerted assistant

 8   director, Daniel Killen."

 9              Why in your complaint did you tell me

10   that Billy Abbott did tell Dan Killen but today you

11   are telling me you don't know whether that

12   occurred?

13        A     I'm sorry.  I'm trying to recall

14   everything as best as possible and I will say I

15   don't recall.

16        Q     Okay.

17        A     But now, even -- there are facts, things

18   that have happened that was hard for me -- I work

19   third shift.  I'm usually tired and I'm honestly

20   trying to keep up with all of this.  And I will get

21   better rest and I will take a couple more days off

22   if in fact this goes trial because I'm really

23   trying.

24        Q     Well, let me say something here.  I

25   mean --
```

www.DelVecchioReporting.com

219

```
 1      A      I mean, this was --

 2      Q      Go ahead.  This was what?

 3      A      Go ahead.

 4      Q      I mean, you understand the importance of

 5  the oath you took this morning?

 6      A      I do.

 7      Q      Okay.  You swore to tell the truth?

 8      A      I am telling you the truth.

 9      Q      Okay.  And I asked you in great detail

10  about why you didn't report this tampon incident to

11  Dan Killen.  And we agreed that Dan Killen couldn't

12  possibly do anything if he didn't know about it and

13  you said yes.

14      A      Okay.

15      Q      And you said you waited 18 months to make

16  a report of this to Mr. Nucci.

17             Correct?

18      A      When --

19      Q      Is that you told me?

20      A      Yes.

21      Q      Okay.  But --

22      A      When.

23      Q      -- in the complaint that's not what it

24  says.  The complaint says that you were aware that

25  you told Billy Abbott who told Mr. Killen?
```

220

```
 1      A      Yes.

 2      Q      So this is the story that you told at the

 3  beginning of this lawsuit that was filed on May 5,

 4  2014.  But here we are almost a year later and

 5  it's -- you are telling me something different so I

 6  don't understand that.

 7      A      The only response I can give you is so

 8  much happened and with all the people coming

 9  together, I guarantee you somebody will get -- and I

10  believe it's going to happen when a Richard Nucci

11  has to come face to face -- when we were all at the

12  CHRO, there were so many contradictions on his part,

13  on Paul Gallipoli's part, on Kristen Albez' part,

14  including Dan Killen's part.

15             So much had happened with this kid.  And

16  you asked me if I think about this at work.  No, I

17  try to put this out of my head.  I'm just happy that

18  where I work I don't deal with any of this.  I'm

19  happy for all the other jobs that I haven't dealt

20  with any of this.

21             But, sir, I have told you the truth and

22  I'll continue to tell the truth.  And I feel like

23  that's the only thing I have on my side.  I'm

24  wondering if the incident happened around the time

25  of the memo.  I'd have to look at the dates and try
```

221

1    to figure it out.

2              I do know that Billy told me when he had

3    approached him a few times that they were having

4    problems themselves, that I do know.

5         Q    So Ms. Willoughby, I'm not concerned

6    about what your perception is of confusion that

7    other people who testified at the CHRO hearing had.

8    I'm primarily concerned with inconsistencies between

9    what you have alleged in the complaint and what you

10   are testifying here today, that's my concern.

11   Because Yale takes these allegations very seriously

12   and you've said certain things in your complaint and

13   you are saying different things today under oath.

14             Now, you are telling me that you have

15   tried to forget about these things, that you are

16   working third shift and you are not getting much

17   sleep.  Am I to believe that you are not prepared to

18   testify today?

19        A    I took the night off to sleep.  And

20   honestly, since I've been working third shift I'm

21   not -- I'm not myself.

22        Q    Okay.  Well, tell me what you want to do

23   because what I need to know is that when you testify

24   it's truthful.  And I need to know --

25        A    It is truthful.
                    www.DelVecchioReporting.com

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - -X
MELITA WILLOUGHBY,                :
                Plaintiff         :
                                  :
VS                                :
                                  :
YALE UNIVERSITY,                  :
                Defendant         :
- - - - - - - - - - - - - - - -X




Continued deposition of MELITA WILLOUGHBY
taken at the offices of John R. Williams &
Associates, 51 Elm Street, Suite 409, New
Haven, Connecticut, before Audra Quinn, RPR,
Licensed Shorthand Reporter #106, and Notary
Public, in and for the State of Connecticut
on May 20, 2015, at 10:10 a.m.





DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE, MADISON CT 06443
(203)245-9583     (800)839-6867
FAX (203)245-2760

HARTFORD       NEW HAVEN       STAMFORD

1          MS. WILLOUGHBY:  This was not provided

2      to the CHRO, and I got that at a later date.

3          MR. DUBIN:  Let's mark that as an

4      exhibit.

5          (THEREUPON, DEFENDANT'S EXHIBIT C,

6             EMAIL DATED 6/17/10,

7          WAS MARKED FOR IDENTIFICATION.)

8  BY MR. DUBIN:

9      Q    What is this document you claim was not

10  provided to the CHRO?

11      A    So when the CHRO originally asked for any

12  type of discipline to all security officers, this is an

13  email from Richard Nucci to Daniel Killen and Francisco

14  Ortiz that Peter Leonardo was giving him a lot of

15  trouble trying to just take time off when he felt like

16  it, walk into the office on the day of and ask for

17  personal leave.  When he didn't get his way, he would

18  get upset, and he would try to get other people to

19  lobby for him because he would want to go to, say, a

20  gun show.

21      Q    So this appears to be -- it's a June 17,

22  2010, email regarding Peter Leonardo's counseling?

23      A    Correct.

24      Q    And it appears from this -- well, do you read

25  this to mean that Peter Leonardo was being disciplined?

1      A     The way I take the email is that they were

2  just talking about what do we do with this employee.   I

3  don't believe he was disciplined because he took time

4  off when he felt like it.   The person that lobbied for

5  him is the president of the union and his friend and

6  his partner within their gun business.   They have a

7  business together.

8           Additionally, I feel as if Richard Nucci

9  couldn't tell him you can't have the time off, and then

10  when Judy told him he couldn't have the time off, who

11  was another supervisor, he went behind her back, and

12  this is Richard complaining that he went behind Judy's

13  back and still tried to get the time off.   Pretty much

14  he -- the way I take the email is what do we do with

15  this employee.   I don't think that was discipline.

16      Q     The email says, "I also told him that if he

17  books off, he will have a disciplinary problem.   A few

18  days ago he stated I may have to book off sick since

19  Judy denied him the same.   I was very clear that I did

20  not want to hear this from him again, whether next week

21  or in the future, and he has had to be on site by 4:00

22  on Wednesday, and I may keep him until 12 a.m. if I

23  need to cover something elsewhere."

24           So this appears to be a dispute between

25  Mr. Leonardo and Mr. Nucci, does it not, about taking

1   time off?

2        A     It does.

3        Q     And Mr. Nucci is a male; correct?

4        A     He is.

5        Q     So Mr. Leonardo was having difficulty with

6   other people, not just you.  Isn't that correct?

7        A     Mr. Leonardo had problems with several

8   people.

9        Q     Males as well as females; correct?

10       A     Males as well.

11       Q     It seems like Mr. Leonardo had somewhat of a

12  personality issue.  Isn't that correct?

13       A     You could say that I guess.

14       Q     Now, the document that you have brought with

15  you to the deposition in support of your contention

16  that Yale University did not provide certain documents

17  to the CHRO, can you tell me who that document was

18  cc'ed to, when it was sent to you?

19       A     This document?

20       Q     Yes.

21       A     Suzanne Westhaver.

22       Q     Who is Suzanne Westhaver?

23       A     She is the CHRO -- she was the hearings

24  officer, but this came more than probably six months,

25  closer to a year after she requested everything in the

1      A      No.  You're the first person that asked me to

2   provide them the last time I was here.  That's why I

3   brought them.  They never asked me for those.

4                (THEREUPON, DEFENDANT'S EXHIBIT D,

5                        PHOTOGRAPH,

6                WAS MARKED FOR IDENTIFICATION.)

7   BY MR. DUBIN:

8      Q      Showing you what's marked as Exhibit D.  Can

9   you identify that document?

10      A      It's a picture I provided of an MDT screen

11   that I attempted to show to Paul Gallipoli, possibly

12   Richard Nucci, telling them that the person that was

13   directly -- the dispatcher, Manuel, Manny Rivera,

14   wasn't giving me any restroom relief breaks, my

15   lunches, was giving me continuous rides, but also

16   sending me to the wrong addresses.  Some of them have

17   addresses in there, and they said that he accidentally

18   inverted the addresses, but I think he was purposely

19   trying to make me fail at my new position.  I was on

20   probation --

21      Q      Ms. Willoughby, what does this picture show?

22      A      It shows an MDT.  It shows times.  It shows

23   79 House Street, but these times would have meant

24   something at the time.  Right now I can't tell you

25   specifically what I was showing Paul Gallipoli, but

1      Q    Are there any incidents that you can recall

2 that you did not discuss with me that support your

3 claim of sexual harassment and gender discrimination

4 that occurred before you were made a full-time employee

5 in September of 2010?

6      A    I do recall -- I remember that one thing I

7 forgot to tell you, on a regular basis Peter would tell

8 the different employees, mostly male employees, to feed

9 me cheese because I was a rat. So aside from calling

10 me an F'ing rat bitch to Damien who worked for SSC

11 while I was in a foyer and was able to hear him through

12 this glass as he stood there and spoke to another

13 person about me. He would, yes, tell people regularly

14 to feed me cheese.

15          There were quite a few things that I may have

16 forgotten. Is this the question you're asking me, sir?

17      Q    I want what I'm trying to figure out is every

18 incident that you are relying on to support your claim

19 of sexual harassment and gender discrimination.

20      A    Would you like me to go back from the very

21 beginning?

22      Q    No, I don't because then we're just

23 recreating the wheel. I want you to tell me -- I don't

24 want to go back over and discuss other incidents that

25 we've covered already exhaustively during the first.

1  If there are other incidents that you did not discuss

2  with me, tell me about them.

3      A    Did I discuss Peter Leonardo's father with

4  you?

5      Q    You said he worked there.

6           Before you get to that, how does the fact

7  that Peter Leonardo called you a rat suggest that he

8  was discriminating -- Yale was discriminating against

9  you because you're a female?

10     A    Well, usually you don't call guys bitches.

11 He called me a fucking rat bitch.  I was actually able

12 to hear him through the glass, and I did approach him

13 that day and asked him if he wanted to repeat that to

14 me.  I approached him in front of Bill Hewitt and

15 Damien.

16     Q    That was in the very beginning of your

17 employment; right?

18     A    That was probably about six months in.

19     Q    You just told me about a separate incident

20 where on a regular basis he would tell employees to

21 feed you cheese?

22     A    Yes.

23     Q    So the question is how does that support a

24 claim of sexual harassment or gender discrimination?

25     A    Usually when you call somebody a rat bitch,

1   and even with my own ears heard him call me a fucking

2   rat bitch.

3        Q    On one occasion?

4        A    On one occasion I heard that with my own

5   ears, and I confronted him in front of two other

6   people, and usually you call females bitches.

7        Q    So what you just said is that on a regular

8   basis he would tell mostly male employees to feed you

9   cheese because you were a rat.  You didn't say a rat

10  bitch.  That was a different incident.  You said rat.

11  So the question I have is how does that support your

12  claim of gender discrimination and sexual harassment?

13       A    I'm sorry if I left out bitch, but he would

14  regularly call me a bitch to people, a rat bitch.

15       Q    And only one of those occasions you heard it

16  with your own ears?

17       A    I heard him call me a fucking rat bitch with

18  my own ears.

19       Q    On one occasion?

20       A    Yes.

21       Q    The other occasions were you learned that

22  from other people?

23       A    Yes.

24       Q    And the one occasion where he called you a

25  fucking rat bitch, it was not to your face.  It was --

1    I think he was in a building, and you were outside a

2    building.  Is that correct?

3        A    I was inside the glass foyer at 25 Science

4    Park.  There was a lobby desk with a contracted

5    security officer named Damien.  I don't recall Damien's

6    last name.  He took a gun safe in or was trying to get

7    him to buy a gun safe.  They were discussing a gun

8    safe, and as I glanced over at the desk, Damien was

9    scared because he didn't want to be discussing things

10   with him that he shouldn't be discussing with him, and

11   as he looked over at me, Peter told him to dismiss me.

12   He basically told him she's a fucking rat bitch, and I

13   was shocked when I heard that.  I always knew he talked

14   about me that way, and I walked in there and I

15   confronted him and asked him if he wanted to say that

16   to me.

17       Q    And he did not?

18       A    He wouldn't say that, but he basically

19   laughed at me and told me to try to stay out of the

20   weather because I was soaking wet.  I just did a

21   walking escort with a woman and walked her down to the

22   skating rink in the dark, in the cold, and it was a

23   raining, pouring rain night.  And there was an email

24   written because when I complained to Billy Abbott

25   because it was just too over the top that this

40

1   happened, finally Dan wrote an email, and it was the

2   first time that anybody really acknowledged his bad

3   behavior.  The email, I have it with me.  I'm sure you

4   have it.

5           (THEREUPON, DEFENDANT'S EXHIBIT W,

6               EMAIL DATED 3/1/10,

7           WAS MARKED FOR IDENTIFICATION.)

8   BY MR. DUBIN:

9       Q     This is a March 1, 2010, email marked as

10  Exhibit W.  Is that the email you're referencing?

11      A     Yes.

12      Q     What's the significance of that email?

13      A     Billy Abbott gave me this email to assure me

14  that he took my concerns and my complaint to the next

15  level.  Dan Killen doesn't talk anything about him

16  calling me a fucking rat bitch, but he does say that

17  he's tired of or does not want the bike officers

18  driving cars all the time if there's not inclement

19  weather, and he doesn't want them yelling out to other

20  officers that are on foot patrol, such as myself, in

21  inclement weather to try to stay dry, to try to stay

22  warm, because this was a pretty much regular occurrence

23  that he did to me.

24          And the night that I was soaking wet, after I

25  called him, caught him talking about me in that manner,

1   I simply wanted this to stop.  I went to Bill Abbott in

2   hopes that maybe he'd talk to him because I knew me

3   talking to him wasn't going to go anywheres.  When I

4   confronted him, I didn't confront him angry.  I

5   confronted him and asked him to repeat what he said

6   about me because I was hoping this would stop.  I'm not

7   a rat and I've never been a rat.

8       Q    And so you took it to Billy Abbott, and Billy

9   Abbott, you believe, took it to Dan Killen because

10  Dan Killen wrote an email; correct?

11      A    Yes.

12      Q    So you had a concern.  You addressed it with

13  a supervisor.  It was sent up the chain of command, and

14  it was addressed?

15      A    And then they fired Billy Abbott.

16      Q    Can you answer the question?  You had a

17  complaint; correct?

18      A    Yes.

19      Q    You addressed your supervisor; correct?

20      A    Yes.

21      Q    It was taken up the chain of command;

22  correct?

23      A    Yes.

24      Q    And it was addressed; correct?

25      A    It was addressed as best as they could I

1  suppose at the time.

2      Q    And the reason that you were offended by the

3  comment was because I think you just said you're not a

4  rat and you've never been a rat?

5      A    I have never been a rat, and I don't want to

6  be called a bitch.  That's just sexist talk.

7      Q    Okay.

8      A    It's derogatory to any woman.  You know, I

9  feel I go to work and I put my best foot forward for

10 anybody I've ever been employed by, and to go to work

11 and be disrespected and terrorized by somebody that

12 shouldn't even have been at that location doing

13 something he wasn't supposed to be doing.  What they

14 really should have disciplined him for was him trying

15 to sell a gun safe while he was supposed to be being a

16 security officer.

17     Q    We --

18     A    What they really should have disciplined him

19 for was him calling me an F'ing rat bitch.  They did

20 somewhat address it, but they didn't address it fully.

21 Really Dan Killen should have pulled us both in the

22 office and talked to us face to face.

23     Q    That happened at one point, didn't it?

24     A    No.  Dan Killen never addressed both of us

25 face to face.

1    Q   We can agree that it sounds like you believe

2 that Peter Leonardo was a bad guy?

3    A   I believe he's a very troubled person.

4    Q   And a lot of people, I'm assuming, shared

5 your belief?

6    A   Oh, I feel a lot of people share my belief.

7    Q   Males and females; correct?

8    A   Males and females.

9    Q   Because he was rude to males and females;

10 correct?

11    A   I think a little more rude to females.

12    Q   That wasn't the question I asked you.

13    A   He was rude to both male and female.

14    Q   And offensive to both males and females;

15 correct?

16    A   Yes.

17    Q   Can we agree, in investigating the sexual

18 harassment case and claim, did he ever touch you

19 inappropriately, make any unwanted sexual comments to

20 you?

21    A   He never touched me inappropriately, but when

22 we were at bike class together, he made some really bad

23 comments.

24    Q   This was the menstrual cycle issue?

25    A   Yes.

1      Q      And we addressed it at the last time, so I

2  don't want to go back into it, unless there's anything

3  you want to add?

4      A      I spoke to Billy Abbott about that.  Dan

5  Killen never addressed that with him.  This is huge.

6      Q      This was in 2009?

7      A      I have to look at the certificate.  I was the

8  last class that ever actually went to one of these

9  classes and passed this.  I was the only person that

10  went to this class that was never allowed to ride a

11  bike.  So you thought it was important that they let me

12  go to the class because it was males that let me go to

13  the class, but really I never was allowed to ride a

14  bike after that.

15      Q      So this was July 9, 2009.  That's when you

16  completed the class?

17      A      I completed the class, which very few females

18  have ever completed in any department across the entire

19  state.

20      Q      And in fact, your supervisor helped you get

21  into this class, you being the only female that was in

22  this class; correct?

23      A      He helped me and then he was fired.

24      Q      If you just listen to my question.  Can we

25  agree that your supervisor at Yale helped you get into

1  this all male class?

2      A      He helped me, yes.

3      Q      And the class was completed on July 9, 2009;

4  correct?

5      A      That's the date, yes.

6      Q      Has anyone shared with you what the statute

7  of limitations is to bring sexual harassment claims?

8      A      The statute of limitations, I don't know the

9  exact dates, no.

10     Q      So what I want to do is -- this is the

11 original certificate; correct?

12     A      Yes.

13     Q      And I don't want to mark this as an exhibit.

14 I know I asked you to bring that.  We discussed that

15 last time.  Can we just take a quick break and we'll

16 get a copy?  I know you have a couple other

17 certificates in there.  Are there any others?

18     A      (Witness complied.)

19     Q      I don't need that.

20     A      I'm sorry.  I do have my diploma.  That just

21 happened to be in there.  I actually do have the high

22 school diploma.

23     Q      Anything else in there?

24     A      This is something to do with the bike class,

25 to continue taking -- there's a group of people after

1   passing that class, that was given to the entire class.

2                    MR. DUBIN:  All right.  I don't need

3              this.  These two I do need, so can I get

4              copies of these documents?

5          (THEREUPON, A BRIEF RECESS WAS TAKEN.)

6          (THEREUPON, DEFENDANT'S EXHIBITS X AND Y,

7                    CERTIFICATES,

8              WERE MARKED FOR IDENTIFICATION.)

9   BY MR. DUBIN:

10      Q    Ms. Willoughby, I'm going to show you what's

11  been marked as Exhibits X and Y.  First I'm going to

12  show you Y.  That has, "State of Connecticut certifies

13  that Melita A. Willoughby has completed all

14  requirements," and it goes on, it says, "to be awarded

15  her diploma in compliance with the rules and

16  regulations of the State Board of Education."  It's

17  January 9, 2001.  So that's the date on which you were

18  awarded your high school diploma?

19      A    Okay.

20      Q    Is that a yes?

21      A    That's the date on there, yes.

22      Q    Then I'm going to show you Exhibit X.  This

23  is a certificate of completion of the bicycle class you

24  referenced in your last deposition?

25      A    Yes.

1      Q      When I reread the deposition, it appeared you

2   weren't certain whether the class was in 2009 or 2010.

3   Does this certificate confirm that the class was in the

4   summer of 2009?

5      A      Yes, it does.

6      Q      And your termination was on December 6, 2010?

7      A      Yes, it was.

8             (THEREUPON, DEFENDANT'S EXHIBIT Z,

9                        AFFIDAVIT,

10            WAS MARKED FOR IDENTIFICATION.)

11   BY MR. DUBIN:

12      Q      When you went to the Commission On Human

13   Rights and Opportunities to complete the affidavit of

14   discrimination, did you have counsel?

15      A      No, not at all.

16      Q      You did it on your own?

17      A      I did everything on my own.

18      Q      And when did you initially retain counsel?

19      A      About a week before the fact finding and that

20   was proved to be a big mistake.  The attorney sat there

21   and texted the entire time, and when he called my name

22   out twice, it was wrong both times.  He had no idea

23   what was going on.  He never provided me with Yale's

24   response, so I was never afforded the ability to read

25   all the different lies that Richard Nucci and

1    that correct?

2        A    Correct.

3        Q    What is the next incident, if any, to support

4    your claim of gender discrimination and/or sexual

5    harassment that occurred between the time you were

6    hired as a casual and the time you were hired as a

7    full-time?

8        A    Since I was not able to read the last

9    deposition and look at everything, I believe I told you

10   almost everything I can recall.

11       Q    Then what we're going to do, I just want to

12   take a five minute break.  I want to now get into those

13   incidents that occurred after you were made a full-time

14   up until the point in time you were terminated.  Okay?

15       A    Yes.

16            (THEREUPON, A RECESS WAS TAKEN

17               FROM 11:35 TO 11:42.)

18   BY MR. DUBIN:

19       Q    Ms. Willoughby, whenever you're ready, why

20   don't you tell me in chronological order all of the

21   incidents that support your claim for sexual harassment

22   and/or gender discrimination between the time you were

23   hired as a full-time in September of 2010 to the date

24   of your termination.

25       A    When I was originally hired full-time and the

DEL VECCHIO REPORTING
(203) 245-9583

1   rest of the department got the memo of the few people

2   that were selected, I was told by Richard Mongillo that

3   when Peter Leonardo found out I was selected and not

4   his friend in dispatch, Brandon McCormick, that I was

5   selected full-time and not his friend Brandon, how did

6   that bossy bitch get selected or pretty much why was I

7   selected and not his friend.

8       Q    Well, you said bossy bitch and then you said

9   pretty much.  Tell me exactly -- was this something

10   that was told to you?

11       A    Yes.  So I wasn't there, but I was told

12   pretty much the context of him being how upset he was

13   that I was made full-time and not his friend.

14       Q    Who told this to you?

15       A    Richard Mongillo.

16       Q    And Richard Mongillo is a coworker?

17       A    He's a coworker.

18       Q    He's not a supervisor?

19       A    No.

20       Q    All right.  So it was Richard Mongillo that

21   told this to you.  You never heard it from Peter?

22       A    Peter was really upset and would show up at

23   roll calls that he wasn't even supposed to be at to

24   taunt me after I became full-time because now my hours

25   changed, and he would show up and pretty much do

1   whatever it took to distract me from roll call, letting

2   me know he was unhappy that I was chosen for the

3   full-time position.

4       Q    Ms. Willoughby, the question I have for you

5   is incident number one that we're talking about

6   subsequent to the point in time you became a full-time

7   employee, you told me that Mr. Mongillo told you that

8   when Peter found out you were selected and not his

9   friend Brandon McCormick, he was upset?

10      A    Yes.

11      Q    What exactly did Mr. Mongillo tell you?

12      A    He told me that he just couldn't understand

13  how I was selected over his friend.  I don't recall the

14  exact conversation because this is in 2010, but he was

15  really upset, highly upset, and he made no bones of it.

16  He talked about it to everybody, supervisors and

17  everybody.

18      Q    How do you know he told everybody?

19      A    Because when he talked about it to Richard

20  Nucci and other people witnessed it, he just couldn't

21  understand how -- because usually the supervisors

22  recommend who becomes full-time, but a lot of different

23  things were happening in the department, and because

24  the department was in such chaos -- they had fired 13

25  supervisors from the time I had started as a casual.

1    They had just gotten Kristin Albis in there to try to

2    help the department.   There were a lot of things going

3    on in the department.

4         Q    Ms. Willoughby, can you just listen to my

5    question?

6         A    Okay.  I'm sorry.

7         Q    I asked you if Peter -- I asked you how you

8    knew this, and you told me that Mongillo told you;

9    right?

10        A    Yes.

11        Q    Okay.  And then you said Leonardo said this

12   to everyone?

13        A    He was saying it to many people.

14        Q    And I asked you how you knew that, and I

15   don't even understand how your answer relates to my

16   question.  So the question I have for you is how did

17   you know that Peter Leonardo was telling this to

18   everyone?

19        A    Several different people told me that he was

20   upset that I became a full-time employee.

21        Q    Who were those people?

22        A    I recall Mongillo.  I recall Noel.  Those are

23   the only two at this time I can recall.

24        Q    What did Mongillo tell you?

25        A    That he was highly upset, that he was talking

1  about me in front of groups of people more or less like

2  on a regular basis, even in front of the supervisor, he

3  named Nucci, and couldn't understand how I became a

4  full-timer, how Brandon McCormick was not a full-timer.

5      Q    You just said more or less on a regular

6  basis.  What does more or less mean?

7      A    So on a regular basis I would hear how

8  disgruntled he was that I became a full-timer.

9      Q    That's because Peter Leonardo didn't like

10 you; right?

11     A    Yes, he did not like me.

12     Q    And there's other people he didn't like;

13 correct?

14     A    I think a lot of people didn't like him.

15     Q    What did Noel tell you?

16     A    Noel told me that he was talking about me in

17 front of several people and saying I should not have

18 become a full-timer.

19     Q    Can you tell me how what you just described

20 supports any claim of gender discrimination or sexual

21 harassment?

22     A    On a regular basis he had no problem calling

23 me a bitch in front of people.

24     Q    I'm talking about this incident.  Can you

25 please tell me how this incident you just described to

1   me supports a claim for sexual harassment or gender

2   discrimination?

3       A    He felt that a male would have been more

4   competent in that position.

5       Q    Are you speculating?

6       A    No.

7       Q    He felt his friend would be more competent,

8   Mr. McCormick?

9       A    His friend, a male, would be more competent.

10      Q    Other than the fact that you believe

11  Mr. Leonardo in expressing his frustration that you

12  were made a full-time employee and thought his friend

13  Mr. McCormick should have instead been made a full-time

14  employee, how else does what you just told me support a

15  claim of either gender discrimination or sexual

16  harassment?

17      A    When you're treating a person, especially

18  when it's of the opposite sex, in a manner that's very

19  uncomfortable and very humiliating and very public,

20  just treating them poorly, being referenced to myself

21  regularly as a bitch or a bossy bitch.  He's even told

22  people I'm a loud mouth bitch.  He doesn't like the

23  fact that I stuck up for myself to him and asked him to

24  repeat what he said about me.  He didn't like the fact

25  that I stuck up for myself when it came to him trying

1      Q      What is the next episode or incident between

2  the time of September 2010 and the date of your

3  termination that you believe supports a claim of sexual

4  harassment or gender discrimination?

5      A      One of the biggest things I can recall is a

6  friend and I were out on a ride, another female.

7      Q      Is this the motorcycle ride?

8      A      Yes.

9      Q      Is this where Mr. Leonardo walked by you when

10  you were not working?

11      A      Right.

12      Q      We did discuss this last time.  This is one

13  of the biggest things that you can recall between the

14  date of your hire as a full-time to the date of your

15  termination?

16      A      That led up to what happened in roll call in

17  front of a room full of over a dozen people.

18      Q      Where Mr. Leonardo said hello to you?

19      A      He came in and from behind me and his voice

20  in a very high and screechy, screechy, he said hi with

21  a really dragged out Melita in a really crazy voice,

22  just very unsettling.  My back was turned to him.  He

23  sat in front of me.  He put his stuff down on the

24  table, and he started staring me down, and I looked at

25  him and I said, "Why are you saying hi to me now?"

1    Because he doesn't say hi to me.  And he, you know,

2    said something to the effect of he always says hi to

3    me.  I said, "Could you just, please, be consistent?"

4    And everybody in the room started laughing at him, and

5    he was embarrassed and said he liked inconsistency.

6           Then when I read Yale's account of that date,

7    Mr. Nucci lied and said that I liked inconsistency and

8    totally left out how he came in in front of a room full

9    of entirely males and just taunted me and embarrassed

10   me, and Nucci didn't even attempt to tell him to stop

11   or act as if there was a problem with that, at which

12   point, again, he was embarrassed because I just asked

13   him to please be consistent, and when he could only

14   come back with he liked inconsistency, I felt he was

15   embarrassed because everybody in the room was clearly

16   laughing at him.

17          I think a lot of people didn't like me being

18   bullied.  Maybe some of his friends liked it, but I

19   think that a lot of people realized that there was a

20   problem with all of this horrible behavior, and it took

21   me to point out to Richard Nucci that Richard Nucci was

22   running a boys club because he shouldn't have allowed

23   that behavior.  He had no control of the entire group.

24   This is supposed to be roll call with adults.

25       Q    So this is one of the biggest incidents you

1   can recall supporting your claim of gender

2   discrimination and sexual harassment between the time

3   you were hired as a full-time to the date of your

4   termination; correct?

5        A    He was --

6        Q    Can you answer my question?

7        A    No, that's not all.

8        Q    This is not one of the biggest?

9        A    It's big.

10        Q    I'm sorry, your testimony was one of the

11   biggest things you can recall was this incident, and is

12   that or is that not the case?

13        A    It's big.

14        Q    So this incident that we're talking about was

15   when you and a girlfriend were on your bikes in New

16   Haven; correct?

17        A    Correct.

18        Q    You were not working; correct?

19        A    I was not working.

20        Q    You were stopped at a light; correct?

21        A    At Temple and Grove I believe.

22        Q    And Mr. Leonardo was working; correct?

23        A    He was.

24        Q    And he got out of his car?

25        A    Got out of his car.

1    Q    Walked by you while you were on your bike?

2    A    Right near us.

3    Q    Said nothing to you?

4    A    I almost was -- I attempted to nod my head

5   and acknowledge him.  He gave us a really hard, crazy

6   look.  My girlfriend, as he's walking away, asked me if

7   I work for Yale University.  I nodded.  She asked me if

8   I knew him.  I nodded.  And she asked me what that was

9   all about, and at which point I told her later because

10  the light turned green, and we discussed it later.  But

11  here's a woman that knew nothing that was clearly --

12  he's representing the organization in uniform to the

13  point where a total unbiased person that knows nothing

14  about what's going on at my job realizes that there's

15  something wrong.

16       Q    Can we agree that Mr. Leonardo said nothing

17  to you?

18       A    He didn't say anything to me, and when I told

19  Richard Nucci about that incident, that's why Leonardo

20  got mad and said, well, you got mad that he didn't say

21  hi to you.  He doesn't have to say hi to me, but he

22  doesn't have to act belligerent to scare -- to actually

23  make another person feel like what's wrong here.  You

24  know, that whole thing for her to ask me don't you work

25  for Yale security.  And again, we had just left having

```
 1   lunch at a little restaurant.  We had, you know,

 2   talked.  We were out all morning, and I was going home

 3   to get ready for work.  I had to be at work at

 4   six o'clock.

 5       Q    Ms. Willoughby, can you answer my question?

 6   Can we agree that Mr. Leonardo said nothing to you?

 7       A    He said nothing to me.

 8       Q    And did you complain about this to Mr. Nucci?

 9       A    I did.

10       Q    And did you complain that day?

11       A    I probably did complain that day because

12   within days that's when he came into the roll call,

13   yes.

14       Q    And what did you say to Mr. Nucci?

15       A    I told Mr. Nucci that on a regular basis this

16   guy goes around being intimidating to me and that even

17   other people that have nothing, no relation to the

18   university are now able to even see and feel as if it's

19   a problem.

20       Q    And what did Mr. Nucci say to you?

21       A    He said, You're mad that he didn't say hi to

22   you?  I mean he downplayed it.  He made a joke out of

23   it pretty much.

24       Q    And then in roll call, he said, hi, Melita,

25   to you in a long, drawn out voice?
```

1    A     In a really loud, long drawn out voice.

2    Q     And you embarrassed him?

3    A     He embarrassed me, and I simply told him to

4  be consistent, but I do feel he embarrassed himself.   I

5  don't feel like I embarrassed him.   I feel he

6  embarrassed himself when everybody laughed at him

7  because the best he can say back was he liked

8  inconsistency.

9    Q     What is the next episode or incident between

10  the time you were hired as a full-time to the date of

11  your termination that supports your claim of either

12  sexual harassment or gender discrimination?

13    A     On a regular basis he would sit in dispatch

14  and pretty much would let Manny know to just make my

15  life miserable, no breaks, just make a very heavy call

16  volume, and different people in the room were present

17  because there's usually about eight dispatchers.

18    Q     How do you know that Peter Leonardo said this

19  to Manny?

20    A     Because Manny was not only regularly making

21  my life miserable, but there were other people in the

22  room.  A girl named Michelle, I can't recall her last

23  name, she confirmed it to one of the other officers who

24  in turn confirmed what I already knew what was going

25  on.  I knew he was friendly with Manny, and I don't

1    think it's because he really liked him.  I think it's

2    because he knew he could manipulate him into making my

3    life miserable on the job.

4        Q    Was Manny a supervisor?

5        A    No.

6        Q    And you said Manny was making your life

7    miserable?

8        A    Yes.

9        Q    Did Manny tell you that Peter was telling him

10   to make your life miserable?

11       A    No.  Manny was being regularly rude to me on

12   the radio, in front of people in the car.

13       Q    So what I want to know is who told you that

14   the reason Manny was making your life miserable was

15   because Peter Leonardo told Manny to make your life

16   miserable?

17       A    Richard Mongillo would also be sitting in the

18   dispatch room regularly.  He would talk about it.

19   Michelle would talk about it.  I do recall Noel telling

20   me that there was a lot of talk about just making me

21   miserable coming from Peter.

22       Q    Mongillo, Michelle and Noel are not

23   supervisors?

24       A    No.

25       Q    I am correct?

1      A    No, none of them are supervisors.

2      Q    And you don't have any firsthand knowledge
3  that Peter Leonardo was telling Manny to make your life
4  miserable?

5      A    Only that every night Manny was just being
6  rude to me over the radio.  I was trying to ask Paul
7  Gallipoli and Richard Nucci to review the tapes every
8  night, and they ignored me because it would just
9  confirm just all the blatant disrespect and kind of
10  nonsense going on any time I tried to ask him why I was
11  at the wrong address again.

12      Q    I'm sorry, you tried to ask Mr. Nucci to
13  listen to the tapes, Mr. Nucci and Gallipoli?

14      A    I asked Gallipoli.  I asked Nucci.  And
15  several times I asked them to look at the pictures of
16  the times that they were trying to give me a break,
17  like three minutes before I'm ready to get off the
18  clock or -- several times.  Then when we went to the
19  CHRO, they tried to say that there was no dispatch --
20  they actually said under oath that there was no
21  dispatch tapes they could have listened to, which
22  that's a lie.  They could have actually reviewed any
23  and all transmission, and they could have went back and
24  listened to just the regular nonsense going on.  I
25  simply just wanted to work.

1     Q     What was the nonsense?

2     A     The nonsense was Manny talking very

3   disrespectfully to me on the radio.

4     Q     What did he say?

5     A     Manny and Ed, just when I would ask why I was

6   at the wrong address or what was the correct address,

7   first they would try not to answer you on the radio.

8   Then the radio would squelch because somebody else that

9   had the ability to take the transmit button, so each

10  time you may try to talk, and then there would be

11  different things said into the radio, name calling,

12  laughing.

13    Q     What name calling?

14    A     I'm sorry, I can't recall exact, but I know

15  there were different things said into the radio, and it

16  would be in different voices.  And there was a memo

17  that went out about this, if I'm not mistaken, in the

18  department from Dan Killen.

19    Q     Because you complained about it?

20    A     A lot of people complained I think.

21    Q     And it was addressed?

22    A     It was addressed, but it continued to happen.

23    Q     When did it happen?

24    A     On a regular basis.

25    Q     What was the date of the memo?

1    A    That I don't know.

2    Q    When did you complain about it?

3    A    I complained to Paul Gallipoli and Richard

4  Nucci several times that if they simply listened to all

5  the unprofessional behavior, to all the sarcastic tone,

6  to them ignoring me when I would clearly try to get

7  information that I needed in order to do my job

8  successfully, and again, night after night they ignored

9  it.  They did not want to listen to the radio.

10    Q    So I'm clear, you're talking about name

11  calling on the radio; correct?

12    A    Yes.

13    Q    And you can't recall what names were being

14  used; correct?

15    A    No, because I was --

16    Q    Am I correct?

17    A    Yes.

18    Q    You're talking about sarcastic tones?

19    A    Yes.

20    Q    What type of sarcastic tones?  What do you

21  mean by that?

22    A    If I were to ask Manny or Ed to give me a

23  specific address, tell them that I arrived at a

24  location, it would be, "Check your MDT."  It would be,

25  you know, "Don't keep calling me on the radio."  I'm

1    Q    How do you know that?

2    A    I picked her up.  She was a good looking

3    girl.

4    Q    How do you know that Manny started

5    intentionally discharging her to another male because

6    she was nice looking?

7    A    Because the different males that requested

8    her specifically, this one particular girl, I was no

9    longer picking her up, and there was talk of her

10   requesting me.  She actually told me she was going to

11   request me.

12   Q    You said there was talk.  What does that

13   mean?

14   A    So I suppose when she would call in for her

15   regular rides --

16   Q    Do you know this to be a fact?

17   A    I know this from just the different officers

18   talking back and forth amongst each other.  So, no, I

19   don't know it to be a fact.

20   Q    What was the woman's name?

21   A    I don't recall her name.  I picked up a lot

22   of people.  This was five years ago.  I actually don't

23   recall any of their names.  I picked up a lot of people

24   regularly.

25   Q    Do you have any direct facts or evidence that

1   Manny was intentionally misdirecting you?

2       A    On a regular basis I was given wrong

3   information on a regular basis.  When I tried to talk

4   to him about that, all he would do is get sarcastic

5   over the radio because I was -- I told him one night on

6   the radio that again I'm at the wrong address, and he

7   started yelling into the radio.  I clearly asked Paul

8   Gallipoli that night to go back and to listen to that

9   entire transmission, which would have validated my

10  suspicion and him regularly giving me the wrong

11  addresses.

12      Q    So we can agree that it's a suspicion?

13      A    My experience.

14      Q    It was your word, suspicion?

15      A    I'm going to change it to experience, sir.

16      Q    Okay.

17      A    That's what I experienced.

18      Q    And what is the next incident that you rely

19  on to support your claim of gender discrimination or

20  sexual harassment that occurred between the time you

21  were hired as a full-time to the date of your

22  termination?

23      A    When I originally got hired and I asked for a

24  bike position, since I was one of the only officers

25  that was -- since I was actually the only officer that

1    UTI, urinary tract infection, from holding my pee in

2    because male officers thought it was a joke not to give

3    me a break.

4         Q    Do you agree that the student made a formal

5    complaint about you?

6         A    A complaint was made to my knowledge.

7         Q    And do you know the basis of that complaint

8    as you sit here?

9         A    I know the basis, but I don't believe -- I

10   believe it was exaggerated on Yale's part.

11        Q    Are you aware of a reckless driving complaint

12   being made against you?

13        A    I'm aware of a complaint, but I never drove

14   reckless.  And I had two passengers in the car, and

15   since they have been named, if it goes to court and

16   they're subpoenaed, they're going to tell you that they

17   were terrified of what this guy did.

18        Q    What did the guy do?

19        A    The boy in the car asked me to take a left on

20   a one-way street.  I was on a one-way street at a

21   light, so I was stopped.  There was a black SUV right

22   behind me to my left.  The boy asked me to take a left

23   to save a lot of time.  I said no problem.  I looked at

24   the driver behind me and I pointed, physically pointed

25   and asked him if I can get over.  He gave me the nod

1 shake, like good driver shake like go ahead.

2   The light turned.  I went and took the left

3 in front of him because there was a line full of

4 traffic at the light, just a line full of traffic.  So

5 at which point I go over.  He follows us down the

6 street.  He's beeping.  He's giving me the finger.

7 He's beeping and he's telling me to pull over, and the

8 kids are scared.  These kids are scared.  They're like

9 please don't pull over.  I'm like I'm not going to pull

10 over.  I'm not pulling over.  And as he's screaming and

11 swearing and chasing us down, maybe he thought if he

12 called Yale -- I don't know if he thinks he's going to

13 sue Yale or what he thinks he's going to do, but if

14 they would have simply called those two kids like I

15 asked them to do because they surely put their names.

16 They had their names.  I didn't like think to go on the

17 MDT and write down their names because usually they put

18 at least one of the passengers names on the MDT to show

19 you who you're picking up in case you need to see a

20 student ID or employee ID to make sure you're picking

21 up somebody who actually goes to school there or works

22 there or might be a professor there.  But the boy in

23 the car said don't pull over.  I said, again, I'm not

24 pulling over, and it was a very irate, crazy driver.

25 So for him to make that complaint is almost laughable.

1  Q Do you know what the nature of the complaint

2 was made against you?

3  A He said I cut him off.  I read that.  I did

4 not cut him off.

5  Q And do you know the name of the person making

6 the complaint?

7  A I don't recall the name, but he said I cut

8 him off, and I did not cut him off.

9  Q Does Major Nelson ring a bell?

10  A That would sound familiar.  That would sound

11 like the name, yes.

12  Q And you don't deny that an incident did occur

13 between you and this gentleman?

14  A I didn't cut him off.

15  Q That's not the question.  You agree that an

16 incident, some incident occurred between you and this

17 gentleman?

18  A Yeah, he was irate.

19  Q And you disagree with his recitation of the

20 facts of that incident.  Is that correct?

21  A I completely disagree, and the two people in

22 the car would disagree as well.  There's no way they

23 forgot that.  Those two students could never forget how

24 scared they were.

25  Q Did you make any attempt to contact those two

1    Q    You understand that --

2    A    He provided it three minutes of the day of

3    the hearing.

4    Q    Yale wasn't withholding this from you.  They

5    provided it to your attorney.  Can we agree on that?

6    A    Yes.

7    Q    Let's look at the email.  Can we agree that

8    it's from Richard Nucci?

9    A    Yes.

10   Q    Can we agree it's dated October 6, 2010?

11   A    Yes.

12   Q    Can we agree that that was during your

13   probationary period?

14   A    Yes.

15   Q    Can we agree that the first line says, "On

16   Thursday, September 30th I received an irate telephone

17   call from Melita Willoughby regarding a transit vehicle

18   not be located at 100 Church Street South."

19   A    I never called him irate.

20   Q    Can we agree that that's what the email says?

21   A    That's what the email says.

22   Q    What does this reference?

23   A    I called him because I was really unsure

24   where to show up for work, 79 Howe or 100 Church

25   Street.  On the nights that I drove, I was supposed to

1   be at work at 6 p.m.  There's a lot of traffic in New

2   Haven at that time.  So although I always was running

3   on time, I was so unsure where to go.  I finally said

4   to him one night where am I supposed to go, 79 Howe,

5   100 Church.

6       Q    Explain to me, because that's what I don't

7   understand.  Why would you need to report to that

8   address?  Is there a vehicle that takes you to work?

9       A    No.  My vehicle I needed to park at one of

10  the two places, but they would never tell me where to

11  go.  So on the night that I called him, I was trying to

12  explain to him I come to work early every night, and

13  sometimes I'm supposed to show up at 100 Church Street

14  and sometimes I'm supposed to show up at 79 Howe.  Can

15  somebody just please tell me, maybe make a schedule on

16  the three nights a week that we're driving, for all the

17  drivers, like let me know where to show up because I

18  don't know where to pick up the car because now it's

19  going to look like I'm late.

20      Q    So you were told that a vehicle should not be

21  at 100 Church Street South; correct?

22      A    I was told that the vehicle could be at

23  either place.

24      Q    Well, this email says -- and if you disagree

25  with it, let me know, but it says that you were upset

1   because a vehicle not be located at 100 Church Street

2   South?

3       A    No.  Actually, going to Howe Street would be

4   way closer for me.  So actually, I showed up at Howe

5   Street first, and then I'm going back and forth and

6   there's no vehicles.  So I can't perform my job without

7   a vehicle.  I'm asking him where do I get a vehicle.

8       Q    The next sentence says you were very rude

9   over the telephone.

10      A    I was never rude to him.

11      Q    So you disagree with that.  It also says

12  Mr. Nucci explained to you that due to the current

13  vehicle situation, a car may not always be located at

14  100 Church Street.  Is that correct?

15      A    He was explaining that cars could be

16  anywhere, but I explained to him that the bike officers

17  were supposed to be on the bikes and a car was supposed

18  to be available to me, at which point --

19      Q    And he told you it would be at 79 Howe;

20  correct?

21      A    He told me it could be at either place.

22      Q    And he told you to travel to 79 Howe to find

23  a vehicle; correct?

24      A    I had just left 79 Howe, so now he's sending

25  me back to where I just went.

1      Q   Did you say now I have to fight the traffic

2  to come all the way over there?

3      A   I told him I was sitting in traffic and that

4  it was going to take me time.

5      Q   And then the email says that Mr. Nucci then

6  pulled you aside a few hours later to discuss your

7  conduct.  Do you remember that?

8      A   I was in the parking garage, and he asked me

9  why I was upset.  I said I'm not upset.  I just want

10 some consistency.  I don't know what to do here.  I

11 didn't understand how an organization such as Yale and

12 all these supervisors couldn't figure out that it's

13 making me look like I'm late if I don't pull that key

14 for that car.

15     Q   Do you recall --

16     A   We didn't have time cards to punch in or

17 anything like that.

18     Q   The question I have for you is do you recall

19 Mr. Nucci meeting with you or pulling you aside to

20 discuss your conduct?

21     A   We didn't discuss my conduct.  We discussed

22 the vehicles and where I should be going.

23     Q   Mr. Nucci termed this a counseling session.

24 Do you recall that?

25     A   It was not -- we're sitting out in the

1    parking lot, and he's in his car and I'm in my car.  So

2    I don't think that was a counseling session, unless in

3    his mind it was.

4         Q    Did you try to tell him how to make

5    operational decisions?

6         A    No.  I just told him that I just needed to

7    know where to go to pick up a car.

8         Q    Did you tell Mr. Nucci that, quote, "I'm just

9    going to wait until my 90 days are up before blowing

10   the lid on this place."  Did you ever say that?

11        A    That is the most laughable statement.  Never

12   have I said that in my life.  I would never ever, and

13   then he proceeds to say that I said it about Dan Killen

14   and Cisco Ortiz.

15        Q    So the answer is you did not say that?

16        A    No.

17        Q    And then it goes on to say that you cited

18   prior conflicts with supervisors and other security

19   officers, in particular Peter Leonardo and Bill Hewitt.

20   Did you do that during the conversation?

21        A    I didn't really have a big issue with Bill

22   Hewitt, so reading that, no, I did not, I did not have

23   a big issue with Bill Hewitt.  The only thing I can say

24   about Bill Hewitt is he was always where Peter Leonardo

25   was.  Was I friendly with him?  The most we said was

1  hello.  We acknowledged each other, but I never had an

2  issue with Bill Hewitt.

3      Q    Did you accuse Peter Leonardo of being into

4  Nazi practices during this meeting?

5      A    I did.

6      Q    Did you tell Mr. Nucci during this meeting

7  that a friend of yours had complained about Peter?

8      A    Yes.

9      Q    And did Mr. Nucci tell you to have that

10  friend contact you?

11      A    He didn't want to hear anything about it.

12  Alls he kept saying was that Peter doesn't have to say

13  hi to me.

14      Q    Did Mr. Nucci ask you to have your friend

15  contact you or Dan Killen?

16      A    What he was asking was who was she.  I told

17  him who she was, and I don't think he ever asked to

18  have her contact him.

19      Q    Do you agree that that's in the email?

20      A    That he's writing this?

21      Q    It says, "I asked her to have the friend

22  contact either me or Dan Killen, and we would take

23  appropriate action based upon facts and specific

24  details."

25      A    I don't recall him actually asking me that.

1    Q    Then it says, "On Friday, October 1, Melita

2  returned to work and asked to speak with me.  I agreed

3  and she proceeded to inform me that she, at the request

4  of her husband, would like to forget all about last

5  night."

6    A    That never happened.

7    Q    Do you know what that's referencing?

8    A    No, because what's confusing about that is I

9  didn't want to forget about what was happening.  I

10 wanted the harassment to stop, but what my husband

11 continued to tell me was be strong, don't allow all

12 this nonsense to come home with you.  My husband was

13 asking me to try to ignore what was happening, but as

14 far as me telling him to forget about everything, no.

15   Q    So there was some conversation with your

16 husband that you did report to Mr. Nucci.  Is that

17 correct?

18   A    I told him that I'm going home, bringing

19 these work problems with me, and yes, discussing them

20 with my husband.

21   Q    Well, you just told me that your husband told

22 you to try to let this go?

23   A    Of course.

24   Q    And Mr. Nucci reports something along those

25 lines in this email; correct?

1     A     I never told -- like what he's saying here, I

2  did not say this, nothing about forget about last

3  night.  Why would I want to forget.  Right now is it

4  hard to recall each and every conversation, yes, but

5  why would I want to forget about things that I was

6  reporting.  So, no, I never said that.

7     Q     The next sentence says, "She then proceeded

8  to complain about Peter Leonardo and bring up prior

9  issues that I could neither confirm nor deny that had

10 occurred."  Do you see that?

11    A     Yes.

12    Q     Did you bring up issues with Peter Leonardo?

13    A     Possibly, yes.

14    Q     When did Mr. Nucci become a supervisor?

15    A     Probably spring of 2010.  I knew him for

16 approximately six months.

17    Q     So can we agree that many of the complaints

18 that you had about Peter Leonardo occurred before

19 Mr. Nucci became a supervisor?

20    A     Agree.

21    Q     And you can agree that there's nothing that

22 Mr. Nucci could do as a supervisor at that point to

23 address the complaints that happened several years

24 back?

25    A     Disagree.

1    Q   What did you want him to do to address the

2  complaints that you had regarding Peter Leonardo's 2009

3  conduct?

4    A   Maybe if he started acting like a supervisor

5  rather than hanging out at pizza places on Crown Street

6  with these guys, acting like their friend.

7    Q   That wasn't what I asked you.  If you could

8  listen to my question.  The question was what did you

9  want Mr. Nucci on October 6, 2010, to do about Peter

10  Leonardo's 2009 conduct?

11    A   I think I was hoping that going through the

12  chain of command, he would address my concerns and my

13  complaints directly with Peter Leonardo and tell him,

14  look, buddy, this has got to stop.

15    Q   And in fact, there was a meeting with Peter

16  Leonardo.  Isn't that correct?

17    A   That I don't know.

18    Q   That's at least what's referenced in Exhibit

19  CC.  Is that correct?

20    A   That's what they said there was, yes.

21    Q   And you have no reason to believe or

22  disbelieve that.  Is that correct?

23    A   I don't -- I think if he did have a meeting

24  with him that it was to just go through the motions.

25    Q   You have no evidence to support that.  That's

1    just your suspicion; correct?

2        A    It was pretty obvious that they were friends.

3        Q    Did you have any evidence to support that

4    other than your suspicion?

5        A    It's my thought.

6        Q    It then says, "She then requested that I

7    forget these conversations occurred."  Do you see that?

8        A    I disagree with that.

9        Q    Then Mr. Nucci says, "I informed her I could

10    not do so, that she should focus on her own performance

11    and not become consumed with the actions of her peers."

12    Was that said?

13        A    No.  I was worried about myself and not other

14    people.

15        Q    Did Mr. Nucci ever tell you that he would act

16    on any inappropriate actions exhibited by either her or

17    other officers?

18        A    No.

19        Q    It then says you said your personal vehicle

20    was in jeopardy parking at Howe Street because Peter

21    Leonardo had, quote, trashed people's cars in the past.

22    Did you say that?

23        A    I was concerned because he was known -- there

24    was another officer that thought his car was damaged by

25    Peter.

1       Q       Did you say this?

2       A       Yes.

3       Q       And do you know that Peter Leonardo in fact

4    trashed other people's cars?

5       A       The other officer seems to think he did.

6       Q       So the other officer thought, but did the

7    other officer have any knowledge?

8       A       I think he may have.

9       Q       Do you know that he did?

10      A       I don't know that for sure.

11      Q       So here you are now on October 6th telling

12   your supervisor, accusing Peter Leonardo of trashing

13   other people's cars without any evidence to support

14   that?

15      A       Or at least one person's.

16      Q       Is that right?

17      A       Yes.

18      Q       And in fact, you told him that you had no

19   evidence to substantiate this accusation; correct?

20      A       I don't recall saying that.

21      Q       You just told me that today.

22      A       I'm telling you that today, but what I said

23   to him four years ago, five years ago, I don't recall

24   each and every thing we spoke about.

25      Q       You were accusing --

```
 1      A    I know I wasn't telling him that I wanted to

 2   forget conversations.  I wanted him to do his job.  So,

 3   no, I wasn't telling him those sorts of things.

 4      Q    You were accusing Peter Leonardo of criminal

 5   conduct without any evidence to support it; correct?

 6      A    I was scared for my car.

 7      Q    Would you agree with me that you were

 8   accusing Peter Leonardo of criminal conduct without any

 9   evidence to support it?

10      A    I didn't accuse him directly.  I was scared

11   for where he wanted me to park my car because there

12   were no cameras, and we were having that discussion

13   because Peter was the only one that was allowed to park

14   in this garage, although Francisco Ortiz put out a memo

15   that nobody park there, and the rest of us just wanted

16   to park somewhere where there was space and where our

17   cars would be under cameras.

18      Q    Ms. Willoughby, did you say that you were

19   concerned that Peter Leonardo would trash your car?

20      A    I don't think I used the word trash.  I think

21   I told him I was worried about my car.

22      Q    About what?

23      A    I know that one of the other officers' cars

24   did get trashed really bad.

25      Q    What did you tell Mr. Nucci?
```

117

1      A     I told him I was worried about my car.

2      Q     That was it?

3      A     I don't recall exactly what I said.

4      Q     You agree that this email says, "because

5  Peter Leonardo had trashed people's cars in the past."

6      A     That's what he writes, yes.

7      Q     And you agree that trashing someone's car

8  would be criminal?

9      A     Oh, of course it's criminal.

10     Q     And you agree that he says in this, he

11 reported that you have no evidence to substantiate your

12 statement; correct?

13     A     That's what Mr. Nucci is writing, yes.

14     Q     So can we agree that if this was true, and I

15 understand you might dispute it, but if this is true,

16 you would be accusing someone of criminal conduct

17 without any evidence to support it during your

18 probationary period, correct, if this was true?

19     A     I was worried about my car.

20     Q     Can you agree with my statement or not?

21     A     I can't fully agree.

22     Q     Okay.  Very good.

23           And then did you accuse Cisco Ortiz, Danny

24 Killen, and supervisors, including Mr. Nucci, of

25 running a good old boys club?

1      A      I accused Richard Nucci of running a boys

2   club.   I never accused Mr. Ortiz or Mr. Killen, and I

3   didn't use the term good old boys club.   I used the

4   term boys club.

5      Q      You see here Mr. Nucci asked for facts to

6   support that statement, and it says you offered no

7   evidence or facts to support your statement?

8      A      I told him that if he stopped being friends

9   with his bike officers and he did his job, and he was

10  upset, and he asked me if I should be complaining in an

11  uncertain economy.   That night he was furious when I

12  told him he was running a boys club, but I never said

13  that about Ortiz, and I never said that about Dan

14  Killen.

15     Q      Then it says that you decided not to involve

16  your friend that you were on the motorcycle with

17  presumably and the complaint against Pete that you

18  brought to Mr. Nucci's attention the prior night.   You

19  see that?

20     A      Yes, I see that.

21     Q      Did your friend decline to be involved in any

22  investigation into Pete Leonardo's conduct?

23     A      She knows that if she's subpoenaed --

24     Q      That wasn't the question I asked you,

25  Ms. Willoughby.   The question I have is did your friend

1    A    I can't recall exactly how that conversation

2    went.   I'm trying, but I cannot recall the exact

3    conversation.

4    Q    Do you remember Mr. Nucci telling you that

5    since your friend would not come forward, he would

6    consider the matter closed?

7    A    No, I don't remember him saying that.

8    Q    Do you recall there being complaints made

9    about you that you were not showing up for work?

10   A    Oh, I always showed up for work.   There were

11   never any complaints made about me not showing up for

12   work.

13   Q    Tom Helland, do you remember Tom Helland ever

14   making a complaint that you had not shown up for work?

15   A    The night that I was -- that I went to Paul

16   Sarno --

17   Q    Let me take that back.   I'm sorry.

18        Well, I don't know.   Look at this email where

19   it says, "Tom Helland."   You see that?   There seems to

20   be an accusation that you had not shown up for work,

21   and you were called and asked if you were working, and

22   you reported that you were in car six awaiting your

23   first call of the night.

24   A    See, I actually told him that I just called.

25   I told Tom Helland, and Tom Helland actually testified

1   at the CHRO that that's how it went.  I told him that I

2   just called dispatch and asked them why I wasn't

3   getting any calls.  They told me I wasn't plugged into

4   the MDT.  I told them that earlier that night I walked

5   by, I said hi to all you guys, you know, not that I

6   don't know that they really noticed, and that I told

7   Paul Sarno, because my cell phone would have supported

8   that I made that call to dispatch at the appropriate

9   time of pulling the keys, to plug me into the MDT.

10  Paul Sarno, when I finally got back to dispatch,

11  admitted that it was his mistake that he forgot to plug

12  me into the MDT.

13         But Brian McCormick, just being a

14  troublemaker, telling Tom Helland a whole different

15  story.  So when Tom and I did discuss it, I says, oh,

16  I'm already on my way to dispatch; they want to check

17  out the MDT.  I said but that's not the issue.  I said

18  I told Paul Sarno.  So when I got in there, Paul said

19  in front of everybody, he goes, you know, she actually

20  did call me.  He goes, it's my mistake, and he

21  apologized in front of a room full of people.

22      Q    Do you recall that immediately following a

23  counseling session that you had with Mr. Nucci and

24  Ms. Albis, you used a confrontational tone with the

25  dean of Davenport College?

1     A     That's a lie.

2     Q     And do you remember an encounter on or about

3  October 29th with the dean of Davenport College?

4     A     I actually remember it well.

5     Q     Was Mr. Nucci with you?

6     A     Mr. Nucci stood there and I would think would

7  be impressed with how I handled the situation, and that

8  is how -- if the dean were spoke to, I'm sure he would

9  actually tell you that not only was that a very

10 friendly conversation, but I handled it appropriately.

11 And the college across the street wasn't the college

12 that I was -- I didn't have keys to that college.   I

13 didn't have the ability to go over and tell those

14 students.  Greg Teel, from what I understand, was

15 contacted and told to go tell them to be quiet, but

16 when the gentleman approached me, I didn't know who was

17 approaching me.  So I did ask him who he was.  I did

18 tell him that we would handle the situation, and he was

19 really nice to me.  He gave me his cell phone number.

20 He shook my hand.  Richard Nucci watched that whole

21 thing.

22          MR. MERLY:  Let's go off the record for

23          a minute.

24          (THEREUPON, A RECESS WAS TAKEN

25               FROM 1:20 TO 2:10.)

```
1                    C E R T I F I C A T E

2

3        I hereby certify that I am a Notary Public, in and

4    for the state of Connecticut, duly commissioned and

5    qualified to administer oaths.

6        I further certify that the deponent named in the

7    foregoing deposition was by me duly sworn, and

8    thereupon testified as appears in the foregoing

9    deposition; that said deposition was taken by me

10   stenographically in the presence of counsel and reduced

11   to typewriting under my direction, and the foregoing is

12   a true and accurate transcript of the testimony.

13       I further certify that I am neither of counsel nor

14   attorney to either of the parties to said suit, nor am

15   I an employee of either party to said suit, nor of

16   either counsel in said suit, nor am I interested in the

17   outcome of said cause.

18       Witness my hand and seal as Notary Public this

19   5th   day of    June    , 2015.

20

21                    _____
                      Audra Quinn, RPR, LSR
22                    Notary Public

23   My commission expires:  7/31/2016
     LSR No. 106
24

25
```

# EXHIBIT 3

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES



## DRAFT FINDING OF NO REASONABLE CAUSE

MELITA WILLOUGHBY
COMPLAINANT

VS.

YALE UNIVERSITY
RESPONDENT

CHRO NO: 1130482                      DATE FILED:   MAY 24, 2011
EEOC NO: 16A201101047                 DATE FILED:   MAY 24, 2011
PARTIES

COMPLAINANT:

Melita Willoughby
466 Carrington Road
Bethany, CT 06524

RESPONDENT:

Yale University
Jonathan E. Clune, Senior Associate General Counsel
Yale Office of the Vice President & General Counsel
P.O. Box 208255
New Haven, CT 06520

RESPONDENT'S COUNSEL:

Jonathan E. Clune, Senior Associate General Counsel
Yale Office of the Vice President & General Counsel
P.O. Box 208255
New Haven, CT 06520

JURISDICTION

[X]   The investigator concludes that the Commission has jurisdiction to receive, investigate
and issue a determination upon the merits of this complaint.

[ ]   The investigator concludes that the Commission does not have jurisdiction to receive,
investigate and issue a determination upon the merits of the complaint. Therefore this
complaint is dismissed due to the lack of jurisdiction.

FINDINGS OF FACT

1.  Melita Willoughby (Complainant) has alleged that she was sexually harassed,
retaliated against for complaining about harassment, and discriminated against on
the basis of her sex (female) when the respondent terminated her employment on
December 6, 2010.

2.  The Respondent is Yale University and employs over fifteen (15) employees.

3.  The Complainant began her employment with the Respondent as a casual employee,
security officer on October 14, 2008. On September 13, 2010 she began a 90-day
probationary period to become a permanent security officer.

4.  The Director of Operations, Francisco Ortiz was a part of the panel which collectively
decided to hire the Complainant on a probationary basis as a permanent officer as
testified by Mr. Ortiz. In addition to his testimony, documentation shows that Ortiz
also made the decision to terminate the Complainant on December 6, 2010 as a
result of poor performance during that period. It is notable that the same individual
who was responsible for hiring the Complainant is the same individual who is
responsible for firing the Complainant, after performance issues developed.

5.  Regularly, permanent employees receive progressive discipline which includes
verbal warnings, written warnings, and possibly suspension before an employee is
discharged as testified by Mr. Ortiz and the HR Generalist Kristen Maloney.

6. As stated in the Yale University Personnel Policies & Practices manual, effective as of November 15, 1993, employees on their 90-day probationary period may be terminated by the University without cause if it is determined that he or she is not suited for the work. Thus, it is in accordance with policy a permanent employee would be given more of an opportunity to correct poor performance than an employee who was in their probationary period.

7. The Complainant had no disciplinary issues during her tenure as a casual employee security officer tasked with patrolling areas on foot and in a T3 vehicle from October 14, 2008 to September 12, 2010.

8. Officer Peter Leonardo bothered everyone and lead Bill Abbott told the complainant that Leonardo had called the complainant a "b*tch," as testified by the complainant.

9. On one occasion in 2008 Leonardo called the complainant a "f***ing rat" and told her to "Stay dry" while Complainant was wet from the rain and Leonardo was in a vehicle, as testified by the complainant. The complainant's lead, Bill Abbott informed Dan Killen, the Security Director of Operations that Leonardo had mocked the Complainant while in a car, and Killen advised Abbott to instruct Leonardo not to have two guards in the same car as testified by Killen.

10. In 2008, Supervisor of Guard Operations Richard Nucci did not address the complainant's complaints about harassment by Leonardo but instead informed the complainant that: she could not find a job elsewhere; she should not complain; and stated he was resentful that she made a similar amount of money as him, as testified by the complainant.

11. When the complainant was on a work-related bike ride in the summer of 2009, Leonardo yelled in front of the bike class "Are you going to change your tampon?" as she was on the way to the bathroom, as testified by the complainant.

12. Although the Complainant urges that the stray remarks made at a few times during her employment created a hostile environment based on sex, the evidence does not support her claim. Moreover, despite these few remarks in 2008 and in 2009, the Complainant still was given the opportunity to have a permanent position as a Security Officer in 2010.

13. Security Officer Richard Mangillo had been told that Leonardo said Complainant was "riding dirty," as testified by the complainant. The complainant believed that this

meant that Leonardo was intimating that she was having an affair outside of her marriage. The Complainant's interpretation of the statement does not relate to her sex, female.

14. In 2010, the Complainant reported an incident where Leonardo used aggressive, threatening body language towards her and a friend while they were riding on motorcycles, as testified by Ms. Maloney. The complainant would not provide the name of her friend as a witness, as also testified by Ms. Maloney. Although Complainant denied this and said that she did give the name of this friend, there is no evidence to support Complainant's testimony.

15. On one occasion, the Dispatcher Manuel Rivera mistakenly gave the complainant wrong addresses for student pickups as the numbers were slightly switched around, as testified by Supervisor of Guard Operations Paul Galipoli. This was the result of a typing error when inputting locations to the electronic manifest, as testified by Galipoli. It is credible that the wrong address was a typing error, due to the fact that this error was not repeated and this was an isolated incident.

16. The radios used by Security would receive transmissions of music, laughter, and speech from an unknown source, and sometimes radio calls by employees would be cut off. The Complainant believed that Mr. Rivera and/or Mr. Leonardo were the people purposely cutting off her transmissions and making annoying noises. The Respondent conducted an investigation, but it was impossible to identify the source of the transmissions. The complainant was unable to support her testimony that this contributed to sex discrimination

17. I find that the respondent did not prevent the complainant from taking bathroom breaks or lunch breaks. The complainant's claim that she was not allowed was not substantiated due to the fact that all drivers receive requests and Complainant's supervisor did not receive notice that she was not able to take breaks. The Yale transit software is designed to find the closest driver to a given transit request and assigns requests automatically to transit vehicles, as testified by Killen. The Complainant could not provide evidence, nor was there evidence available to refute the function or use of the transit software.

18. The Complainant's supervisor Paul Galipoli received a complaint from a transit passenger the night of September 24, 2010, who stated that Complainant was rude while doing a drop-off. Galipoli earlier in the evening saw this passenger approach the Complainant and heard Complainant tell the passenger that she knew how to read the manifest and told them to sit in the vehicle. The passenger later in the ride was upset that Complainant had missed a turn. It is reasonable to believe that this

incident contributed to Respondent's desire to terminate the Complainant during her probationary period.

19. On the night of September 25, 2010, the Complainant took out a different transit vehicle than the one assigned to her. The vehicle which Complainant took had a defective electronic manifest. Complainant called Dispatch asking for information at the beginning of her shift but received no response. Thereafter, Complainant waited for two (2) hours and did not do any pick-ups during that time. Shift Supervisor Tom Helland contacted her and resolved the issue after about two (2) hours. It seems reasonable that Respondent believed that waiting two hours without doing any pickups was poor performance.

20. On the night of November 11th, 2010, Mr. Gallipoli received a complaint from a man named Major Nelson, who stated that he had been cut off by a Security vehicle which was found to be a vehicle driven by the Complainant. In a telephone call the next day, Major Nelson claimed that the transit driver did not signal to move into his lane. This investigator finds it reasonable for the Respondent to rely on a complaint made by the public to determine whether an employee has performance issues during their probationary period.

21. Documentation shows that there were seven accidents involving security officers from December 2008-December 2010 recorded by Yale Risk Management. There were only two accidents where the Yale employee was found to be at fault and as a result, that employee received counseling. The specific employees who received counseling for accidents were the Complainant and Security Officer Cruz Castillo.

22. The Notice of Loss Report and Yale University Security Programs Incident Report reveal that Complainant had a minor accident while driving a transit vehicle while carrying four passengers. Risk Management found that Complainant was at fault in this accident and she received counseling.  Complainant had this accident during her probationary period.

23. Documentation also shows that Security Officer Cruz Castillo, a male, who was also in his probationary period, was involved in a minor accident in a transit vehicle on October 22, 2010. Risk Management found that he was at fault and he received counseling. The evidence does not show that Castillo had a similar number of disciplinary issues as the Complainant.

24. The Connecticut Uniform Police Report dated April 4, 2010 reveals that another Yale Security employee, William Hewitt, a male, was also involved in an accident while driving a Yale transit vehicle, but he was not deemed to be at fault as he was unexpectedly rear ended by a motorcycle. That accident is not comparable to

Complainant's driving record where Complainant was deemed to be at fault and where Complainant was in her probationary period.

25. The facts reveal that Yale Security Officer Judith Ocasio-Rivera, a female, was involved in a vehicle accident on October 19, 2009, but she was not found to be at fault and this accident was not during her probationary period. The facts also reveal that Ocasio-Rivera received a complaint against her on May 15, 2010 but this was not during her probationary period. Ocasio-Rivera received counseling and later became a permanent Security Officer.   Moreover, Officer Ocasio-Rivera and the Complainant belong to the same protected class, sex female. This fact does not support Complainant's claim that she was treated more harshly based on her sex.

26. The totality of the information in the case file leads the investigator to conclude that there is not sufficient evidence supporting reasonable cause for the claim that the Respondent discriminated against the Complainant on the basis of her sex, female. Complainant's sexual harassment claim is based on the actions of coworker Peter Leonardo. Although Complainant alleges that there were a few gender related comments made by a co-worker, such as Leonardo asking if Complainant was "going to change her tampon" these stray remarks don't amount to sexually harassing conduct. Most of the incidents that Complainant alleged were sexually harassing did not target Complainant's gender in any way, such as Leonardo telling her to "stay dry" at Science Park or the incident where Leonardo allegedly directed aggressive body language towards Complainant and her friend.

27. Throughout the process where Complainant talked to Management about Leonardo's behavior, he was told to behave in a more professional manner, and both Complainant and Leonardo were sent a memo on November 11, 2010 instructing them to treat each other with respect. Management made an effort to resolve the ongoing conflict between the Complainant and Leonardo and the evidence reveals that the conflict seemed like a personality conflict as opposed to a conflict based on the gender of the Complainant.

28. The totality of information does not create reasonable cause for believing that Complainant was terminated in retaliation for complaining about sexual harassment in the workplace. Respondent demonstrated that the performance issues were the reason for Complainant's termination and were not pretextual but were legitimate non-discriminatory reasons supporting their decision to terminate the Complainant. Complainant had several performance issues and incidents during her probationary period from September 12, 2010 to December 6, 2010, including a minor car accident, a student complaint, a complaint from a driver on the road, and an incident where Complainant did not do any student pick-ups for two hours. The

student and the driver, who did not have a stake in having the Complainant terminated, called in the complaints.

29. There is no evidence that suggests that the Respondent solicited complaints from the student or the driver who complained.  The only other Security Officer on probation to be in a vehicle accident and found to be at fault was Cruz Castillo, but he did not have a similar volume of incidents as the Complainant. There is no reasonable cause to believe that Complainant was discriminated against on the basis of sex, as she was hired for the probationary permanent position by Mr. Ortiz and a panel of other Management personnel, and the decision to terminate was made after Mr. Ortiz collectively inquired from the Management team about Complainant's performance.

## DETERMINATION

☐   After reviewing all of the evidence in the Commission's file, the investigator concludes that is reasonable cause for believing that a discriminatory practice has been or is being committed as alleged in the complaint.

☒   After reviewing all of the evidence in the Commission's file, the investigator concludes that there is no reasonable cause for believing that a discriminatory practice has been or is being committed as alleged in the complaint.

Dated and entered this ___27___ day of __March__ 2014.

COMMISSION ON HUMAN RIGHTS
AND OPPORTUNITIES