**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MELITA WILLOUGHBY, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 14-CV-608 (JCH) |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | JANUARY 11, 2016 |
| Defendant. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (DOC. NO. 30)**

**I.     INTRODUCTION**

Melita Willoughby brings this employment discrimination action pursuant to Title

VII of the Civil Rights Act of 1964.  Complaint (Doc. No. 1) at 1.  She claims that her

former employer, Yale University, for which she worked as a Security Officer from 2008

to 2010, terminated her employment in retaliation for having made complaints of

workplace discrimination, in violation of section 2000e-3(a) of title 42 of the United

States Code.  Id. ¶ 19.

Yale has moved for summary judgment on the ground that no genuine issues of

material fact exist, and that it is entitled to judgment as a matter of law.  Def.'s Mot. for

Summary Judgment (Doc. No. 30) (the "Motion for Summary Judgment" or "Motion").

See Fed. R. Civ. P. 56.  Willoughby has opposed the Motion.  Pl.'s Mem. of Law in

Opposition (Doc. No. 35) ("Opposition").  Willoughby asserts that genuine issues of

material fact exist as to whether Yale's proffered legitimate reasons for her termination

are, in fact, pretextual.  Id. at 12.  For the reasons set forth below, the Motion for

Summary Judgment is **DENIED**.

## II.    BACKGROUND

Yale University hired Melita Willoughby as a casual employee in its Security Department on October 14, 2008.  Pl.'s Local Rule 56(a)(2) Statement ("Willoughby's Statement") (Doc. No. 36) ¶ A.1.  As a part-time Security Officer, Willoughby was initially tasked with the responsibility of patrolling Science Park, an area of the University.  See Dep. of Melita Willoughby, Feb. 10, 2015 ("Feb. 10 Deposition") (Doc. No. 41-1) at 50:8-11.  About a year into her employment, Willoughby was transferred to the Yale Health Plan Hospital, where she performed substantially the same patrolling duties.  Id. at 50:13-16; 56:4-57:1.  After approximately two years as a casual employee, Willoughby applied for and was granted a position as a full-time Security Officer on September 14, 2010, subject to a 90-day probationary period.  See Def.'s Local Rule 56(a)(2) Statement ("Yale's Statement") (Doc. No. 31) at 2.

### A.    Willoughby's Complaints and Termination

The most significant events giving rise to Willoughby's complaints occurred during her two years as a casual employee and concern her relationship with one employee in particular.  A few weeks into her term of part-time employment, in October 2008, a man named Peter Leonardo, a fellow Security Officer with no supervisory authority, was verbally reprimanding a co-worker of Willoughby's.  Pl.'s Exhibit 9 ("CCHRO Hearing") Tape 1A 12:00-20:00.  See also Feb. 10 Deposition (Doc. No. 30-3) at 116-18.  Willoughby intervened and later learned from her supervisor, Billy Abbot, that Leonardo had later opined to Abbot that Willoughby was a "fucking bitch."  Id. at 118:1-4.  This was the beginning of what appears to be a lengthy period of animosity between Willoughby and Leonardo, the most salient portions of which Yale concedes

"arguably could constitute gender discrimination or sexual harassment."  Memorandum in Support at 11.

For example, apparently in response to Willoughby's reporting his behavior toward her co-worker to Abbot, Leonardo called Willoughby a "fucking rat bitch" within her earshot.  Id. at 142:12-13.  Later in the summer of 2009, during a bicycle class attended exclusively by men – including Peter Leonardo – with the sole exception of Willoughby, Willoughby's menstrual cycle began and showed through her clothing. When Willoughby used the bathroom the following day, Leonardo is alleged to have shouted, "Are you going to change your tampon?"  Id. at 166-73.  After returning from the bathroom, she found that her bag had been rifled through and that her tampons had been opened; Willoughby inferred from Leonardo's comment that he had tampered with her things.  Id.  In addition to Leonardo's obvious use of gendered language, Willoughby believed herself targeted by Leonardo because of her gender after having heard him complain to fellow officers that women should not be on the security team.  CCHRO Hearing, Tape 1A at 41:30.

She did not complain to Yale's Human Resources Department during her time as a casual employee for fear that she would lose her job.  Id. at 36:50.  During her time as a casual employee she accumulated praise from other members of the Department, the public, and the University.  See Willoughby Statement, Exhibits 5-7 (indicating praise for Willougby's work at the University Commencement, and at Science Park, from co-workers, University employees, and a member of the community).  Her supervisors were recipients of all messages concerning her exceptional performance as a casual employee.  Id.

Willoughby was hired as a full-time employee in September 2010.  Her duties changed considerably at this juncture: she was assigned the new responsibility of driving Yale security vehicles to pick up and drop off students around campus. Willoughby's Statement, Exhibit 3 ¶ 14 (describing, in part, her duties as a full-time employee).  During this period, her relationship to Leonardo did not improve.  See, e.g., id.  He continued to refer to her as a "loud-mouthed bitch" to other employees and Willoughby alleges that he committed other acts of hostility toward her, such as accusing her of "riding dirty" (i.e., having an affair) with a co-worker.  Feb. 10 Deposition at 194:23; 188:16-19.  Additionally, Willoughby believed Leonardo had a practice of encouraging their mutual co-worker, Manuel Rivera, to send her to incorrect addresses while she was picking up students, and to keep her ride responsibilities full to the point where she could not take restroom breaks during her shift.  See, e.g., Willoughby Statement Ex. 3 ¶ 14.  Finally, in October, 2010, Leonardo approached Willoughby and a friend of hers, Millicent Bowens, in a threatening manner at a red light.  See, e.g., id. ¶ 11.

After being hired full-time, Willoughby initially voiced complaints concerning Leonardo's behavior with Richard Nucci, one of Willoughby's supervisors, sometime early in her probationary period.  Willoughby Statement, Ex. 3 ¶ 12.  She later raised her complaints concerning Leonardo's behavior – and the alleged complicity of Rivera in disrupting her shifts – with Kristen Albis at Yale's Human Resources Department, on October 29 and November 5, 2010.  Nucci was present for the meetings with Albis, and on November 9 wrote a negative performance evaluation in which he cited "an ongoing conflict with fellow Officer Peter Leonardo."  Affidavit of Daniel Killen (Doc. No. 30-2),

Exhibit G ("Performance Review") at 1.  Willoughby also claims that Nucci ominously asked her if she should complain about Leonardo's behavior in this "uncertain economy."  Dep. of Melita Willoughby, May 20, 2015 ("May 20 Deposition") (Doc. No. 41-1) at 118:8-14.  Willoughby's employment was terminated on December 6, 2010.  Francisco Ortiz, the Director of Security Officer Operations, signed the letter of termination and has acknowledged that, at the time that he terminated Willoughby's employment, he was aware of her complaints concerning Leonardo.  CCHRO Hearing, Tape 2A at 20:00.

       B.    <u>Yale's Proffered Legitimate Bases of Termination</u>

Though Yale concedes that Willoughby had no disciplinary problems during her term as a part-time employee, it claims that it terminated her employment as a probationary full-time employee entirely because of her performance on the job.  <u>See, e.g.</u>, Def.'s Reply to Pl.'s Memo. in Opposition ("Reply") (Doc. No. 40) at 3.

Willoughby confronted several difficulties in her first two weeks of work in her new duties as a driver for the Security Department.  The first was an episode at the Yale School of Nursing where she is alleged to have used a short tone of voice to a disgruntled student.  <u>See</u> CCHRO Hearing Tape 2B 0:00-7:10; Affidavit of Daniel Killen (Doc. No. 30-2), Exhibit B ("Nursing School E-Mail") at 1.  She had not had a restroom break over the course of her shift, and she approached a supervisor, Paul Gallipoli, to explain the situation.  <u>Id.</u>  When a student exited the Nursing School to advise Willoughby that another student would be joining her in the van, Willoughby used, in Gallipoli's estimation, a rude tone of voice to tell the student to wait in the car.  <u>Id.</u>  The student later called the Department to complain about Willoughby's attitude in the car

while being driven to her apartment and asked that she not be picked up by Willoughby again.  Id.  When Gallipoli confronted her with his opinion of the situation, Willoughby denied being rude and stated that the student had asked her to make an illegal u-turn while driving and was upset that she had refused.  Id.  Willoughby later called Gallipoli to say that she should not have been so abrupt with the student.  Id.

The following day, Willoughby could not be located at work: she had not been informed of the proper procedure for signing into cars once she entered on duty and had inadvertently taken a car with a non-functioning radio.  CCHRO Hearing, Tape 3A 3:20-6:25.  Thomas Helland, her supervisor at the time, indicated that she never made that mistake again, after being instructed on the matter, and he explained that he did not think she was avoiding work and that she made a good-faith mistake.  Id.

The following week, on September 30, 2015, Willoughby is alleged by Nucci to have complained to him about the Department's vehicles, and to have stated, "I'm just going to wait until my 90 days are up before blowing the lid on this place."  Affidavit of Daniel Killen (Doc. No. 30-2), Exhibit D ("Nucci's E-Mail of Oct. 6, 2015") at 1.  Willoughby denies making this statement.  Willoughby's Statement ¶ 5.  The next day, Nucci alleges that Willoughby accused Nucci and the other supervisors of running a "good old boys [sic] club."  Nucci's E-Mail of Oct. 6, 2015, at 1.  In his October 6 e-mail, Nucci also claims that Willoughby acted inappropriately with Leonardo at roll-call on October 6.

> Tonight, Wednesday October 6th, I noted an obvious conflict between Melita and Pete during the 6:00pm Roll Call.  This occurred after Pete said "hello" to her and she replied "now you are saying hello to me.  What brought this on?"  Pete stated that he "liked to be consistent" and Melita informed him she liked "inconsistency."

Id. at 1-2.  Willoughby claims Nucci has mixed up the parties to the conversation: she insists that she said "Pete, would you just please be consistent?" and that Leonardo replied that he liked "inconsistency."  See Feb. 10 Deposition at 215:3-4.

Roughly a month later, Willoughby and Nucci were having a conversation regarding Leonardo in front of Yale's Saybrook College.   Affidavit of Daniel Killen (Doc. No. 30-2), Exhibit F ("Nucci's E-Mail of Dec. 7, 2010") at 1.  A man approached them and complained that a student party at Saybrook College was too loud.  Id.  Willoughby asked, in what Nucci characterized as a "confrontational tone," who he was.  Id.  The man indicated that he was the Dean of Yale's Davenport College.  Nucci indicated to the Dean that they would "handle" the party at Saybrook College.  While Nucci claims that he considered Willoughby's tone a "performance issue," he also concedes that it was "not necessarily odd" that she would ask for the identity of a stranger who approached them at night.  CCHRO Hearing, Tape 3A at 20:10-20:35.  Nucci did not make a record of this incident until after Willoughby's employment was already terminated.

Finally, between November 12 and November 19, 2010, Willoughby was involved in two minor traffic incidents.  In the first, on November 12, Willoughby brushed the bumper of a parked car as she dropped off another student.  See Yale's Statement ¶ 11.  On November 19, Gallipoli received a complaint that Willoughby had cut him off while driving.  Id. ¶ 12.  Though Gallipoli followed up with the complaining member of the public, he did not contact the student passengers who were in Willoughby's car at the time.  Willoughby's Statement ¶ 12.

Willoughby was terminated on December 6, 2010.

III.     STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011). Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." Id. In making this determination, the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). Once the moving party has satisfied that burden, to defeat the motion "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F. App'x 52, 53 (2d Cir. 2011); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor). "[U]nsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The Second Circuit has recently reiterated that, although summary judgment is proper in employment discrimination cases "where there is nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony . . . there is a need for caution about granting summary judgment to an employer in a discrimination case where the merits turn on a dispute as to the employer's intent." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 843 (2d Cir. 2013) (internal quotation marks, citations, and modifications omitted).

## IV. DISCUSSION

Title VII of the Civil Rights Act of 1964 provides, in pertinent part:

> It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2. The Supreme Court has found that "severe and pervasive" harassing conduct can produce a "constructive alteratio[n] in the terms or conditions of employment" that is actionable under Title VII. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 752 (1998).

Title VII does not simply protect employees from discrimination. It also protects them from adverse employment action taken in retaliation against complaints alleging discrimination. Specifically, Title VII provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter.

42 U.S.C. § 2000e-3.    It is under this section of Title VII that Willoughby has made her claim.  To make out a claim for retaliation, an employee must at least have had a reasonable belief that her complaint alleged an unlawful employment practice under Title VII; she need not show that her underlying complaint of discrimination had merit. Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012); see also Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 270 (2001) (assuming without deciding this standard's propriety).

Claims for retaliatory adverse employment action under Title VII are analyzed under the burden-shifting framework outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Zann Kwan, 737 F.3d at 842.  Under that standard, a plaintiff must first show that there are sufficient facts to make out a prima facie case of employment discrimination.  Id. at 843.  If the plaintiff succeeds in doing so, a presumption of retaliation is raised and the burden shifts to the defendant "to articulate some legitimate, non-retaliatory reason for the employment action."  Id. at 845.  If the defendant proffers such reasons, "the presumption of retaliation . . . drops from the picture. . . . The plaintiff must then come forward with [reasons why the] retaliatory reason is a mere pretext for retaliation."  Id.

A.    Willoughby's Prima Facie Case and Yale's Response

To make out a prima facie case of unlawful retaliation, a plaintiff must bring forward evidence of (1) participation in a "protected activity;" (2) the defendant's knowledge of the protected activity; (3) "an adverse employment action;" (4) a "causal connection" between the protected activity and the adverse employment action.  See id. at 844.  To make out the "causal connection" element, a plaintiff must show that her

protected activity was the "but-for cause" of the adverse employment action.  <u>University of Texas Southwestern Medical Center v. Nassar</u>, 133 S. Ct. 2517, 2534 (2013).  The plaintiff's burden of proof at this stage is "minimal."  <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005).

Willoughby has made out a prima facie case of retaliatory termination.  As an initial matter, Willoughby's employment was terminated, which constitutes "adverse employment action."  Further, she engaged in protected activity.  As Yale itself acknowledges, much of Leonardo's conduct "arguably could constitute gender discrimination or sexual harassment."  Memorandum in Support at 11.  This concession alone indicates that there is a "genuine dispute of material fact" as to whether Willoughby could conclude, in good faith, that the conditions of her employment had been constructively altered as a result of Leonardo's persistent behavior.  <u>See</u> <u>Lore v. City of Syracuse</u>, 670 F.3d at 157.  The record reveals that, over the course of a two year period, Leonardo subjected Willoughby to gender-based insults and, on at least one occasion, publicly humiliated her on account of her menstrual cycle.  Even assuming that Leonardo's conduct was insufficient to make out a Title VII claim on its own, Willoughby could reasonably have concluded that it was sufficient.  Consequently any complaint she lodged with her supervisors constitutes "protected activity."  By way of comparison, in <u>Breeden</u>, the Court found that a single off-hand, sexual remark by a supervisor that was neither derogatory nor directed at the plaintiff would have been insufficient to have caused a reasonable person to believe that the Title VII standard had been violated.  532 U.S. at 271.  Here, a reasonable juror could find that Willoughby believed herself to have been subjected to repeated, derogatory remarks that were

plainly directed at her, and consequently that she reasonably believed that the Title VII standard had been violated.  Additionally, the individuals who chose to terminate her employment were fully aware of her complaints.  See, e.g., CCHRO Hearing, Tape 2A 19:15-20:30 (Ortiz acknowledging that he was aware of Willoughby's complaints).

Yale contends that Willoughby cannot establish the requisite, but-for causal connection between her termination and her complaints.  The record indicates otherwise.  It is first necessary to observe that Willoughby's central complaints to Human Resources concerning Leonardo's behavior toward Willoughby during, for example, the bicycle class in 2009, occurred on October 29 and November 5, 2010, and her employment was terminated roughly one month later.  See, e.g., Willoughby's Statement ¶ B.3.  The Second Circuit recently found that a "three-week period from [a plaintiff]'s complaint to her termination is sufficiently short to make a prima facie showing of causation through temporal proximity."  Zann Kwan, 737 F.3d at 845. Indeed, the Second Circuit has found that "five months is not too long to find the causal relationship."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).  On that basis alone, Willoughby may establish her prima facie case.

However, the record reveals more than just temporal proximity.  In Nucci's Performance Review of Willoughby on November 9th, the first concern he expresses with regard to Willoughby's work on the job is "an ongoing conflict with fellow Officer Peter Leonardo."  Performance Review at 1.  A reasonable juror could find that this, coupled with the fact that Nucci had, only two days before writing the Performance Review, been present for Willoughby's complaints concerning Leonardo's harassment,

suggests that her complaints were more than just a contributing factor to her termination.

Yale notes that after Willoughby's complaint on October 29, Albis and Nucci met with Leonardo.  See Affidavit of Daniel Killen (Doc. No. 30-2) at 22.  Nucci sent a memorandum to Willoughby indicating that he and Albis had met with Leonardo, and expressed Yale's expectations "for both [Willoughby] and Officer Leonardo moving forward" – that they "must treat one another with mutual respect and professionalism at all times" and that they "must completely refrain from speaking negatively about one another." Id.  The memorandum, though sent on November 11th, makes no mention of Willoughby's November 5th complaint, however.

The record reflects that Willoughby has shouldered her "minimal" burden to establish a prima facie case for retaliatory termination.  Jute, 420 F.3d at 173.  As discussed above, supra at 5-7, Yale has carried its burden to put forward "non-retaliatory" reasons justifying Willoughby's termination, including two instances in which members of the community complained about Willoughby's performance, one instance in which she could not be found while she was on duty, one instance in which she was purportedly rude to the Dean of Davenport College, and one minor car accident.  Id.  Willoughby contends that a genuine dispute of material fact exists as to whether these reasons are mere pretext.  Opposition at 8-13.  For the reasons set forth below, the court agrees.

　　B.　　Pretext

Before discussing the inadequacy, at the summary judgment stage, of Yale's proffered explanation, it may be useful to reiterate certain principles regarding a

plaintiff's responsibility, under the <u>McDonnell Douglas</u> framework, to establish the pretextual nature of a defendant's explanations.  To establish pretext, a plaintiff "may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations."  <u>Zann Kwan</u>, 737 F.3d at 847.  <u>See also</u> <u>Giscombe v. New York City Dep't of Educ.</u>, 39 F. Supp. 3d 396, 403-04 (S.D.N.Y. 2014) ("A plaintiff may show pretext by illuminating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons.") (internal quotation marks and citations omitted).

Though the court considers it a close question, Willoughby has pointed to sufficient inconsistencies and incoherencies in Yale's explanations that, in conjunction with the temporal proximity of her termination to her complaints regarding Leonardo, the court concludes that a genuine dispute of material fact exists that precludes the court from granting Yale's Motion.  Taking the explanations in chronological order, Yale first contends that the episode at the School of Nursing was a legitimate ground for termination.  Yale's Statement ¶ 3.  However, the record is clear that the student that complained regarding Willoughby's performance was, herself, "having a bad day," yet Willoughby's supervisor at the time, Paul Gallipoli, has refused to concede that the passenger was "overdramatizing."  CCHRO Hearing, Tape 2B 0:00-7:00.  More importantly, Gallipoli himself would later indicate, in an e-mail over a month after the incident, that he "believe[d] Melita [had] adjusted pretty well to the driving portion" of her new duties, but, rather, that her "constant negative attitude [was] starting to become monotonous."  Affidavit of Daniel Killen, Exhibit E at 1 (e-mail, sent on October 29, from

Gallipoli to Kristin Albis of Human Resources and Richard Nucci).  This message creates a genuine issue of material fact as to the validity of Yale's contention that the incident at the Nursing Home was fatal to her employment.

Next, Yale insists that Willoughby's unavailability on September 25, 2015, was a legitimate basis for her termination.  Yale's Statement ¶ 4.  However, her supervisor at the time, Thomas Helland, has stated quite clearly that he did not believe she was avoiding work, but rather that she simply did not know the proper procedure yet and that, once taught how to do it, the incident was never repeated.  CCHRO Hearing, Tape Tape 3A at 3:20-6:25.

Yale claims that Willoughby gave Yale legitimate bases for termination when she stated to Nucci, "I'm just going to wait until my 90 days are up before blowing the lid off this place," for accusing Leonardo of engaging in "Nazi practices," and for claiming that Nucci and others were "running a good old boys [sic] club."  Yale's Statement ¶ 5-6. Willoughby outright denies making the first statement.  Feb. 10 Deposition at 86:9-10.

Further, Willoughby could persuade a fact-finder that the other statements alleged above were used in a pretextual manner.  She has proffered testimony in her deposition that she had reason to believe that Leonardo had bought Nazi memorabilia, see Feb. 10 Deposition at 89:18-90:6, and her other statement, if anything, supports an inference that she was sincerely concerned about gender discrimination in the workplace.  To use an accusation to a supervisor that he and his coworkers were "running a good old boys' club" as a ground for termination could support a claim for retaliatory termination, rather than disprove it.

Yale also points to her use an allegedly rude tone of voice toward the Dean of Davenport College on October 29.  Yale's Statement ¶ 8.  In light of the evidence of record, a reasonable juror could find that this incident was also used as a pretextual basis for Willoughby's termination.  The incident occurred at night in downtown New Haven.  CCHRO Hearing, Tape 3A at 19:00-20:00.  Nucci, the supervisor who claims that Willoughby used an inappropriate tone of voice with the Dean, conceded at the Fact-finding Investigation at the CCHRO that there is not anything "necessarily odd" about Willoughby asking for the identity of a complete stranger who approached her on the street at night.  Id.  Further, Nucci also conceded that "of course" he had to counsel others who were new to the job about similar things.  Id. at 22:15.  On top of all this, Nucci did not send an e-mail concerning this incident until one day after Willoughby had been terminated.  Compare Nucci's E-Mail of Dec. 7 with Yale's Statement ¶ 13 (indicating that Willoughby was fired on December 6).  In fact, Nucci omitted any reference to the incident in Willoughby's Performance Review.  These facts could persuade a rational fact-finder that Yale is using the incident with the Davenport College Dean as a pretext.

Finally, Yale relies on Willoughby's minor car accident, as well as the report by a member of the community that Willoughby had cut him off while she was driving.  Yale's Statement ¶¶ 11-12.  However, the evidence of record shows that a genuine dispute of material fact exists as to whether these reports were used a pretext for Willoughby's termination.  First, another employee on his probationary period had a minor vehicular accident for which he was at fault, and no adverse consequences appear to have followed.  CCHRO Ruling (Doc. 30-3) ¶ 21-22.  Also, the accident was trifling:

Willoughby has produced the police report, which indicates only that "she rubbed up against [the other driver's] fender" and that Willoughby's vehicle sustained an abrasion on the passenger's side rear view mirror.  Willoughby's Statement, Exhibit 4 at 2. Yale's behavior concerning the complaint by the member of the community whom Willoughby is alleged to have cut off similarly indicates that it considered the episode a minor one.  Specifically, Yale never contacted the only impartial witnesses to the incident – the passengers in Willoughby's car, whose contact information it had.  <u>See</u> Willoughby's Statement ¶ 12 <u>and</u> Affidavit of Daniel Killen, Exhibit I at 1.

These discrepancies are sufficient to carry Willoughby's burden to show that a genuine issue of material fact exists as to the legitimacy of Yale's proffered reasons. Consequently, there is a genuine issue of material fact as to whether the termination of Willoughby's employment at Yale was the result of unlawful retaliation for her having complained of gender discrimination.  <u>See, e.g.</u>, <u>Zann Kwan</u>, 737 F.3d at 847.  Viewing the evidence in the light most favorable to the plaintiff, as is required on a motion for summary judgment, there is sufficient evidence to mandate denial of Yale's Motion.  <u>Id.</u>

## V.     CONCLUSION

For the reasons set forth above, Yale's Motion for Summary Judgment (Doc. No. 30) is **DENIED**.

**SO ORDERED**.

Dated this 11th day of January, 2016, at New Haven, Connecticut.


                                     /s/ Janet C. Hall_____
                                     Janet C. Hall
                                     United States District Judge